# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ROBERT BARNES, on behalf of himself
and similar situated individuals,

Case No:
HON.

Plaintiffs,

v.

G4S SECURE SOLUTIONS (USA) INC.,
RENAISSANCE CENTER MANAGEMENT
COMPANY, GENERAL MOTORS, LLC.
F/K/A GENERAL MOTORS COMPANY,
GREGORY JENKINS, MICHAEL
BALDWIN, JR., LARRY PAYNE, CHAD
GRUETMAN, MICHAEL MOUILLESEAUX,
DANIEL REBAR, MATTHEW WILEY,
MATTHEW ZANI, CRAIG HACKETT,
LAWERENCE CHILDS, DOUGLAS
BAYER, AND RENE LACELLE Jointly and
Severally, Defendants.

DANIELLE B. SAFRAN (P61965)
THE SIGLER LAW FIRM, PLC.
30300 Northwestern Hwy., Suite 337
Farmington Hills, MI 48334
(248) 705-6400
safranlaw1@gmail.com
*Attorney for Plaintiffs*

## PLAINTIFFS' COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Robert Barnes, on behalf of himself and similarly

situated individuals, by and through their attorneys, The Sigler Law Firm, PLC., and

submits Plaintiffs' Complaint as follows:

## JURISDICTION AND VENUE

1.      Plaintiff Robert Barnes resides in the City of Harper Woods, State of Michigan and has been employed by Defendants GM, RCMC and G4S that jointly own and/or operate the Renaissance Center Security department, ("RCS"), located in the Renaissance Center building in the City of Detroit Michigan, County of Wayne, State of Michigan for over thirty years.

2.      At all relevant times, Defendant, G4S SECURE SOLUTIONS (USA) INC., ("G4S") has been a foreign, Florida corporation registered in the State of Michigan that conducts a regular and systematic portion of its business in Wayne County, State of Michigan; the Defendant has its principal place of business in the state of Florida.

3.      At all relevant times, Defendant, RENAISSANCE CENTER MANAGEMENT COMPANY, ("RCMC") has been a domestic profit corporation registered in the State of Michigan that conducts a regular and systematic portion of its business in Wayne County, Michigan.

4.      At all relevant times, Defendant, GENERAL MOTORS, LLC., ("GM") has been a foreign corporation registered in the State of Delaware that conducts a regular and systematic portion of its business in Wayne County, Michigan.

5.      Upon information and belief, Defendant Gregory Jenkins, worked in the City of Detroit, Wayne County and resided in the State of Michigan for all

relevant time periods.

6.　Upon information and belief, Defendant Larry Payne, worked in the City of Detroit, Wayne County and resided in the State of Michigan for all relevant time periods.

7.　Upon information and belief, Defendant Michael Baldwin, Jr., worked in the City of Detroit, Wayne County and resided in the State of Michigan for all relevant time periods.

8.　Upon information and belief, Defendant Chad Gruetman, worked in the City of Detroit, Wayne County and resided in the in the County of Wayne, State of Michigan for all relevant time periods.

9.　Upon information and belief, Defendant Michael Mouilleseaux, worked in the City of Detroit, Wayne County and resided in the in the County of Wayne, State of Michigan for all relevant time periods.

10.　Upon information and belief, Defendant Daniel Rebar, worked in the City of Detroit, Wayne County and resided in the County of Wayne, State of Michigan for all relevant time periods.

11.　Upon information and belief, Defendant Matthew Wiley worked in the City of Detroit, Wayne County and resided in the County of Wayne, State of Michigan for all relevant time periods.

12.     Upon information and belief, Defendant Craig Hackett worked in the City of Detroit, Wayne County and resided in the in the County of Wayne, State of Michigan for all relevant time periods.

13.     Upon information and belief, Defendant Matthew Zani, worked in the City of Detroit, Wayne County and resided in the in the County of Wayne, State of Michigan for all relevant time periods.

14.     Upon information and belief, Defendant Lawerence Childs, worked in the City of Detroit, Wayne County and resided in the in the County of Wayne, State of Michigan for all relevant time periods.

15.     Upon information and belief, Defendant Douglas Bayer, worked in the City of Detroit, Wayne County and resided in the in the County of Wayne, State of Michigan for all relevant time periods.

16.     Upon information and belief, Defendant Rene Lacelle, worked in the City of Detroit, Wayne County and resided in the in the County of Wayne, State of Michigan for all relevant time periods.

17.     Jurisdiction is proper in this Court pursuant to U.S.C §28.1331 and §1343.

18.     The citizenship of the parties in this matter are diverse.

19.     The amount in controversy exceeds the sum of $75,000, exclusive of

4

costs, interest, and attorney fees and this matter is otherwise within the jurisdiction of this Court.

20.     Venue is proper in this Judicial District under U.S.C. §28.1391(b).

## CLASS CERTIFICATION

21.     Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

22.     In 1992, Plaintiff Robert Barnes, a Black male was jointly hired by Renaissance Center Management Company ("RCMC") and General Motors, LLC. ("GM") as a part-time employee, Security Officer, providing security services on the premises of the Renaissance Center in Detroit Michigan.

23.     In approximately 1994, Plaintiff Barnes was brought on as a full-time employee in the position of Security Officer for Defendants GM and RCMC and was certified through the State of Michigan, pursuant to MCL §338.1079 ("PA330"), to conduct misdemeanor arrests without a warrant when on duty, in uniform and on the premises of the Renaissance Center, which includes the Renaissance Center building, Detroit Marriott Renaissance Center Hotel ("Hotel") and the Millender Center (Collectively referred to as, "RENCEN")

24.     That in approximately 2018, Defendant G4S entered into a contract with Defendant GM for the operation and management of RCS, including all RCS

5

security officers with arrest authority under a license obtained by Defendant GM executives in the name of Renaissance Center Management Company ("RCMC"); Defendant G4S became a joint employer of the Security Officers working in the RCS department at this time.

25.    That Plaintiff Robert Barnes has worked for Defendants in the RCS department for over thirty years, including holding the following titles: security officer, security police officer, executive protection officer, PPCT Instructor, Senior PPCT (Use of Force) Instructor and Shift Supervisor.

26.    That Robert Barnes has been certified as a PA330 Security Police Officer by the State of Michigan from 1994 to present.

27.    Plaintiff Barnes, a Black male employed jointly by Defendants GM, G4S, RCMC and Allied Universal as a Security Officer, providing security services on the RENCEN premises brings this Complaint on behalf of himself and on behalf of other similarly situated, former and/or current African American Security Officers that provided or continue to provide security services for Defendants on the premises of the RENCEN from 2019 to present.

28.    Regularly since 2016 and continuing to date, Plaintiff Barnes and other Black security officers that provided security services on the premises of the RENCEN for Defendants routinely experienced race discrimination and a race hostile work environment; including but not limited to racial slurs, epithets,

inappropriate and offensive jokes, threats, failure to promote, unequal application of Defendants' company policies, and other violations of the race discrimination policy committed by Caucasian Security Officers, supervisors, management and director level personnel.

29.    On numerous occasions from 2019 to present, Security Officers provided notices and complaints to Defendants' management detailing experiences of race discrimination committed by several Caucasian Renaissance Center Security Police Officers, both verbally and in writing, including but not limited to reports that several white officers used racial slurs, epithets, racially hostile and inappropriate "jokes," and acted in an overly aggressive and provoking fashion towards Black individuals, including Black co-workers, guests, and visitors to the RENCEN.

30.    Regularly throughout his thirty-year employment, Plaintiff Barnes has experienced, witnessed and reported incidents of race discrimination at the Renaissance Center committed by several of Defendants' Caucasian security officers: racial slurs; race hostile jokes; demeaning conduct based on race; threats of rape; failure to promote; use of unreasonable and excessive force; provocation; officer brutality; abuse of power; wrongful arrest; racial profiling; false imprisonment; assault and battery; and wrongful/retaliatory termination of Black employees that report acts of race discrimination in Defendants' workplace; however, such was not properly addressed and/or investigated by Defendants,

7

including but not limited to Payne, Jenkins, Greutman and Mouillesaux.

31.     Throughout his thirty-year employment, Plaintiff Barnes has received numerous complaints from other Black security police officers detailing incidents of race discrimination at the Renaissance Center by Defendants Rebar, Wiley, Zani, Hackett, Childs, Bayer, and Lacelle, including racial slurs, race hostile jokes, demeaning conduct based on race, police brutality, excessive force, provocation, abuse of power, wrongful arrest, racial profiling, false imprisonment, assault and battery and collusion with management to retaliate against those individuals that bring complaints of race discrimination against them.

32.     Plaintiff Barnes promptly reported others' complaints to upper management, including but not limited to Defendant Payne who reports such to Defendant Jenkins, and urged them to take action against the offending officers; however, such was not taken seriously or properly addressed by Payne or anyone in Defendants' management.

33.     From 2019 to present, several of Defendants' security officers and former security officers have brought EEOC Charges of Discrimination and Retaliation against Defendants due to the foregoing; however, Defendants failed to take reasonable or effective measures to end the discrimination and harassment at RENCEN.

34.     Defendants failed to conduct any thorough investigations and/or take

8

any remedial or disciplinary actions in response to any complaints of race discrimination or race hostile work environment at Renaissance Center Security.

35. Defendants each have their own "zero tolerance" policy for race discrimination and harassment based on race in their workplace; yet no action has ever been taken in response to numerous such complaints and such has been permitted to permeate the work environment from at least 2016 to present.

36. Defendants' Caucasian Security Officers' actions, including but not limited to Defendants Greutman, Mouilleseaux, Rebar, Wiley, Zani, Hackett, Bayer and Lacelle, constituted a violation of company policy, state law and the constitutional rights of Hotel guests and visitors to the RENCEN; yet such is/was permitted to continue, unabated by Jenkins, Payne or Defendants' other management personnel even after Plaintiff Barnes, similarly situated security officers, Hotel Guests and visitors to the RENCEN reported such.

37. Defendants' certified security police officers, supervisors and executives, including but not limited to Jenkins, Payne, Gruetman, Mouilleseux, Rebar, Wiley, Zani, Hackett, Childs, Bayer and Lacelle, acting under color of law, have a pattern, practice, and history of profiling, harassing, annoying, threatening, provoking, injuring and discriminating against Black security personnel and Black civilian visitors and guests of the RENCEN which has been ongoing from 2016-present; such has resulted in serious physical and emotional injuries and other damages.

38.     Defendants' management, including but not limited to Defendants
Jenkins, Baldwin, Jr. and Payne, condoned and continues to condone the acts of their
white security officers by refusing to thoroughly investigate and/or address complaints
of racial bias, racial profiling, acts of discrimination, racially offensive comments,
harassment, wrongful arrest, unwarranted and unreasonable uses of force, excessive
uses of force, and false arrests brought to upper management's attention.

39.     Plaintiff and similarly situated individuals who complained of race
discrimination and inequality in the Renaissance Center security workplace have been
retaliated against by Defendants, including but not limited to: wrongful disciplinary
action and write-ups; manifested "violations of policy;" threats and intimidation;
transfer to undesirable shifts, regardless of seniority; demotion; removal of authority
and/or job duties that convey authority; refusal to provide training; requests to "ban
them from the premises" by Defendants GM and Jenkins; micromanagement;
harassment; termination; and/or constructive discharge from employment by
Defendants G4S, RCMC, GM and Payne.

40.     There are numerous such similarly situated current and former Black
Security Officer employees of Defendants who provided/provides security services on
the RENCEN premises from 2019 to present whose claims are substantially similar to
those presented through Plaintiff Barnes' individual allegations; thus, Plaintiffs request
that a class be certified and/or brought through collective action based on the

allegations set forth herein.

## GENERAL ALLEGATIONS

41.     Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

42.     The Renaissance Center premises (hereinafter "RENCEN") consists of 5.5 million square foot of space, including six office towers, the Detroit Marriott Renaissance Center Hotel, the Millender Center, and several parking lots/garages; all of which are open to the public.

43.     Upon information and belief, RCMC, GM and G4S jointly operate, administer and/or manage "Renaissance Center Security department" (hereinafter "RCS"), which has provided security services for the RENCEN for over thirty years.

44.     Upon information and belief, during all relevant time-periods, GM directly hired, contracted and/or retained Defendant RCMC, of which GM is a partial owner, and G4S to handle and/or administer all "security" through RCS under a PA330 Security Police Agency license provided to RCMC by the State of Michigan.

45.     That Defendant Jenkins, an executive for Defendant GM, is the license holder for the PA330 Security Police Agency which covers RCS security police officers working on the RENCEN premises; Jenkins has held such since approximately 2018.

11

46.     That Defendant RCMC is a licensed as a Security Police Agency through the Michigan State Police and is/has been entitled to hire arrest authority security police officers to provide security services on the premises of the RENCEN from approximately 2016 to present.

47.     That security police officers employed by RCMC, GM, and/or G4S to provide security services at the Renaissance Center are empowered to conduct misdemeanor arrests without a warrant while on duty, in uniform and on the premises of the RENCEN through the State of Michigan.

48.     Security police officers must adhere to the same rules, regulations, laws, and constitutional guidelines as that of state police officers, relative to search, seizure, arrest, and detainment of individuals. *MCL §338.1079*

49.     Defendant Chad Gruetman is a Caucasian male Security Police Officer and Senior Shift Supervisor that preforms security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

50.     Defendant Michael Mouilleseaux, is a Caucasian male Security Police Officer and Shift Supervisor that preforms security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

51.     Defendant Daniel Rebar is a Caucasian male Security Police Officer that preformed security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

12

52.     Defendant Matthew Wiley is a Caucasian male Security Police Officer that preformed security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

53.     Defendant Craig Hackett is a is a Caucasian male Security Police Officer that preformed security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

54.     Defendant Matthew Zani, is a Caucasian male Security Police Officer and Union Representative that preforms security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

55.     Defendant Lawerence Childs, is a Caucasian male Security Police Officer and Union President that preforms security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

56.     Defendant Douglas Bayer is a Caucasian male Security Police Officer and Union Representative that preformed security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

57.     Defendant Rene Lacelle is a Caucasian male Security Police Officer that preforms security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

13

58.     Defendant Michael Baldwin, Jr. is a Black Security Officer and current Security Operations Manager that preforms security services for Defendants at the RENCEN and acted at all times under the color of law for all relevant time periods.

59.     As the license holder of the PA330 Private Security Police Agency on behalf of GM and RCMC, Defendant Jenkins is ultimately responsible for training, supervising and/or disciplining all licensed security police officers that provide security services on the RENCEN premises for all relevant time periods.

60.     Defendant Jenkins, acting under the color of state in law as a PA330 license holder, has violated the constitution by engaging in actions that caused unconstitutional harm to Plaintiffs and other similarly situated Black security police officers working on the RENCEN premises.

61.     As the license holder on behalf of GM and/or RCMC, Defendant Jenkins is and has been for all times relevant herein accountable and responsible for the conduct of each person so employed as private security police officer working under a PA330 license on the RENCEN premises. *MCL §338.1067*

62.     As the license holder, Defendant Jenkins was, and has been for all relevant time periods herein, acting under the color of law and is responsible for conducting investigations into complaints brought against RCS security officers detailing constitutional violations, including those protected under the 4th and 14th Amendment, including excessive/unwarranted use of force based on race, and/or

14

reports of racial profiling, race discrimination and/or harassment, racial biases, officer brutality, wrongful arrest, use of force and/or assault filed against any security police officer working at the RCS department located on the RENCEN premises.

63.    Defendant Gregory Jenkins had the authority and discretion to ban a security officer and/or supervisor from working on the RENCEN premises if they posed a safety concern to anyone on GM's property; however, such was never done in response to any complaint of race discrimination, use of unreasonable or excessive force, abuse of authority based on race, and/or claim of hostile work environment at RCS which is located on the RENCEN premises in Detroit, Michigan.

64.    Upon information and belief, Defendant Larry Payne, was employed by Defendants RCMC, G4S, and/or GM, as the Security Operations Specialist and/or the Security Director from approximately 2017 through his retirement in October 2021, acting under the color of law at all times.

65.    Defendant Payne, acting under the color of state in law as the Security Director of a PA330 Private Security Police Agency, has violated the constitution by engaging in actions that caused unconstitutional harm to Plaintiffs and other similarly situated Black security police officers, past and present, who preform security services on the RENCEN premises.

66.    Defendant Payne had authority to hire and issue discipline, suspension and/or termination to any RCS security officer, employee, supervisor, administrator and/or director from approximately 2017 through October 2021.

67.    Upon information and belief, the security officers, security guards and private security police officers providing security services on the premises of the RENCEN are all referred to as "Security Officers," regardless of licensure, certification, training, education, supervisory authority, union authority, and/or whether they are armed or unarmed with guns during their shift; these security officers are jointly employed by Defendants GM, G4S and RCMC.

68.    Defendants G4S, GM, RCMC, Jenkins, Baldwin, Jr. and Payne were notified that several Caucasian RCS Security Officers had been accused of persistent and continual acts of race discrimination and/or harassment, including incidents that revealed racial biases, such as racial epithets, slurs and race hostile "jokes" in the workplace by co-workers; these complaints also detailed acts of discrimination against Black Hotel guests and visitors to the RENCEN, including racial profiling, officer brutality, false arrests, violence against Black individuals, and intentional violations of the constitutional rights of individuals based on their race.

69.    Despite such complaints, Defendants continued to maintain the employment of such security officers to the detriment of their Black security officer co-workers, supervisors, Hotel guests and visitors to the RENCEN.

16

70.     Defendants have never found any violation of the race discrimination policy to have occurred in the Renaissance Center Security workplace; despite receiving regular notice of such from various Black security police officers, Hotel guests and visitors to the RENCEN from 2014 to present.

71.     At all times relevant herein, Defendant Jenkins was an executive and acting agent, director and/or upper management personnel of Defendants GM, acting under the color of law for all relevant times.

72.     From 2018 through October 2021, Defendant Payne was an executive, acting agent, director and/or upper management personnel of Defendants GM, G4S and RCMC acting under the color of law for all relevant times.

73.     Defendants GM, RCMC and G4S are vicariously liable for the acts of their private security police officers, security officers, security guards, managers, supervisors, directors, agents and other employees, including but not limited to Jenkins and Payne, under the theory of respondeat superior.

74.     Defendants Jenkins, Payne, Greutman, Mouilleseaux, Rebar, Wiley, Hackett, Childs, Bayer, Lacelle, Baldwin, Jr. RCMC, G4S and GM were at all times acting under the color of law by and through the authority vested in them as arrest authority officers by the State of Michigan and Michigan State Police.

75.     Defendants by and through their agents and management personnel have condoned department-wide race discrimination which permeates the Renaissance

17

Center Security department and has resulted in a dangerous and life- threatening environment for Plaintiffs, similarly situated past and present Black security officers providing security services in the RENCEN, Hotel guests, and members of the public that visit the RENCEN.

## STATEMENT OF FACTS

**FACTS RELATED TO DEFENDANTS' PATTERN AND PRACTICE OF RACE DISCRIMINATION AND CREATION OF A RACE HOSTILE WORK ENVIRONMENT FOR SECURITY EMPLOYEES WORKING ON THE PREMISES OF THE RENAISSANCE CENTER IN DETROIT, MICHIGAN**

76.     Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

77.     Defendants GM, G4S, and RCMC jointly own and/or operate Renaissance Center Security, a Private Security Police Agency located on the Renaissance Center premises in Detroit, Michigan; by and through the actions of the individual Defendant officers and management personnel named herein, Renaissance Center Security suffers from a pattern and practice of discrimination against both Black citizens and Black private security police agency department employees based on their race.

78.     That for all relevant time periods, Defendants were acting under the color of law as security officers and/or agents and license holders of the Private Security Police Agency located on RENCEN premises.

79.     During Plaintiffs' employment, Defendants' Caucasian security officers continually and constantly made and continue to make demeaning and racially derogatory remarks, "jokes" and comments to Plaintiff and similarly situated Black security employees in the Renaissance Center workplace which were racially offensive, including but not limited to the following racial slurs and epithets: "bitch ass nigger," "nigger," "Black jackal," "rusty," referring to skin color, "Heckle and Jeckle," referring derogatorily to their race, from approximately 2019 through present.

80.     That from 2019 to present Defendants received ongoing and regular race discrimination complaints against Defendants' Caucasian security officers, supervisors and management personnel alleging they violated Defendants' race discrimination policies, including but not limited to: making racial epithets, racial slurs, racially hostile and offensive jokes and comments; racial profiling; wrongful arrest; false imprisonment; using unreasonable and excessive force, using violence and/or threats of violence against African American employees, guests of the Hotel and visitors to the RENCEN, based on their race; Defendants did nothing in response.

81.     Continually since 2019, Plaintiff Barnes and similarly situated past and present security officers working on the premises of the RENCEN brought complaints of race discrimination to Defendants' upper management, including Defendants Payne and Jenkins, which detailed the following racially hostile and discriminatory slurs, comments and communications  made during work hours on the premises of the

19

RENCEN:

    a)        "[w]hat do you have to do to stop a Black guy from raping a white girl? Throw them a basketball;"

    b)        displaying a photo of the decapitated head of a Black male car accident victim and describing passing around this decapitated head and making racial jokes about it;

    c)        referring to Black Security Officers as "Niggers;"

    d)        referring to Black Security Officers as "bitch ass niggers;"

    e)        referring to Black Security Officers as "Black jackal;"

    f)        referring to a Black Security Officer as "rusty," referring to his skin color;

    g)        referring to Black Security Officers as "Heckle and Jeckle;"

    h)        referring to Black security officers, including Plaintiff Barnes as "dogs in heat;"

    i)        telling other White security officers they need to be "protected" from Plaintiff Barnes and other Black security officer co-workers;

    j)        stating "this Nigger is using their Black Card again;"

    k)        asking a fellow Black Officer "what would you do if I shot your Black ass?;"

    l)        stating  "we need to get this nigger out of here," referring to a Black Security Officer;

    m)        collusion with union representatives and the Union President as to how they were "going to get rid of all the niggers" in the department

82.    Plaintiff Barnes is unaware of any action taken by Defendants' management, including but not limited to Jenkins and Payne, in response to these egregious violations of Defendants' zero-tolerance race discrimination policies.

83.    That no member of Defendants' management, including Jenkins or Payne, interviewed Plaintiff Barnes and/or witnesses named in his various reports of race discrimination; nor did Defendants contact Plaintiff Barnes relative to any findings of an investigation and/or action taken in response to any of his complaints of

discrimination, harassment, hostile work environment and/or retaliation in the RCS workplace, including those he brought on behalf of other Black security officers and Black civilian guests and visitors to the RENCEN.

84.     That, following receipt of numerous complaints of race discrimination against Defendants' Caucasian security officers and supervisors, Defendants' management, including but not limited to Payne and Jenkins, decided to promote such offenders instead of taking disciplinary action against them for their racially discriminatory actions.

85.     Defendants Payne and/or Jenkins selected the following white employees for promotion over Plaintiff and similarly situated Black Security Officers with more seniority and/or experience: Defendants Rebar, Bayer, Wiley, Lacelle, Childs, Greutman, Mouilleseaux, Chrystal Marginean, and John Crowley.

86.     Defendant GM was notified of several instances of race discrimination by Caucasian security officers on the RENCEN premises; Defendant GM was also told that RCMC and G4S failed to take any remedial action to end such discrimination however, nothing was done by GM to investigate and/or address any complaint of race discrimination in the RCS workplace.

87.     Defendant GM, by and through Defendants Jenkins and Payne, responded to complaints of race discrimination by terminating their employment and/or prohibiting the complaining employees from coming on the premises of the RENCEN;

thus, retaliatorily terminating the employment of employees who filed complaints of race discrimination in their workplace.

88.     That from 2016 to present Defendants promoted and continue to promote the very Caucasian security officers and employees that were accused of violating Defendants' race discrimination policies and creation of a race hostile work environment, including but not limited to: making racial epithets, racial slurs, racially hostile and offensive jokes and comments; using unreasonable and excessive force, using violence and/or threats of violence against African Americans in the RENCEN based on their race.

89.     That, during a PPCT Training Class in which Plaintiff Barnes was instructing Defendants' security officers on the Use of Force policy and ethics in reporting such honestly, a Caucasian security officer that Barnes had previously, privately counseled in regards to falsifying reports to justify the use of unreasonable force against Black hotel guests, verbally threatened Plaintiff Barnes, saying "[you] better walk backwards to [your] car tonight."

90.     Plaintiff Barnes reported this conduct to management and stated it was race related; Defendants management did not take this complaint seriously and took no action to counsel or discipline the white officers that threatened their Black superior.

91.     That from 2019 to present Plaintiff Barnes forwarded several emails, reports and complaints from other security officers to Defendants' management detailing racially hostile, harassing and discriminatory conduct by the same repeat offender Caucasian security employees; however, Defendants failed to adequately investigate, respond and/or address any of these complaints of race discrimination.

92.     That from 2019 until his separation from employment, Defendant Bayer, Union President, often monitored Black employees, Hotel guests and visitors to the RENCEN based on his racial biases and he did not do so to Caucasian employees; Defendants' management was notified of this racially discriminatory and harassing conduct but no action was taken in response.

93.     In the Summer of 2020, while in the locker room area, a Black RCS security officer overheard Defendant, Senior Shift Supervisor, Chad Greutman, talking to Defendant Caucasian Security Officer/ Union President, Bayer, about another Black security officer; Bayer said "he's so stupid when you go up there to do tower checks" and referred to him as a "nigger;" this was reported immediately to Defendant Payne but nothing was done in response.

94.     Neither Defendants Gruetman, Payne or Jenkins, or any other of Defendants' management corrected or counseled the Union President as to this clear violation of Defendants' anti-discrimination policy in the Summer 2020.

95.     In August 2020, Defendants' Black Security Officer employee filed a complaint of race discrimination on Defendant G4S' hotline, stating, "[s]ince November 19, 2017, I have been undergoing and experiencing severe racial discrimination, harassment and retaliation. I reported to supervisors and HR, but they have failed to address these important issues. In addition, two reports were filed with the EEOC….Management has been clever in erasing all paper trails ….They are running this place like the Mafia." No member of Defendants' management ever reached out to discuss these matters. *See Companion Case 2:21-cv-11846-DML-CI ECF No. 30, PageID.506-520*

96.     In December 2020, while in the cafeteria, kitchen area, a Black RCS security officer overheard Defendants' Caucasian Security Officer/ Union President Bayer talking to Caucasian security officers Phil Johnson and Tim Henson about

Black security officer, Michael Young, referring to him as "dumb" and "stupid," and then the Union President said "I am tired of that "nigger."

97.     This December 2020 incident and racial slur was reported to Defendants' management, including Payne, as a violation of the zero-tolerance, anti-discrimination policy but nothing was done in response.

98.     It was reported to Defendants' upper management, including Defendant Payne that, on several occasions from March 2020 through May 2021, Security Officers witnessed Defendant, Caucasian Senior Shift Supervisor, Chad Gruetman,

laughing at racially offensive jokes made by white officers at work; participating and condoning egregious violations of the Defendants' race discrimination policies as opposed to enforcing the zero-tolerance policy.

99.     From 2020 through September 2021, Defendant Caucasian Security Officer Douglas Bayer routinely made racially discriminating and offensive comments, slurs, epithets and racist jokes to and in the presence of supervisors and Caucasian Security Officers, including but not limited to Defendants Rebar, Zani, Lacelle, Johnson and Senior Supervisor Greutman, who laughed at and encouraged such conduct Defendants' workplace.

100.    On approximately February 1, 2021, a Black security police officer, Barry Peguese, reported to Plaintiff Barnes that he overheard Caucasian Security Officer/Union President Bayer conspiring with Defendant Zani and other white officers to get another Black security officer fired; Defendant Bayer stated they need to discuss how they were "going to get rid of all the niggers" in the department.

101.    Plaintiff Barnes immediately reported this incident to Defendant Payne, Security Director; however nothing was done in response.

102.    Security Officer Peguese was fired immediately afterwards in retaliation for his complaints of race discrimination in Defendants' workplace.

25

103.     That in March 2021, during his shift, Officer Bayer, a Caucasian Security Officer/ Union President, showed another officer a picture saved in a private folder in his phone showing the **decapitated head of a Black male victim** of a car accident; Officer Bayer then informed the co-worker that he and white co- workers **passed around the decapitated head and made racial jokes about it, laughing a**t the recall of his racist antics.

104.     This conduct was reported to management; including but not limited to Defendant Payne, however, no investigation and/or action was taken in response.

105.     Defendants management, including but not limited to Payne and Jenkins, took no action to discipline or ban this racially biased Officer from Defendants' premises or take him out of a position of power, trust and authority.

106.     In March 2021, Plaintiff Barnes and another female security police officer reported Defendant Bayer, the then Union President's, acts of racial discrimination, racially hostile and graphic jokes and racial epithets in the workplace to the immediate attention of Defendant Payne who reported such to Defendant Jenkins; however, management replied that they could not do anything that could be perceived as "retaliating" against a union official while they are working on a switch from G4S to Allied Universal as it is a "crucial time."

26

107.    In approximately May 2021, Plaintiff Barnes reported to Defendants'
management, including but not limited to Payne, the following comments made to a
female security police officer: Officer Bayer Union President stated, in the presence of
Defendants, Caucasian Officers Rebar, Zani, Lacelle and Johnson, "Black [officers]
are like 'dogs in heat" because "you are a white woman" and they are ''going after
you'." Management did nothing in response to this report.

108.    Shortly thereafter, Plaintiff Barnes spoke to Defendants' upper
management, including Payne, and insisted that this female officer's complaints of race
discrimination and harassment be taken seriously and immediately investigated and
addressed by management; however, no action was taken by Payne, Jenkins or any
other member of Defendants' management, to investigate and/or address these
complaints despite bringing such on several occasions.

109.    At one point during Plaintiffs' employment, Defendants instructed
security officers and employees to bring complaints of race discrimination and
harassment to Defendants' supervisory team, Human Resources, management or via
G4S or GM's complaint hotlines which was done without any recourse or response; if
anything, individuals that reported discrimination and/or utilized these complaint
hotlines and identified themselves by name were retaliated by management as a result.

110.    That on July 7, 2021, Plaintiff Robert Barnes forwarded a written
complaint filed by a Black Security Officer detailing continued, perpetual race

discrimination and harassment; this employee requested Defendants' managements' assurance that he would be safe at work because he feared for his life; yet Defendants' upper management refused to address these continued complaints, even after Plaintiff Barnes insisted such be investigated and the employee assured that the zero tolerance policy was in place and being enforced.

111.    Historically, the strongest African American male in a community was forced to touch his toes and be raped and/or sexually violated by Caucasian male slave owners in attempt to show their power and superiority and instill fear in the slave community; this was referred to as "buck breaking."

112.    In December 2021, Defendants' Caucasian Officer familiar with "buck breaking," repeatedly cornered a Black co-worker at work and asked him to preform lewd and degrading acts, including asking him to "bend over and touch his toes" and asking "if I was standing here butt naked with my dick out would you suck it," alluding to the historical atrocities committed against African Americans in order to discriminate, harass, intimidate, provoke and instill fear.

113.    Defendants' management personnel, including Jenkins and Payne, were immediately informed of this employee's actions and failed to investigate or otherwise address this flagrant display of racial bias and discrimination which affected Plaintiff Barnes and all Black security officers working on the RENCEN premises.

114.    Plaintiff Barnes immediately reported this race hostile conduct to upper management on behalf of his subordinate security police officer as such constituted violations of Defendants' zero tolerance policy against race discrimination and elicited fear in many Black security employees; yet, nothing was done by upper management to investigate and/or address the situation.

115.    That Plaintiff Barnes and similarly situated individuals were retaliated against by Defendants' management, including Payne and Jenkins for engaging in protected activity, namely, attempting to vindicate the rights of Black civilian visitors and guests of the RENCEN by reporting race discrimination, racial profiling, racial biases, harassment, wrongful arrests, false imprisonment, and use of unreasonable and excessive force by white officers against Black civilians in Defendants' workplace.

## FACTS RELATED TO DEFENDANTS' RACIALLY DISCRIMINATORY ACTIONS AGAINST BLACK CIVILIAN VISITORS AND GUESTS OF THE RENAISSANCE CENTER

116.    Unreasonable and excessive force is often used by Caucasian RCS Security Officers and condoned by Defendants' management, including Defendants Payne, Jenkins, Greutman, and Mouilleseaux, which often includes several white officers piling on Black civilians without any display of resistance and/or utilizing force even when suspects are in the process of following officers' verbal directives and/or utilizing force for a violation of RENCEN's building policy, as opposed to a violation of law, which is contrary to Defendants' company policies and in violation of the civil

29

rights of Black civilian visitors and guests of the RENCEN. *See Case No: 2:23-cv-10085-BAF-KGA*

117.   Instead of working to deescalate any security concerns, as required by Defendants' company policies and directives; unreasonable, unwarranted and excessive force was often utilized by Defendants' White Security Officers at the RENCEN, including but not limited to Defendants Zani, Rebar, Childs, Wiley, Hackett, Bayer and Lacelle, in violation of Black visitors and guests' rights afforded by the 4th and 14th Amendments to the United States Constitution; such has been ongoing since 2016 and was reported to Defendants' management without response.

118.   That Defendants failed and/or refused to abide by and/or enforce Defendants' use of force policy, use of force directives, use of force continuum, race discrimination, harassment and/or retaliation policies against white security officers who violate such, including but not limited to Defendants Mouilleseaux, Greutman, Rebar, Wiley, Zani, Hackett, Childs, Bayer and Rebar.

119.   Defendants routinely stop, detain and/or prohibit Black guests and visitors from entering the Renaissance Center premises based on intentional race discrimination and biases which Plaintiff Barnes and other similarly situated past and current Black security officers reported to Defendants regularly since 2019 but the issues have not been addressed by Defendants management.

120.     Continually and regularly throughout his employment, Plaintiff Barnes brought additional complaints of race discrimination to Defendants Jenkins and Payne detailing instances of race discrimination on behalf of Black civilian visitors and guests of the RENCEN whose constitutional rights had been violated based on such; however, there was never a thorough investigation or follow up by Defendants' management, including but not limited to Defendants Payne, Jenkins or Greutman.

121.     That from 2016 to present, Defendant GM executives, including but not limited to Defendants Jenkins and/or Payne, have encouraged and empowered Renaissance Center security officers to use whatever force necessary to get rid of the "undesirables," referring to Black civilians, juveniles and homeless persons on Renaissance Center premises; regardless of whether they had legal justification and/or probably cause to do so, in violation of constitutional rights afforded under the 14th Amendment.

122.     That as a Senior Use of Force Instructor, Plaintiff Robert Barnes reviewed dozens of surveillance videos, reports, statements and other evidence related to the use of force by RCS Security Officers from 2016 through present and found dozens of violations of the Use of Force policies and directives which put and continues to place the public in extreme danger and risk of harm and violates their constitutional rights.

123.    During these use of force reviews from 2016 to present, Plaintiff Barnes noticed that the surveillance videos evidenced repeated constitutional violations and violations of Defendants' use of force directives and continuum, including use of unreasonable, excessive and/or unwarranted use of force and wrongful arrest and detainment without probable cause by the very same Caucasian employees that were previously accused of violating Defendants' race discrimination policies; including but not limited to Defendants Rebar, Wiley, Zani, Hackett, Childs, Greutman, Bayer, and Lacelle. These findings were immediately reported to management on each occasion without any action taken to address it.

124.    On several occasions from 2017 to present, Defendants, by and through their management, supervisory and union personnel, including Defendants Payne, Jenkins, Greutman, Mouilleseaux, Bayer and/or Childs, has permitted their Caucasian employees, including but not limited to Defendants Zani, Rebar, Wiley, Hackett, Childs, Bayer, Lacelle, Greutman, and Mouillesaux, to violate constitutional rights and use of force protocols and directives against African American individuals without any repercussion; despite reports and videos evidencing that such violations resulted in physical assault, battery, injury, harm and violation of the constitutional rights of Black Hotel Guests and visitors, without legal justification and/or without probable cause for any stop, detainment and/or arrest.

125.    That Plaintiff Barnes and similarly situated Black security officers working at the RENCEN fear that Black employees, Black Hotel guests and visitors to the RENCEN are in extreme danger and risk for their lives as these acts of security police brutality by Defendants Gruetman, Rebar, Wiley, Zani, Hackett, Childs, Bayer and Lacelle have been condoned and/or permitted to continue unabated to date.

126.    That Defendants by and through their management, supervisory and union representatives and Presidents, including but not limited to Defendants Payne, Jenkins, Baldwin, Jr., Greutman, Mouilleseaux, Zani, Bayer and/or Childs, permit their Caucasian security officers to fraudulently falsify and/or alter incident reports in order to conceal and/or support utilization of force against African American individuals without repercussion; despite the knowledge that such falsification resulted in African American civilians being wrongfully arrested and/or detained for "crimes" that were not committed.

127.    That Defendants employed, recruited and/or hired Caucasian Security Officers knowing they had previously been terminated from other employment due to their use of unwarranted and/or excessive force against African American civilians and/or for committing acts of racial bias, hatred and/or discriminatory conduct aimed towards African American individuals based on their race.

128.    For all relevant time periods, Defendants Payne, Baldwin, Jr., Jenkins, RCMC, GM and/or G4S had the authority to provide weapons, including guns and OC

Spray to Security Officers who preform security services on the RENCEN premises and as such is responsible to do so in a manner that does not cause harm or constitutional violations of Plaintiffs and other similarly situated Black officers preforming security services on the premises of the RENCEN, including but not limited to properly vetting such officers for any known racial biases and violent tendencies and ensuring they are properly trained and certified to do so.

129.   Defendants Payne, Baldwin, Jr., Jenkins, RCMC, GM and/or G4S provided weapons, including guns and OC Spray to untrained and/or certified Caucasian Security Officers who preform security services on the RENCEN; despite having knowledge that such officers, including but not limited to Defendants Zani and Lacelle, had a tendency towards racism as reported by Defendants' co-workers.

**FACTS RELATED TO DEFENDANTS' RACE DISCRIMINATION OF BLACK CIVILIANS: CONSTITUTIONAL RIGHTS VIOLATED AND UNREASONABLE USE OF EXCESSIVE FORCE REPORTED TO DEFENDANTS RCMC, GM, G4S, JENKINS AND PAYNE**

130.   That Defendants were notified numerous times over the years that several of their Caucasian Security Officers were abusing their authority, using unreasonable and excessive force; profiling, brutalizing and provoking Black Hotel guests and visitors to the RENCEN due to their race; yet, Defendants failed to take any remedial action to train, counsel, arrest, charge, report and/or discipline such officers providing security services and conducting misdemeanor arrests on the RENCEN

premises through the authority of the State of Michigan.

131.    That from 2017 to present, Defendants' officers failed to deescalate situations involving the arrests of Black Guests, in violation of Defendants' company policies, based on their race without consequence, discipline or counseling.

132.    Plaintiff Barnes reported to management that Defendants' Greutman, Mouilleseaux, Rebar, Wiley, Hackett, Zani, Bayer and Childs actions against black civilians were reckless, dangerous and constituted unwarranted and excessive force in violation of Black Guest's 4th and 14th Amendment rights; yet, Defendants took no action ensure a safe, work environment free from discrimination for Black security officers, visitors and employees working at the RENCEN.

133.    That in 2011, Defendants and their Caucasian Security Officers were sued and accused of utilizing unreasonable and excessive force against a Black male visitor to the RENCEN, Dion Reese, based on his race. *See Wayne County Circuit Court Case #1 I-003265-CZ*

134.    That on June 24, 2014, a Black male, Tu'sond Jewell, filed a complaint with Defendants stating that their Caucasian Security Officer, Carrignan, "slammed" his brother on the back and forcibly arrested him despite him following verbal directives and not displaying any resistance or posing any threat to officers, based on his race.

135.    That in August 2014, Defendants' management was informed that two Caucasian Security Officers brutally assaulted a Black homeless man that was sleeping at the time, in violation of his constitutional rights against excessive force and race discrimination.

136.    After complaints of police brutality were filed against Defendants' Caucasian Security Officer, Crowley, Defendant G4S promoted him to Fire Coordinator and Defendant GM later promoted Crowley to their GM Tactical Team, illustrating Defendants failure to take such race discrimination and biases seriously.

137.    On approximately April 2017, several Caucasian Security Police Officers, including Defendant Gruetman and PPCT Instructor Aaron Carrignan provoked, tackled, brutally attacked a Black male, Obie Trice, Jr., utilizing several repeat pressure point control tactics and discharged OC Spray within inches of this Black civilian's face;  despite the fact that he was following officer's verbal directives and attempting to leave the Detroit Marriott Hotel at the Renaissance Center's premises at the time Defendants' officer initiated their arrest.

138.    As the Senior Use of Force Instructor, Plaintiff Barnes reviewed the surveillance footage of this April 2017 arrest and, as reported to Defendant Payne, opined that these officers lacked probable cause to arrest or utilize any force during this incident as no resistance was displayed and no law was violated.

139.    Plaintiff Barnes informed Defendant Payne that the involved officers, including Defendant Greutman, violated the use of force policy, use of force continuum, company directives, and the law which could have resulted in blindness and severe permanent injuries to a Black male civilian who was merely coming into the Marriott Hotel to use the bathroom.

140.    Defendants' upper management, including Defendants Jenkins and Payne, chose to take no action in response to Plaintiff Barnes' findings after reviewing surveillance video of the April 2017 assault of a Black male visitor to the RENCEN.

141.    Defendant Greutman was subsequently promoted to a Senior Shift Supervisor by Defendants Payne and/or Jenkins.

142.    Plaintiff Barnes discovered that evidence and documents related to Obie Trice's arrest had been intentionally deleted off Defendants' system following the notice and initiation of a federal lawsuit, in attempt to conceal the unreasonable and brutal use of force based on race. *See Wayne County Circuit Court, Case #18-000993-NO*

143.    On a reoccurring, regular basis from 2019 through present, Defendants' Caucasian Security Officers, including but not limited to Gruetman, Rebar, Wiley, Zani, Hackett, Childs, Bayer, Lacelle and Mouilleseaux, intentionally provoked and continue to provoke Black men, elderly women and juveniles to order to elicit a reaction that would justify their premeditated violent response which often includes a wrongful

detention, stop, and/or arrest in violation of constitutional rights and violation of Defendants' anti-discrimination policies.

144.    On a regular basis from 2019 to present, Defendants' Caucasian Security Officers radioed when they saw groups of Black teenagers on the property and indicated that they should be monitored closely while such was not done with groups of white teenagers, based solely on race.

145.    That on many occasions from 2019 to present, Defendants Caucasian security officers fail to provide medical care to Black civilians that were OC sprayed and/or injured by Defendants' white security officers, including but not limited to Defendants Childs and Rebar, in violation of Defendants' policies and directives; Caucasian civilians who were sprayed did receive medical care.

146.    On several occasions from 2019 to present, Caucasian Security Officers, including but not limited to Defendants Childs and Zani, falsely accused Black civilians and/or Security Officers of assault; such was investigated and found not to have occurred, yet Defendants, including but not limited to Payne and Jenkins, took no action against this display of race discrimination.

147.    That Caucasian female Security Officer, Marginean, made false complaints and/or stated in incident reports that she was "assaulted" by Black civilian visitors to the Renaissance Center when such was deemed not to have occurred after reviewing these various incidents on surveillance footage; management, including but

not limited to Payne and Jenkins, took no action in response to Plaintiff Barnes' report that this employee had racial animus and was falsifying police/incident reports in violation of company policy.

148.    Despite Marginean's false reports of assault and clear racial animus, Defendants Jenkins and/or Payne chose to promote her to Shift Supervisor within six months of her hire; Defendants Jenkins and/or Payne made the decision to promote her again, this time to Defendants' Field Training Coordinator/Director; despite several other complaints of unreasonable and excessive use of force were brought against her by Black guests and visitors to the RENCEN.

149.    Defendants' Caucasian Security Officers harassed, abused and discriminating against Black civilians in kept their custody in the basement detention cell; refusing to permit them to utilize the bathroom; instead forcing them to urinate on themselves and sit in wet clothing for hours before release.

150.    That from 2019 to present, Defendants' Caucasian security officers, including but not limited to Defendants Mouilleseaux, Greutman, Rebar, Wiley, Zani Hackett, Childs, Bayer, and Lacelle, detained, stopped, searched, and/or arrested many Black civilians based solely on their Black race and not due to any violation of law which resulted in a violation of their constitutional rights and a hostile work environment for Defendants' Black Security Officers, including Plaintiff Barnes.

39

151.    That from 2019 to present, Defendants' Caucasian security officers, including but not limited to Defendants Childs, Zani, and/or Hackett used excessive force against Black civilians by overtightening handcuffs, refusing to loosen and/or remove such upon request, even after the suspects were detained in a holding cell and posed no threat to others; this treatment was not done to white civilians who were detained/arrested.

152.    In January 2019, Defendants' management received a report that their Caucasian Security Officer, Defendant Craig Hackett, attempted to provoke a Black male suspect who was in RCS custody, handcuffed and was following officer directives when Officer Hackett slammed his head into the elevator wall, using unreasonable and excessive force without any display of resistance.

153.    Plaintiff Barnes discussed this January 2019 incident with Defendants Payne and Jenkins and stated that he believed Defendant Hackett's January 2019 use of unreasonable, excessive use of force was due to the race of the suspect and because he harbors racial biases against Black people; however, nothing was done to address this officer's violation of an individuals' civil rights and/or violation of company policies or use of force directives to date.

154.    On approximately Feb. 12, 2019, Defendants' Caucasian security police officer sprayed a homeless Black male with OC Spray; despite the fact that this "suspect" did not display any resistance, committed no violation of law and appeared

to be responding to the officer's verbal directives.

155.    Plaintiff Barnes reviewed the surveillance footage of this incident and reported to Defendant Payne that this white Officer violated the use of force policy and appeared to do so based on harbored racial biases; however, nothing was done by Defendants to address this officer's violation of constitutional rights, company discrimination policies and the use of force directives provided by the Michigan State Police.

156.    That on approximately March 21, 2019, Plaintiff Barnes brought a complaint to Defendants' management detailing a wrongful arrest, stop, detainment, take-down, use of unreasonable and excessive force and assault of a Black male visitor to the RENCEN by Caucasian Security Officers, Defendants Childs and Hackett; this Black male was falsely accused of having a weapon, baseball bat and assaulted, even after he surrendered such voluntarily to the officers.

157.    Defendants' management, including Payne and Jenkins, took no action in response to Plaintiff Barnes' March 2019 use of force review findings that these security officers had no legal justification or right to utilize force after the suspect surrendered his bat/"weapon"; despite having had several complaints of race discrimination and/or racial profiling, bias, and excessive use of force based on race previously alleged against these same officers.

41

158.    On approximately April 10, 2019, Plaintiff Barnes reported another violation of the Use of Force policy committed by two of Defendants' white Security Officers who stopped, detained and attempted to provoke a Black male visitor to the RENCEN, as opposed to deescalating the situation per Defendants' policy.

159.    Per Plaintiff Barnes' report to Defendant Jenkins, these officers were previously accused of violating the companies' race discrimination policies on several occasions.

160.    Nothing was done by Defendants Payne or Jenkins to address Plaintiff Barnes's complaints that company policies against race discrimination were being violated without recourse.

161.    That on approximately May 26, 2019, Defendants' management, including Payne, was informed that, in the presence of Defendants Gruetman and Bayer, tripped a Black male subject that was in custody and handcuffed, causing him to fall so hard onto his chest on the floor that he had difficulty breathing and started having seizures; Defendant Bayer subsequently wrote a false report to conceal his racially motivated actions and use of force, indicating that injuries sustained were the result of the suspect being "high on acid" despite no tox screening being conducted and no mention as to the subject being tripped or falling.

162.    Nothing was done by Defendants' management, including Jenkins or Payne, in response to the May 2019 report of unreasonable and excessive use of force based on race or the falsification of incident reports by Defendant Bayer to conceal his wrongful and discriminatory actions, either of which should have resulted in termination per Defendants' policies.

163.    On approximately July 20, 2019, Plaintiff Barnes reviewed surveillance footage of an incident where Defendant Childs, utilized OC Spray on a Black male visitor to the RENCEN who allegedly was "trespassing;" despite the fact that he was following officer's verbal directives and attempting to leave the premises at the time this officer utilized force.

164.    Plaintiff Barnes reported Defendant Child's use of excessive and unreasonable Use of Force, in violation of the Michigan State Police Use of Force Continuum, and stated such appeared to be based on Childs' harbored racial biases; however, nothing was done by Defendants' management, Jenkins or Payne, to address this report of security police brutality based on race or the violation of an individual's civil rights.

165.    A few days later, Defendant Childs falsely reported that a Black male visitor to the RENCEN assaulted him without provocation; the surveillance video established this as a false complaint; Plaintiff Barnes informed Defendant management that Defendant Childs, was continuing to make false reports and must be counseled

and/or disciplined.

166.     Defendants management, including but not limited to Payne or Jenkins, did nothing in response to these July 2019 complaints that Defendant Childs' violation of constitutional rights was race based.

167.     On approximately August 18, 2019, Plaintiff Barnes reviewed a surveillance video which again evidenced a Caucasian Security Police Officer, Defendant Hackett, with the assistance of Defendants Childs and Mouilleseaux and Defendants' Field Training Director, Marginean, utilize a Choke Hold on a Black, male civilian that posed no threat to anyone while handcuffed, in custody alone in Defendants' detention center located in the basement of the RENCEN.

168.     Plaintiff Barnes immediately opined and reported to Defendants' management that these Caucasian officers brutalized this Black male, utilizing unreasonable, excessive and apparently deadly force against this Black detainee in violation of his 4th and 14th Amendment rights based on his race; however, nothing was done in response to these serious violations of Defendants' zero tolerance anti-discrimination policies, Michigan State Police's Use of Force Continuum, and/or violations of constitutional rights and criminal law against assault.

169.     Shortly thereafter, despite having knowledge of her presence and involvement in several arrests which evidenced serious violations of Black civilian's civil rights and allegations of racial biases filed against her, Defendants, by and through

Defendants Jenkins and/or Payne, again promoted Officer Marginean to Field Training Director, hand-picking her over more seniored, qualified and experienced Black security officers, including but not limited to Plaintiff Barnes.

170.    Plaintiff Barnes received a complaint in September 2019 from a Security Officer that his co-worker, a Caucasian security officer physically attacked a homeless, Black male, Ken Matthews, and was boasting about the fact that management does not care what "they" do to Black people.

171.    Plaintiff Barnes brought this serious security concern, incident of assault and complaint of race discrimination immediately to the attention of Defendants' management, including Defendant Payne; however, nothing was done to address this clear violation of company policy, use of force continuum, Michigan law and civil rights.

172.    In August 2020, Defendants' Caucasian Security Police Officer Johnson admitted to a co-worker while laughing that he "kicked and punched Sherry" a mentally ill, Black homeless woman and told her to "get the hell out of here;" he then bragged management does not care what he "does to Black people."

164   This August 2020 complaint of race discrimination and excessive force and abuse of power was brought to Plaintiff Barnes and, in turn, he reported such to Defendant Larry Payne per his chain of command; nothing was done by Defendants to address this clear violation of constitutional rights, use of force or anti-discrimination.

165. On October 7, 2020, Defendants' Caucasian Security Officers jumped, attacked and took down a Black Hotel guest heaving his head into the concrete, face down in the process; despite the fact that he was not resisting or posing any threat to the officers, in violation of the Defendants' use of force policy, company policy, Michigan law, and his civil rights.

166. The Caucasian officers involved in the October 7, 2020 arrest, including Defendants Rebar, Wiley, Zani, Childs, and Bayer were previously reported to management for their repeated violations of Defendants' discrimination policies; thus, it is clear from those reports that these officers harbored racial biases against Black people in violation of Defendants' anti-discrimination policies and constitutional rights of a Black civilian.

167. Shortly thereafter, a Black RCS security officer informed management, including but not limited to Defendant Payne, that the assault and arrest of Demarko Brown was clearly motivated by race as evidenced by the prior complaints brought against the same involved Caucasian security officers and the fact that he personally told these officers and the supervisor at the scene that he was going to get a mask and bring it back for this individual in order to deescalate the situation; by the time he returned with a mask, these racially biased Caucasian officers had already bashed Brown's head, face first, into the concrete with the full, combined weight of their bodies.

46

168.    Defendants' rationale for this arrest and detainment were pretextual in nature; Defendants had no legal justification for their stop, detainment or arrest of this black civilian in October 2020.

169.    In approximately mid-November 2020, Plaintiff Barnes, the Senior Use of Force Instructor, reviewed the surveillance footage related to the October 7, 2020 arrest; immediately afterwards, Plaintiff Barnes informed Defendants' Security Director, Larry Payne, that the involved officers committed a serious physical assault by "ambushing" Brown and unreasonably utilizing excessive, deadly force without legal justification in violation of Brown's constitutional rights due to his race which is a serious violation of the race discrimination policies, Michigan State Police Use of Force Continuum and criminal law.

170.    As a result of his findings, Plaintiff Barnes opined that action must be taken by management against the involved officers, including but not limited to bringing criminal charges against them, reporting them to the Detroit Police Department, reporting this use of excessive force to MCOLES and/or MSP and terminating their employment.

171.    Plaintiff Barnes is unaware of any action taken by Defendants' management, including but not limited to Defendants Jenkins or Payne, in response to his complaint.

172.    Defendants' Security Officers, including but not limited to Defendants Child, Rebar, Bayer, Zani, Wiley and Mouilleseaux, actions on October 7, 2020 were motivated by race.

173.    Despite Plaintiff Barnes' November 2020 report of excessive force based on race, none of the involved security officers were counseled, disciplined and/or terminated for violating the zero-tolerance policies against race discrimination in Defendants' workplace; none of the involved officers were terminated or reported criminally for their actions on October 7, 2020.

174.    In approximately January 2021, Defendants GM, G4S and RCMC received an eye-witness complaint that Defendant Bayer, who was the subject of prior allegations of race discrimination and racial profiling, was involved in another racially motivated incident where excessive force was used; Defendant Bayer called the swat team on four, 14 year old Black juvenile Guests who were just playing outside the Renaissance Center, not causing any trouble and falsely reported they were four "men with weapons."

175.    Defendants Bayer's actions and false statements resulted in a swat team response by GM's Tactical Officers who rushed to the scene with weapons drawn to address a situation that did not warrant such a response.

48

176.    Defendant Childs was present at the scene and was aware Defendant Bayer made a false complaint motivated by racial biases; yet took no action to report such to management.

177.    Prior to the swat team rushing in with weapons, these Black male minors were never asked to leave the premises by anyone simply based on this security police officer's false report, scaring, traumatizing and seizing Black civilians without probable cause or rationale.

178.    Defendants Bayer and Childs' actions resulted in an unnecessarily dangerous situation for all involved, as well as seriously egregious violations of the constitutional rights of Black male minors that unnecessarily put their lives at risk.

179.    Defendants' Security Officer witnessed and reported that Officer Bayer falsified the January 2021incident report to conceal what she believed were his "racially discriminatory motives." However, management took no action in response to these serious complaints which are clear violations of the Defendants' zero-tolerance policy against race discrimination and violations of Michigan State Police's Use of Force Continuum.

180.    On April 12, 2021, a security police officer reported an incident to Defendants' management whereupon she was dispatched to ask a group of African-American teenagers on scooters to leave the Renaissance Center parking garage; Defendant Bayer appeared on scene as back up without any request to do so.

49

181.    Per this complaint, Defendants' Caucasian Security Police Officer, Defendant Bayer, slammed the security police car in reverse and proceeded to drive backwards in the parking structure at approximately 25 mph, aiming the car *directly at the Black juveniles* in the parking lot, coming so close to them that his fellow officer feared the kids would be injured or killed; Officer Bayer continued to chase the kids out of the parking garage even after he saw they were voluntarily leaving.

182.    When Defendant Bayer's reckless actions were brought to his attention, he indicated that he thought his actions were humorous and was amused.

183.    Instead of deescalating the situation, as required by Defendants' company policies, Officer Bayer's presence added a serious risk of harm to Black civilian minors on General Motor's property based on their race; yet Defendants' management, including Payne and Jenkins, permitted him to stay employed, continuing to provide security related services at the Renaissance Center.

184.    In May 2021, Defendants Rebar and Bayer OC Sprayed a Black male civilian visitor to the Renaissance Center without any display of resistance or violation of law based on his race, in violation of company policy, Michigan State Police's Use of Force Continuum and constitutional rights; White civilians were not treated in this manner.

185.     In approximately June 2021, Defendants Rebar and Lacelle abused their authority and arrested an underaged Black male, detaining him against his will in the basement detention cell based on his race, although Renaissance Center Security Officers are not authorized to arrest or handcuff a minor; this violation of Defendants' policy and state law was reported to Defendant Payne and other management however; no action was taken by Defendants Payne or Jenkins in response.

186.     On January 5, 2022, Defendant Lacelle shoved an unruly white male civilian with a video camera who dared to question his authority; in response, Defendants' management immediately disciplined Defendant Lacelle for violating the use of force policy; however, much more egregious uses of force violations and criminal assaults perpetrated against Black civilians went completely unaddressed with no discipline issued to involved officers.

187.     August 14, 2023, Defendant Zani, brutally attacked, tackled, punched, choked, detained and arrested an elderly Black female for allegedly "impersonating an officer;" despite the fact that she presented as confused and/or mentally ill, was wearing a full length dress and sweater with a sun hat and had pedestrian bicycle with a basket attached; this individual did not falsely act as any public officer or otherwise act to further the operation of any legal process that affects persons or property, did not dress in any uniform, and did not produce any badge of authority or any other "official."

188.     Defendant Zani's rationale for this arrest and detainment were pretextual in nature; Defendants had no legal justification for their stop, detainment or arrest of this black elderly female in August 2023.

189.     Defendant Zani was accused of racial discrimination, harassment and hostile work environment by co-workers in Defendants' workplace prior to August 2023; yet Defendants failed to take corrective measures or address his racial biases and permitted him to use his arrest authority, gun and position to harass, discriminate and assault Black visitors to the RENCEN.

190.     Defendants' Security Officer Zani had no legal right to stop, detain and/or arrest this elderly, Black female as he had no probable cause to do so; this individual did not display any resistance or pose any real threat to anyone.

191.     In approximately September 2023, Plaintiff Barnes obtained witness statements in regards to the arrest and assault that occurred on August 14, 2023, reviewed the surveillance footage and presented such to Defendants' Security Director, Baldwin, Jr., along with his professional opinion that such was an egregious use of unreasonable and excessive, deadly force which warrants immediate termination and criminal prosecution of the involved officer, Defendant Zani and constituted a violation of Defendants' policies on use of force and zero-tolerance against race discrimination.

192.    Defendants Baldwin, Jr. and Jenkins failed to follow their company policies, directives or law in failing to take any corrective action and/or discipline against Officer Zani for his brutal attack of an elderly, Black female based on her race.

193.    Defendants' Security Officer, Zani currently works the same midnight shift and Defendants, by and through their agents Jenkins and Baldwin, Jr., still provide him with a gun to use during the performance of his job duties on the premises of the RENCEN; despite his egregious and criminal actions which violated the constitutional rights of a Black female.

194.    Despite complaints to Defendants' management detailing several white security police officers' racial discrimination, racial biases and motivation, Defendants' management, including Jenkins and Payne, failed to conduct any investigation or take any remedial action to address this serious violation of company policy and intentional disregard for violating the constitutional rights of others based on race while holding a position of power thus endangering future Black visitors, guests and security officers of the RENCEN.

195.    None of the Security Officers involved in the foregoing complaints and assaults against Black civilians were criminally charged, arrested, reported to police, disciplined, suspended, terminated or even counseled by Defendants G4S, GM, RCMC, Jenkins, and/or Payne for their racially motivated use of unwarranted, unreasonable and excessive use of force against Black civilians and/or co-workers at the

Renaissance Center, resulting in an extremely hostile work environment for Plaintiff and other similarly situated past and present Black officers working at the RENCEN.

196.   Defendants RCMC, GM and G4S were aware that white security officers had been previously terminated from prior employment for Fourth Amendment and Due Process Violations, including for wrongfully detaining and arresting civilians without probable cause, for criminal activity and abusing their authority as officers; yet Defendants G4S, RCMC, and GM, by and through Defendants Jenkins and Payne, still made the decision to hire them as security officers at the Renaissance Center in Detroit, Michigan which put them in a position of power to harass and discriminate against Black visitors and Hotel guests of the RENCEN and security employees working in the RCS department based on their race.

197.   Plaintiff Barnes and similarly situated individuals reported that Defendants' Caucasian security police officers maliciously and wantonly disregarded the constitutional rights of Black Hotel guests and visitors to the RENCEN in contravention of company policies, directives and state law; however, Defendants' management took no action to address such violations which poses a serious risk of danger to Black civilians and security employees of RCS while on the RENCEN premises.

198.    Defendants' white security police officers' actions constituted intentional and reprehensible misconduct which was based on race discrimination which has not been addressed by Defendants' management personnel; despite ample notice.

199.    Defendants' management, including but not limited to Defendants Payne and Jenkins, took no action to investigate and/or address the complaints brought by Plaintiff or similarly situated Black security officers working at the RENCEN and/or to ensure a safe environment for future Black visitors, Hotel guests or security employees of the RENCEN; despite company policy and state laws requiring such.

200.    On or about December 2022, Plaintiff and other members of Defendants' management personnel received a notice to preserve evidence and information related to any arrest where force was utilized by Renaissance Center Security from 2017 to present due to a federal case that has since been filed. See *Case No. 2:23-cv-10085-BAF-KGA*

201.    Within days of receiving this duty to preserve, Plaintiff Barnes noticed that computer files including arrest records, surveillance videos, incident reports and other documents which he believed to be included in the duty to preserve had been deleted since the notice was received; Plaintiff Barnes immediately questioned the senior level supervisor, Defendant Greutman, about why the documents had been deleted since they were notified such must be preserved.

202.     Defendants' senior supervisor, Greutman, responded by laughing and saying, "what they don't know, can't hurt us, now can it?"

203.     This was not the first time Plaintiff Barnes and/or similarly situated Black officers witnessed Defendants destroying relevant evidence, documents, information and surveillance footage during a pending federal lawsuit where there was a stated duty to preserve; it was clear that management, including Defendant Baldwin, Jr., was disinterested in hearing Plaintiff Barnes' report of destruction of evidence.

204.     Defendants, by and through their actions under color of law, are complicit in the race discrimination of black RCS Security Officers, past and present, including Plaintiff Barnes, as well as the race discrimination and violation of constitutional rights of Black visitors and guests of the RENCEN.

## COUNT I
## DEFENDANTS' RACE DISCRIMINATION AND CREATION OF A RACE HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE MICHIGAN ELLIOTT LARSEN CIVIL RIGHTS ACT

205.     Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

206.     The conduct of the Defendants, by and through their management and supervisory personnel, has discriminated against the Plaintiff Robert Barnes and similarly situated Black security officers providing security services on the RENCEN premises based on their race in violation of the *Michigan Elliott Larsen Civil Rights Act*

*MCLA §37.2101 et. seq.*; and all relevant sections of the Act.

207.    At all material times herein, Plaintiff Robert Barnes and similarly situated individuals were security officers and employees of Defendants; Defendants were jointly Plaintiffs' employer, covered by and within the meaning of *Michigan Elliott- Larsen Civil Rights Act, MCL 37.2101 et seq.*

208.    Defendant, through its agents, representatives, and employees, treated Plaintiff Robert Barnes and other similarly situated Black security officers differently from Caucasian security officers working on the RENCEN premises in the terms and conditions of their employment, based on unlawful considerations of race.

209.    Defendants, through its agents, representatives, and employees, were predisposed to discriminate against Plaintiff Robert Barnes and other similarly situated Security Officers working at RCS on the basis of their race and acted in accordance with that predisposition.

210.    Defendants have a pattern and practice of discriminating against their Black Security Officers working at the RENCEN on the basis of race.

211.    The Defendants' have substantially interfered with the employment of Plaintiff Barnes and similarly situated Black Security Officers working on the premises of the RENCEN based on race in the following manner:

a.      Allowing a work environment to exist which is permeated with race bias in violation of all state and local laws applicable to Equal Employment Opportunity;

b.      Failing to comply with Defendants' policies, directives and procedures and/or to enforce such only in favor of non-minority employees;

c.      Refusing to conduct investigation(s) and/or take disciplinary action against Caucasian employees who violate Defendants' zero tolerance, anti- discrimination and anti-retaliation policies and instead condoning the behavior, conduct and/or actions that violated such policies;

d.      Refusing to provide Plaintiff Barnes and other Black security officers with a safe working environment free of race discrimination, harassment, violence and/or threats of violence based on race;

e.      Failing to discipline Caucasian security officers, supervisors and/or management personnel who violate Defendants' policies and procedures while disciplining Black officers that violate such;

f.      Failing to investigate complaints of race discrimination, racial epithets and slurs, threats of violence based on race and/or race hostile work environment and instead blaming Plaintiff Barnes and similarly situated security officers working at the RENCEN premises;

g.      Failing to discipline the unethical behavior of Caucasian co-workers, supervision and upper-level management which violates Defendants' company policies;

h.      Promoting and/or rewarding Caucasian employees that reportedly violated the Defendants' respective EEO and/or race discrimination and/or harassment policies;

i.      Condoning and/or not taking any remedial action in response to Caucasian security officers' unwarranted, unreasonable and/or excessive use of force, racial profiling, provocation, security police brutality, assault and battery, false imprisonment and/or wrongful arrests based on race without due process in violation of Black civilian Hotel guests', RENCEN visitors' and security personnel's' rights afforded under the 4th and 14th Amendment to the United States Constitution;

j.      Promoting Caucasian security employees instead of African American security employees that have more seniority, qualifications, education and/or experience;

k.      Retaliating against security officers that report incidents of race

discrimination in the Defendants' Renaissance Center workplace;

l.      Retaliating against security officers that report incidents of race discrimination, racial profiling, assault, wrongful arrest, false imprisonment, racial biases, and/or excessive, unreasonable and/or unwarranted use of force by Defendants' Caucasian security officers against Black civilian Hotel guests and visitors to the RENCEN;

m.      Failing to promote and/or advance their Black security officers/employees while promoting and/or advancing Caucasian security officers/employees; despite having less seniority, experience and/or qualifications than their minority comparables;

n.      Defendants' Caucasian security officers/employees have been provided with advancement opportunities and receive(d) promotions, bonuses, and/or raises while their non-minority counterparts were not provided such;

o.      Failing to post job opportunities and/or posting job opportunities for a short period immediately after informing Caucasian employees that they should apply for such immediately before pulling the post, thus minimizing Defendants' Black security officers/employees' ability to be considered for such positions;

p.      Knowingly hiring and retaining security officers/employees and management personnel who have been previously terminated for acts of race discrimination, racial bias, racial profiling, and creation of a race hostile environment;

q.      Failing to enforce their policies, directives and/or procedures for Caucasian security officer employees while strictly enforcing its policies against Black security officer employees;

r.      Refusing to provide training and/or classes to Black security officers in order to hold them back from being considered for promotional opportunities while providing such to Caucasian security officers without regard to seniority;

s.      That preferential assignments, shifts, overtime and/or posts were given to Caucasian employees, due to their race;

t.      Allowing managements' discriminatory animus to prevail in Defendants' workplace without consequence; and

u.      Refusing to discipline Caucasian security officer employees that violate the zero- tolerance anti-discrimination policies which resulted in a race hostile work environment for Plaintiff Barnes and similarly situated Black security officers.

212. Plaintiff Robert Barnes and other similarly situated Black security employees reported complaints of race discrimination, violations of company policy and other inappropriate behavior aimed at Black civilian visitors and guests to the RENCEN to Defendants' management personnel, including but not limited to Defendant Payne, on a regular basis; however, no action was taken in response to these complaints to ensure a safe premises.

213. That Defendants permitted and condoned race discrimination in their workplace and allowed such to permeate the work environment resulting in a hostile work environment based on race.

214. Plaintiffs are, and were at all relevant time periods, treated less favorably by Defendants than their similarly-situated, non-minority security officers and employees in the terms and conditions of their employment.

215. That Plaintiff and similarly situated Black security employees providing security services at the RENCEN were treated differently from similarly situated Caucasian security employees in the terms and conditions of their employment.

216. That Defendants Caucasian Security Officers have been continuously treated more favorably than their Black Security Officer counterparts as it relates to all aspect of the day-to-day operations and supervisor leniencies.

217. That Defendants have a pattern and practice of discriminating against African American employees based on their race and favor non-minority security

officers in the terms and conditions of their employment.

218.    That preferential assignments and posts were given by Defendants' management personnel to Caucasian employees due to their race.

219.    That Plaintiff and similarly situated Black security officers and employees that provided and/or continue to provide security services to Defendants on RENCEN premises are and continue to be paid less than their non-minority counterparts based on race despite preforming substantially similar work for Defendants.

220.    That Plaintiff Barnes does not have the same or similar authority similarly situated White Security Officers and Shift Supervisors employed by Defendants.

221.    That Defendants' policies and procedures are enforced in a manner that has a disproportionate effect and/or disparate impact on African American security officers and employees, including but not limited to Plaintiff Barnes.

222.    Defendants disproportionately terminate African American security officers/employees for minor infractions and/or for violations of company policy without adequate support/evidence of such violation while Caucasian security officers/employees that violate the same policies do not receive disciplinary action even when there is ample evidence proving such violations.

223.    That Defendants' Caucasian security officer employees were subject to

progressive discipline while Black security officers and employees, including but not limited to Plaintiff Barnes were not given the option of progressive discipline by the same Defendant decision maker(s).

224.    That from 2019 through present Defendants' management disciplined and/or terminated Black security officers employed to provide security services at the Renaissance Center for violations of the attendance and/or tardiness policies while Caucasian officers that violated such policies did not receive such discipline.

225.    That from 2020 through 2022, Defendants' management disciplined and/or terminated Black security officers employed to provide security services at the RENCEN for violations of the mask policies while Caucasian security officers that violated such policies did not receive discipline.

226.    Defendants' Black security officers' requests for medical and/or stress leave and/or requests for accommodation of a disability/disorder/medical condition are highly scrutinized by Defendants; despite being supported by their medical providers in writing substantiating the medical necessity for such requests based on their race.

227.    Defendants' Caucasian Security Officers' requests for medical and/or stress leave and/or requests for accommodation of a disability/disorder/medical condition are routinely granted and are not scrutinized by Defendants' management.

228.    Medical leave requests from minority employees are often denied by Defendants and/or are approved but are accompanied by a lay-off notice dated the same

day the leave was to begin while Caucasian security officers that request such leave are treated preferentially.

229.    Defendants routinely granted Caucasian employees requests for medical leave, stress leave and/or requests for accommodations of a disability/disorder or medical condition; despite the lack of any documentation or substantiation from medical providers detailing the medical necessity for such requests.

230.    Defendants enforced, defined, manipulated, contorted, and/or amended several company policies in order to apply them solely against minority, African American security officers and employees; Defendants later destroyed such "policies" and documents that allegedly formed the "basis" of Defendants' disciplinary action.

231.    Defendants' supervisory and management personnel intentionally discriminated against Black RCS security officers performing security services at RENCEN based on their race and management's racial animus.

232.    Defendants' workplace culture has rewarded and continues to reward employees who violate its EEO, anti-discrimination, harassment and/or anti-retaliation policies.

233.    Defendants' African American Security Officers have been denied preferential career progression and/or advancement positions, based on Defendants' findings that they were "not qualified;' however, Caucasian officers who were likewise "not qualified" were hired and/or transferred into such preferred positions

which constituted career progressions and/or promotions of employment.

234.     Defendants' management refused to provide timely training to African American security police officers that requested it; however, Caucasian officers were given such training, without regard to seniority.

235.     That Defendants, by and through Payne, Jenkins and Greutman, failed and/or refused to investigate or take seriously Plaintiffs' and similarly situated Security Officers' claims of race discrimination brought internally to Defendants' management and Human Resources personnel directly and through online complaint hotlines and forums, in violation of Defendants' company policies.

236.     That Defendants failed to investigate or address claims of race discrimination alleged in several Charges of Discrimination which were filed with the EEOC, in violation of their own company policies.

237.     That Defendants by and through their management, supervisory and union personnel, including but not limited to Defendants Payne, Jenkins and Greutman, collude, conspire, and cover-up discriminatory acts by their White Security Officers.

238.     That Defendants by and through their management, supervisory and union personnel, including but not limited to Defendants Payne, Jenkins and Greutman, aid and reward Caucasian Security officers and management employees who file false and fraudulent incident reports intended to conceal discriminatory animus, discrimination and bias in the Defendants' RENCEN workplace.

239.    That Defendants by and through their management, supervisory and union personnel, including but not limited to Defendants Payne, Jenkins and Greutman, retaliate against any employee that reports race discrimination and/or discriminatory animus which was used to support violations of black civilians' constitutional rights

240.    That Defendants by and through their management, supervisory and union personnel, including but not limited to Defendants Payne, Jenkins and Greutman, retaliate against any employee that requests incidents of race discrimination and/or violation of individuals' constitutional rights based on race be investigated and/or addressed by management.

241.    Defendants have not terminated or otherwise disciplined any Caucasian security officers or management employees for egregiously falsifying records and/or incident reports in their workplace, despite such being reported with proof substantiating several such violations had occurred; however Black Security Officers that had even clerical errors in their reports were often disciplined and/or terminated.

242.    Defendants' management has a pattern and practice of terminating African American employees from their employment without rationale and/or based on violations of policy that are violated routinely by non-minorities without recourse.

243.    That Defendants failed to take prompt and/or remedial action in response to Plaintiff's and similarly situated Black security officers' complaints of race discrimination in their workplace.

244.    That Defendants management, including but not limited to Payne and Jenkins, failed to adhere to company policies and/or handbooks relative to the handling of race discrimination complaints, arrest procedure, use of force, racial biases and profiling, including the investigation, response and reporting of such in their workplace.

245.    That Plaintiff and similarly situated Black security employees providing security services at the RENCEN that reported violations of the race discrimination, harassment, and/or EEO policies were subjected to adverse employment actions by Defendants, including but not limited to Defendants Jenkins, Payne, Greutman and Mouilleseaux in response.

246.    That Plaintiff Barnes is and was for all relevant times qualified for the positions that he held and the promotional positions that arose but was not selected for the job and/or was rejected or deterred by Defendants Jenkins and/or Payne based on race.

247.    That Defendants Payne and/or Jenkins provided false, pretextual reasons for not awarding and/or selecting Plaintiff Barnes for promotional opportunities; despite the fact that he was more qualified and experienced than the white employees they selected for such positions.

248.    That Defendants, including Payne and Jenkins, conspired, colluded and collaborated to deny Plaintiff Barnes promotional opportunities since 2005.

249.    During Plaintiff's employment, Defendants, including but not limited to Jenkins and Payne, never disciplined any Caucasian RCS security officers for a violation of their "zero-tolerance" EEO and/or policies against discrimination.

250.    That, as a result of Defendants failure to act, investigate and/or otherwise address Plaintiffs' complaints, Plaintiff Robert Barnes and similarly situated individuals suffered severe emotional distress and anxiety, resulting in a stress leave of absence from employment.

251.    That Defendants' management personnel, including but not limited to Defendants Payne and Gruetman, have destroyed evidence of race discrimination, racial profiling, wrongful arrests, false imprisonment, assault and batteries and/or retaliation in their RENCEN workplace, including but not limited to incident reports, call sheets, draft reports, surveillance videos, photos, complaints, reports, audio recordings, arrest reports, investigations, witness statements and use of force forms in order to conceal such acts and in attempt to avoid liability.

252.    White litigation was pending against Defendants for egregious race discrimination and race hostile work environment, Defendants' agents forced Plaintiffs into signing agreements, waivers, notices and acknowledgements, with complete awareness that these employees did not have full access to the language of the agreements they were entering into at the time and forced them to sign electronic acknowledgements entering into such immediately and blindly; these agreements were

not entered into knowingly or voluntarily but through fraud and coercion.

253.    At the time Plaintiff Barnes and other RCS Security Officers were asked to sign waivers, releases and acknowledgements, Defendants purposely provided RCS Security Officers an electronic link with errors so they were not shown the full language of the waivers or releases that they were forced to sign immediately "or be fired*;"* such fraudulent and wrongful actions were intended to conceal, modify and/or limit Plaintiff Barnes and similarly situated Security Officers' ability to bring lawsuits alleging race discrimination or race hostile work environment against Defendants.

254.    Defendants, by and through their management personnel, colluded as to ways they can retaliate against employees who complain of race discrimination in their workplace and routinely put such plans into action against Plaintiff Barnes and other Security Officers who complained.

255.    Defendants only promoted minority employees who demonstrate a willingness to overlook the racial disparity, disparate treatment, racism, race discrimination, hostile work environment, undue force against African American civilians and resulting false police reports by non-minority security officers, and complaints of such by co-workers in Defendants' workplace in furtherance of management's discriminatory animus, intent and/or concealment thereof.

256.    Defendants promoted Michael Baldwin, Jr., a black male, into the position of Security Director in approximately October 2021 but only after he started telling the Black Security Officers and Supervisors that "*when [I am] in charge, there will be no more Black- white issues.*"

257.    Defendant Baldwin Jr. retaliated against Plaintiff Barnes and other similarly situated Security Officers who reported violations of the race discrimination policies in the RENCEN workplace.

258.    That Defendant Baldwin, Jr. has not been given the full authority, decision-making, management duties, responsibilities and/or power that was afforded to his predecessor, Defendant Payne, by Defendants due to his race.

259.    That as a result of Defendants' failure to act, investigate and/or otherwise address Plaintiffs' complaints of discrimination, hostile work environment and retaliation, Plaintiffs suffered severe emotional distress, worry, fear and anxiety, resulting in intermittent medical leaves due to the continuing race discrimination, race hostile work environment and retaliation.

260.    As a result of Defendants' actions, continuing race discrimination, race hostile work environment and retaliation, Plaintiff Robert Barnes and similarly situated Black RCS security officers, past and present, have suffered severe emotional distress, worry, fear, anxiety, and physical manifestations of stress, including but not limited to heart attacks and high blood pressure necessitating several medical leaves in 2023.

261.    As a direct and approximate result of said acts of Defendants, by and through its agents and employees, Plaintiff Robert Barnes and similarly situated Black RCS security officers, past and present, have suffered and will continue to suffer loss of past and future earning capacity, loss of dignity, pain and suffering, and enjoyment of life, extreme mental and emotional distress, severe nervousness, mental anguish, embarrassment and humiliation.

262.    Plaintiff and similarly situated victims of Defendants' acts of race discrimination pray for a judgment of compensatory, liquidated and exemplary damages which are fair and just in favor of the against the Defendants resulting from race discrimination, along with an award of costs and attorney fees so wrongfully incurred.

## COUNT II: INTENTIONAL RACE DISCRIMINATION OF PLAINTIFF AND SIMILARLY SITUATED SECURITY EMPLOYEES IN VIOLATION OF THE CIVIL RIGHTS ACT, SECTION 1981, 42 USC § 1981

263.    Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

264.    Defendants intentionally discriminated against Plaintiff Barnes and similarly situated Black security employees that provide or provided security services at the Renaissance Center based on their race and failed to provide them a work environment free of discrimination in violation of §1981 of the Act. *42 USC §1981*

265.   Federal Civil Rights Laws prohibits race discrimination in the making and enforcement of contracts, including employment. *42 USC § 1981*

266.   The Parties had a contractual relationship for purposes of *42 USC §1981.*

267.   42 USC §1981 includes a federal "anti-discrimination" statute which prohibits race discrimination by employers against employees. *Id.*

268.   Defendants are and were, for all relevant time periods herein, joint employers of Plaintiff Barnes and similarly situated Black security employees that provided and/or provide security services at the Renaissance Center under the color of law.

269.   Defendants G4S, GM and RCMC, by and through their employees, contractors, supervisory personnel, agents and assigns, intentionally discriminated against Plaintiff and other similarly situated individuals based on their race.

270.   Defendants' intentional race discrimination resulted in a contractual injury to Plaintiff and similarly situated individuals.

271.   Defendants' actions prevented Plaintiffs' enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship between him and Defendants.

272.   Defendants G4S, GM and RCMC, by and through their non-minority employees, contractors, supervisory personnel, agents and assigns, intentionally

discriminated against Plaintiffs based on their race.

273.   Race was the "but for" factor in Plaintiff Barnes' and similarly situated Black RCS security employees' loss of protected and/or constitutional rights, including but not limited to their rights to be free from discrimination in employment.

274.   Defendants' Rebar, Wiley, Zani, Hackett, Childs, Bayer, and Lacelle actions were clearly based on race as evidenced by the historical violations and complaints of racial bias, discrimination, and motives of these white RCS officers; yet, management, including Greutman, Mouillleseaux, Jenkins and Payne, refused to take any action to address or end such intentional race discrimination.

275.   Defendants management, including Payne and Jenkins, were aware that several of their white security police officers were former police officers with racial biases; yet hired them into positions of power, trust and authority, including but not limited to armed Customs Police Officer positions and/or Security Police Officers which permitted them to be a catalyst to promote race discrimination and harassment and create the race hostile work environment that permeates the Renaissance Center security department.

276.   Defendants RCMC and G4S were aware that white security police officers were previously terminated from prior employment for violating the constitution rights of others, including violations of their Fourth Amendment and

Due Process rights based on race; yet Defendants still made the decision to hire them as a security officer at the Renaissance Center in Detroit Michigan, allowing them to harass, assault and discriminate against Black visitors and employees of the Renaissance Center.

277.   Despite Plaintiff's and other Guests' and co-workers complaints against Defendants' white officers for acts of race discrimination, racial epithets, bias, wrongful arrest, racial profiling, harassment, assault and use of excessive and unwarranted force against Black individuals, many of which who received promotions of their employment despite their intentional disregard for violating the constitutional rights of others based on their race while holding a position of power.

278.   Defendants permitted and allowed Caucasian security police officers who exhibited racial bias continue to hold a position of power, trust and authority, resulting in a severe race hostile environment at the Renaissance Center which continues to date.

279.   Acts of unwarranted/excessive use of force against Black civilians by white officers were condoned and complaints were ignored by Defendants' management, including but not limited to Defendants Jenkins and Payne.

280.   Defendants maliciously and wantonly disregarded Plaintiff's and similarly situated individuals who have been and/or continue to be victims of Defendants' Jenkins, Payne, Greutman, Mouilleseaux, Rebar, Wiley, Zani, Bayer,

Hackett, Childs and/or Lacelle's discriminatory actions in violation of their constitutional rights.

281. Defendants' Greutman, Mouilleseaux, Rebar, Wiley, Zani, Bayer, Hackett, Childs and/or Lacelle's actions, constituted intentional and reprehensible misconduct based on race discrimination which was not addressed by Defendants' management personnel, including but not limited to Payne, Jenkins, Baldwin, Jr., and Greutman,

282. Defendants' named officers' actions constituted intentional and reprehensible race discrimination which was and is condoned and perpetuated by Defendants' managements' failure to act including but not limited to Payne, Jenkins, Baldwin, Jr., and Greutman,

283. Defendants are aware that several of their Caucasian male security police officers harbor racial biases; yet hired them into *armed positions of power,* trust and authority which permitted them to be a catalyst to promote race discrimination and harassment and create the race hostile work environment that permeates the Renaissance Center security department.

284. Defendants' management is and was deliberately indifferent to these risks.

285.   Defendants' officers failed to deescalate situations involving the arrests of Black visitors and/or employees of the Renaissance Center, in violation of Defendants' company policies without consequence; resulting in an atmosphere of acceptance of unequal protection and unequal application of policies and directives based on race.

286.   None of Defendants' Security Officers that were reported as violating the discrimination policies were disciplined or counseled by Defendants G4S, GM, RCMC, Jenkins, or Payne for their racially motivated use of unwarranted and excessive use of force against Black guests and/or employees of the Renaissance Center.

287.   Defendants'   Black   security   officers   are   and   have   been disproportionately terminated and/or laid off from their employment by Defendants' management, including by Jenkins and Payne, compared to their similarly situated white counterparts who are not subject to termination for the same or similar actions.

288.   Plaintiff Barnes and similarly situated Black security employees that provide and/or provided security services at the Renaissance Center are and/or were concerned and fear for the safety and life of Black visitors and employees of the Renaissance Center and reported such to upper management to no avail.

289. Defendants each have a zero-tolerance policy against race discrimination, excessive force, racial profiling and/or harassment based on race in their workplace and fail to enforce such.

290. Defendants' managements' failure to take any action in response to severe acts of race discrimination resulted in a race hostile work environment for Plaintiff and similarly situated Black Security Officers, past and present, that provided security services on the RENCEN premises.

291. As a direct and proximate result of said acts of Defendants, by and through its agents and employees, Plaintiff and similarly situated individuals have suffered and will continue to suffer loss of dignity, pain and suffering, and enjoyment of life, extreme mental and emotional distress, severe nervousness, mental anguish, embarrassment and humiliation.

292. Plaintiff and similarly situated individuals pray for a judgment of compensatory, liquidated, punitive and exemplary damages which are fair and just in their favor against the Defendants resulting from Defendants' actions, along with an award of costs and attorney fees so wrongfully incurred.

**COUNT III: RACE DISCRIMINATION OF PLAINTIFF AND SIMILARLY SITUATED SECURITY OFFICERS IN VIOLATION OF THE CIVIL RIGHTS ACT, 42 USC §1983**

293.   Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

294.   Defendants discriminated against Plaintiff Barnes and similarly situated Black security employees that provide or provided security services at the Renaissance Center based on their race and failed to provide them a work environment free of discrimination in violation of §1983 of the Act. *42 USC §1983*

295.   At all times relevant to this matter, Defendants' security officers, including but not limited to Rebar, Wiley, Zani, Childs, Hackett, Bayer, Jenkins, Payne and Mouilleseaux had the authority to arrest a person without a warrant as vested by state law. *MCL §338.1080*

296.   These security officers, were acting under the color of state law when they committed racially discriminatory actions towards Black co-workers and Guests based on their race in violation of the constitutional rights afforded under the 4th and 14th Amendments of the US Constitution. *42 USC §1981; 42 USC §1983*

297.   These security officers, were acting under the color of state law when they arrested, stopped, harassed, searched, seized and/or or detained Black individuals without probable cause and violated constitutional rights afforded under the 4th and 14th Amendments of the US Constitution. *42 USC §1981; 42 USC §1983*

77

298.   Plaintiffs and similarly situated Black security officers working on the premises of the RENCEN  have the constitutional right to be free from race discrimination in employment.

299.   Defendants Rebar, Wiley, Zani, Childs, Bayer, Lacelle, Hackett and Mouilleseaux's entitlement to perform security police services at the RENCEN was derived directly from their state licensure and certification under PA330.

300.  Licensed private security agencies, such as Defendants GM and RCMC, are empowered by the state to hire licensed private security police officers to perform security services with arrest authority while on duty, in uniform and on the premises of their employer.

301.   Defendant GM, RCMC, G4S, Jenkins and Payne's entitlement to operate a Private Security Police Agency on the premise of the RENCEN is derived directly from state licensure and certification under PA330.

302.   For all relevant time periods, Defendants GM, G4S, RCMC  and their security officers and management personnel working in the Renaissance Center Security Department were clothed with the authority of the State of Michigan as PA330 licensed Security Police Officers. *MCL §764.15*

303.   Defendants exercised power possessed by virtue of state law and made possible only because Defendants were clothed with the authority of state law.

304.    The State of Michigan provided a mantel of authority that enhanced the power of Defendants by delegating arrest authority to Defendants as security police officers; as such they were obligated to do so without regard to race.

305.    Defendants' Renaissance Center security officers, including but not limited to Rebar, Wiley, Zani, Childs, Hackett, Bayer, Lacelle and Mouilleseaux exercised powers exclusively reserved to the state when they conducted arrests while on the property of their employer, during work hours and while wearing the security police uniform.

306.    Defendants are public employers.

307.    Defendants hold a security police agency license which enables Plaintiffs to be state actors licensed under the State of Michigan for all purposes under the Act.

308.    Defendants and Defendants' agents that were acting under the color of state law while providing security services at the RENCEN.

309.    Defendants Jenkins and Payne were clothed with the authority of the state when they intentionally discriminated against Plaintiffs and violated their constitutional rights afforded by the 4th and 14th Amendments of the Constitution.

310.    That the State of Michigan delegated its authority to Defendants, private actors.

311. Defendants' management acted with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the race discrimination and constitutional violations.

312. Defendants Jenkins and Payne made adverse employment decisions with discriminatory intent and purpose in violation of the equal protection under §1983.

313. Racial animus motivated the employment decisions of Defendants' management, including but not limited to Jenkins and Payne, as it related to Plaintiff and similarly situated Black officers.

314. Race was a motivating factor in Defendants' Jenkins and Payne's discriminatory treatment.

315. Race was the "but for" factor in Plaintiff Barnes' and similarly situated Black RCS security employees' loss of protected and/or constitutional rights, including but not limited to their rights to be free from discrimination in employment.

316. Defendants' Caucasian management employees conspired to deprive Plaintiff and similarly situated Black officers a workplace free of discrimination and/or violations of Black Guests' equal protection of the laws and constitutional rights afforded by the 14th Amendment to the US Constitution because of their race.

317.   The conduct of Defendants and Defendants' agents deprived the Plaintiff and similarly situated individuals of equal protection of the law and associated constitutional rights.

318.   Defendants' management, including Jenkins, Payne, Mouilleseaux and Greutman retaliated against Plaintiff Barnes and similarly situated Black security officers who complained and/or opposed race discrimination in Defendants' employ.

319.   As a direct and proximate result of said acts of Defendants, by and through its agents and employees, Plaintiff and similarly situated Black security officers, past and current, have suffered and will continue to suffer loss of dignity, pain and suffering, and enjoyment of life, extreme mental and emotional distress, severe nervousness, mental anguish, embarrassment and humiliation.

320.   Plaintiff Barnes and similarly situated individuals pray for a judgment of compensatory, liquidated, punitive and exemplary damages which are fair and just in their favor against the Defendants resulting from Defendants' actions, along with an award of costs and attorney fees so wrongfully incurred.

**COUNT IV: PLAINTIFF AND SIMILARLY SITUATED SECURITY EMPLOYEES ENDURED A HOSTILE WORK ENVIRONMENT BASED ON RACE IN VIOLATION OF THE ELLIOTT LARSEN CIVIL RIGHTS ACT AND THE CIVIL RIGHTS ACT 42 USC §1981 AND 42 USC §1983**

321. Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

322. The conduct of the Defendants, by and through their management and supervisory personnel, has discriminated against the Plaintiff Robert Barnes based on race in violation of the Michigan Elliott Larsen Civil Rights Act *.MCLA §37.2101* et. seq.; the Civil Rights Act, 42 USC §1981 and §1983 all relevant sections of such Acts.

323. The conduct of the Defendants, by and through their management and supervisory personnel, including but not limited to Payne, Jenkins, Greutman and Mouilleseaux, allowed the discrimination against Plaintiff Robert Barnes and similarly situated individuals to permeate; resulting in a race hostile work environment in violation of the Michigan Elliott Larsen Civil Rights Act. *MCLA §37.2101 et. seq.; §1981 and/or §1983 of the Civil Rights Act of 1871* as amended all relevant sections of the Act.

324. Defendants' management, including Defendants Payne, Jenkins, Greutman and Mouilleseaux, permitted and condoned acts of race discrimination and allowed such to permeate its work environment and to continue unabated from

82

at least 2016 to present.

325.   Plaintiffs were subject to a hostile work environment in violation of *42 U.S.C. § 1981 and/or §1983.*

326.   Defendants' conduct was objectively severe and/or pervasive in that it created an environment that a reasonable person would find hostile and/or abusive.

327.   Defendants created an environment that the Plaintiff and similarly situated individuals subjectively perceived as hostile and/or abusive.

328.   Defendants' actions occurred because of the Plaintiff's and similarly situated past and present Black security employees of the Renaissance Center security department protected characteristic; they were all of the African American race.

329.   Despite Plaintiff's and other similarly situated security officers' consistent complaints regarding the hostile work environment, nothing was done by Defendants' management to cease the hostile work environment or to ensure Plaintiffs' safety during their term(s) of employment.

330.   Plaintiff and similarly situated employees experienced frequent and continual acts and incidents of race discrimination while working at RCS on a regular basis from 2019 to present which went unaddressed by Defendants Payne, Baldwin, Jr, Jenkins and/or Greutman.

331.   Defendants' actions and the discrimination experienced by Plaintiffs was both physically threatening and humiliating and unreasonably interfered and continues to interfere with the Black employees' work performance.

332.   Defendants' management, by and through their actions, condoned and created a race hostile work environment for Plaintiff and similarly situated individuals during their employment by refusing to investigate, address and/or discipline employees responsible for the race discrimination as set forth in their company handbooks and policies.

333.   That Defendants through counsel contacted a former Black security officer to threaten and intimidate him following the issuance of the EEOC Right to Sue Letter by stating, "whatever you do is going to fail," and stating "your EEOC complaints are null and void, you can't use anything" against the company.

334.   That the Plaintiff and similarly situated Black security officers routinely witnessed assaults and battery, wrongful arrests, false imprisonment, harassment, racial profiling, violation of constitutional rights, race discrimination and general brutality towards Black visitors to the Renaissance Center premises by their white counterparts and reported such violations of company policy and state law to management to no avail.

335.   Defendants and its agents' actions were intended to harass, embarrass and humiliate the Plaintiffs and limit their rights of recourse for discriminatory and retaliatory actions.

336.   As a direct and proximate result of said acts of Defendants, by and through their agents and employees, Plaintiffs have suffered and will continue to suffer loss of past and future earning capacity, loss of dignity, pain and suffering, and enjoyment of life, extreme mental and emotional distress, severe nervousness, mental anguish, embarrassment and humiliation.

337.   Plaintiffs pray for a judgment of compensatory, liquidated and exemplary damages which are fair and just in favor of the against the Defendants resulting from the creation of race hostile work environment, along with an award of costs and attorney fees so wrongfully incurred.

**COUNT V: FAILURE TO PROMOTE BASED ON RACE IN VIOLATION OF ELLIOTT LARSEN CIVIL RIGHTS ACT AND THE CIVIL RIGHTS ACT, §1981 AND/OR §1983,** *42 USC §1981; 42 USC §1983*

338.   Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein

339.   The conduct of the Defendants, by and through their management and supervisory personnel, constitutes a failure to promote Plaintiff and similarly situated Black security employees working at the Renaissance Center based on their race in violation of the *Michigan Elliott Larsen Civil Rights Act MCLA §37.2101 et. seq.; MCL §37.2211 et. seq*., *The Civil Rights Act of 1871 a*s amended, codified as, *42 USC §1981 and 42 USC §1983* and all relevant sections of such Acts.

340.   That Defendants Jenkins and/or Payne were public actors engaged in actions in promoting less qualified candidates based on race which resulted in unconstitutional harm to Plaintiffs and similarly situated past and present Black Security Officers at the RENCEN.

341.   In 2005, eleven years after his hire, Plaintiff Barnes was promoted to Shift Supervisor by Defendants; this position included more responsibility but less pay as Plaintiff was no longer eligible for overtime differentials or pay.

342.   In contrast, after approximately six months of only part-time experience, Defendants promoted a white, female employee to Shift Supervisor and then promoted her again less than a year later, to a Director level Field Training

86

Coordinator position earning more pay than Plaintiff.

343.   Management promoted Plaintiff to Executive Protection Specialist on approximately May 13, 2006 to aid in the security of GM executive level VIPS and foreign dignitary visitors to the Renaissance Center.

344.   At Defendants' request, Plaintiff was certified as an Executive Protection Specialist after completion of a course given by Robert L. Oatman in Townson, Maryland.

345.   To date, Plaintiff has never received any additional compensation for the services he performed for Defendants as an Executive Protection Specialist or for obtaining the certification at Defendants' request; similarly situated white male GM employees are provided additional and/or more compensation than Plaintiff for the same job.

346.   In approximately May 2008, in addition to performing the job duties of a Security Police Officer and Shift Supervisor, Plaintiff Barnes was given the additional responsibility of becoming a PPCT Instructor, teaching pressure point control tactics and use of force directives to Security Police Officers at the Renaissance Center. Plaintiff has never received additional compensation for the extra duties associated with that role.

347.   Since approximately 2016, Plaintiff Barnes has been the Senior PPCT Instructor for Defendants' security department which included additional responsibilities and duties, including but not limited to reviewing surveillance videos, recordings, incident reports, and/or interviewing witnesses following any use of force by a Security Police Officer at the Renaissance Center and reporting his findings to upper management.

348.   Plaintiff Barnes has never been compensated for the extra responsibilities and duties he performs as a Senior PPCT Instructor or Executive Protection Specialist for Defendants.

349.   Through information and belief, Defendants' Caucasian employees that provide additional duties and/or job responsibilities are compensated for such while Black employees are not compensated for such.

350.   That during Plaintiffs' employment, senior supervisor positions were awarded to white males over Black counterparts with more seniority and experience.

351.   That during Plaintiffs' employment, Defendants' senior supervisor position was purposely posted for only a few days during the time that Supervisor Barnes took his one week paid vacation leave, in Defendant's management's effort to prevent him from applying and/or being considered for such.

352.   That during Plaintiff Barnes' one-week paid vacation leave, Defendants posted, interviewed and chose a candidate for the Senior Supervisor position; a white male employee with less experience and seniority that had been previously accused of race discrimination in the Defendants' workplace.

353.   That during Plaintiffs' employment, the Training Coordinator/Director position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

354.   That during Plaintiffs' employment, the Fire Security Specialist position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

355.   That during Plaintiffs' employment, Defendant G4S' Fire Coordinator position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

356.   That during Plaintiffs' employment, the G4S' Fire Coordinator promotion was awarded to a Caucasian officer who had several prior race discrimination and race hostile work environment complaints launched against him by several Black officers and guests/visitors to the RENCEN.

357.   That during Plaintiffs' employment, the Fire Safety Officer/Director position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

358.   That during Plaintiffs' employment, the Fire Safety Officer/Director promotion was awarded by Defendants Jenkins and/or Payne to a Caucasian officer that had several prior race discrimination and race hostile work environment complaints launched against him by several Black officers and guests/visitors to the RENCEN.

359.   That during Plaintiffs' employment, the Emergency Manager position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

360.   That during Plaintiffs' employment, the Emergency Manager promotion was awarded by Defendants Jenkins and/or Payne to a Caucasian officer that had several prior race discrimination and race hostile work environment complaints launched against him by several Black officers and guests/visitors to the RENCEN.

361.   That during Plaintiffs' employment, the Fire & Emergency Response Specialist position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

362.   That during Plaintiffs' employment, the Fire & Emergency Response Specialist promotion was awarded by Defendants Jenkins and/or Payne to a Caucasian officer that had several prior race discrimination and race hostile work environment complaints launched against him by several Black officers and guests/visitors to the RENCEN.

363.   That during Plaintiffs' employment, several Caucasian male employees of the Renaissance Center Security Department were promoted and/or hand-picked and appointed to GM Tactical Team Officers by Defendants Jenkins and/or Payne without applying, interviewing, posting and/or making such opportunities available for Plaintiff Barnes or similarly situated Black officers.

364.   That during Plaintiffs' employment, several Caucasian male employees of the Renaissance Center Security Department were promoted and/or hand-picked and appointed to join the GM executive team by Defendants Jenkins and/or Payne without applying, interviewing, posting and/or making such opportunities available for Plaintiff Barnes or similarly situated Black officers.

365.   That Defendants, by and through Jenkins and/or Payne, failed to post the Field Training Director opening, contrary to company policy, prior to giving it to Marginean, a white female who had violated the constitutional rights of several Black individuals and guests of the Renaissance Center which were previously reported to upper management.

366.   That during Plaintiffs' employment, the Field Training Officer position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees by Jenkins and/or Payne; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

367.   That during Plaintiffs' employment, the Field Training Officer promotion was awarded by Defendant Payne and/or Jenkins to a Caucasian officer that had several prior race discrimination and race hostile work environment complaints launched against him by several Black officers and guests/visitors to the RENCEN.

368.   That during Plaintiffs' employment, the Lead Customs Protection Officer position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

369.   That during Plaintiff's employment, the Lead Customs Protection Officer promotion was awarded by Defendants Payne or Jenkins to a Caucasian officer who had several prior race discrimination and race hostile work environment complaints launched against him by several Black officers and guests/visitors to the RENCEN; Plaintiff was not considered for this position despite being qualified for it.

370.   That during Plaintiffs' employment, the Senior Site Coordinator position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees; thus, preventing Plaintiff Barnes from being considered for such promotion.

371.   That during Plaintiffs' employment, the Security Specialists position(s) were not posted prior to the interview, selection, appointment and/or promotion of Caucasian employees by Defendants Payne and/or Jenkins; thus, preventing Plaintiff Barnes and other similarly situated Black officers from being considered for such promotion.

372.   That in approximately September 2021, Defendants' management posted a Security Coordinator position opening.

373.    That in September 2021, Plaintiff Barnes inquired into the Security Coordinator position and was told by Defendant Payne that the position was an "assistant" position that would constitute a demotion for him and encouraged him

not to apply.

374.   Plaintiff Barnes later found out that the Security Coordinator position was considered #2 in charge of the Renaissance Center Security department and did not constitute a demotion from his shift supervisor position as he was falsely informed by Defendants' management in effort to keep him and other similarly situated Black officers from applying for such.

375.   That Plaintiff Barnes and similarly situated Black employees that provided and/or continue to provide security services to Defendants at the Renaissance Center are and continue to be paid less than their non-minority counterparts that preformed substantially similar work for Defendants based on their race in violation of *MCL §37.2211 Section 211, §1981, and/or §1983.*

376.   Defendants' Black employees were skipped over for promotion while less senior and/or less experienced Caucasian employees were provided such opportunity for advancement.

377.   As a direct and proximate result of said acts of Defendants, by and through their agents and employees, Plaintiffs have suffered and will continue to suffer loss of past and future earning capacity, loss of dignity, pain and suffering, and enjoyment of life, extreme mental and emotional distress, severe nervousness, mental anguish, embarrassment and humiliation.

378.   Plaintiffs pray for a judgment of compensatory, liquidated and exemplary damages which are fair and just in favor of the against the Defendants resulting from the failure to promote, along with an award of costs and attorney fees so wrongfully incurred.

**COUNT VI: RETALIATION OF PLAINTIFF AND SIMILARLY SITUATED INDIVIDUALS IN VIOLATION OF ELLIOT LARSEN CIVIL RIGHTS ACT, §1981 AND §1983 OF THE CIVIL RIGHTS ACT, AND INTERFERENCE WITH FAMILY MEDICAL LEAVE ACT LEAVES**

379.   Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

380.   The conduct of Defendants, by and through its management and employees have had, and continues to have a policy, pattern and practice of retaliation against the Plaintiff and similarly situated individuals because they protested and/or filed internal claims, complaints and/or EEOC Charges of Discrimination against Defendants for unlawful race discrimination, retaliation, violence and threatening behavior, and violations of company policy, in violation of *Michigan Elliott Larsen Civil Rights Act ("ELCRA") MCLA §37.2101;* §37.2701 *et. seq.; §704(a) of the Civil Rights Act of 1871 as amended and codified in 42 USC §1981 and 42 USC §1983 and the Family and Medical Leave Act of 1993 29 U.S.C. §§ 2601–2654 (2006).*

381.   An employee shall not be retaliated against or discriminated against for opposing a violation of *Michigan's Elliott-Larsen Civil Rights Act ("ELCRA")* or for

95

making a charge, filing a complaint, or participating in a proceeding/investigation under *ELCRA. MCL §37.2701*

382.    Defendants retaliated against their employees, including Plaintiff Barnes, and discriminated against them for opposing a violations of *Michigan's Elliott-Larsen Civil Rights Act, The Civil Rights Act of 1871*, including *§1981* and *§1982*, and for making a charge, filing a complaint, or participating in a proceeding/investigation under those statutes. *MCL §37.2701; 42 USC §1981; 42 USC §1983*

383.    That Plaintiff Barnes and similarly situated employees that reported race discrimination violations in the RCS workplace were participating in protected activity under the Acts. *MCL §37.2701; 42 USC §1981; 42 USC §1983*

384.    Plaintiff Barnes and similarly situated employees that reported race discrimination violations in the RCS workplace was engaged in protected activity at the time Defendants Jenkins, Baldwin, Jr., Payne and/or Greutman took adverse action against him.

385.    Plaintiff Barnes and similarly situated employees that reported race discrimination violations in the RCS workplace availed themselves of a protected right by filing complaints of race discrimination and excessive force based on race with public bodies, namely, GM/RCMC's Private Security Police Agency, MCOLES,  the Michigan Attorney General's office.

386.    Defendants took adverse action against Plaintiff and others for engaging in protected concerted activity.

387.    Plaintiff was adversely affected by Defendants' employment decisions following his protected activity and/or following reporting of his intent to engage in such protected activity.

388.    Similarly situated Security Officers that reported race discrimination in Defendants' workplace likewise experienced adverse employment actions, including write-ups, suspensions and/or termination from employment.

389.    There was a "close temporal proximity" between the Plaintiff's retaliatory discipline and his reports of race discrimination to management and to a Private Security Police Agency, reports of discrimination and excessive force based on race with MCOLES/MSP, intent to pursue a complaint with the Attorney General and filing his complaint with the Attorney General Wage, thus evidencing a causal connection between Plaintiff's intent, his complaints and Defendants' adverse action, including counseling, harassment and disciplinary action. *29 U.S.C. §215*

390.    Supervisors who did not report race discrimination in the workplace were not compelled by Defendants to take courses and training  as Plaintiff was.

391.    *The Civil Rights Act of 1871* as amended and codified, including *42 USC §1981,* was intended to prohibit employers from retaliating against individuals *for attempting to vindicate the rights of minorities* protected by the statute itself.

97

392.   That Plaintiff Barnes reported such violations of law and constitutional rights to Defendants management, including Defendant Payne and/or Jenkins, regularly from 2016 to present without satisfactory response; all such officers remained employed, without disciplinary action on their record and remain eligible for PA330 arrest authority certification.

393.   That Plaintiff Barnes was retaliated against by Defendants' management, including but not limited to Defendants Payne, Jenkins and Greutman, for attempting to vindicate the rights of Black civilians and Black security officers at the RENCEN.

394.   That in retaliation for his various complaints of race discrimination, on behalf of himself and other similarly situated individuals, Plaintiff was passed over for promotion by Defendants Payne and Jenkins with regards to the Security Director position in October 2021.

395.   Defendants Payne and Jenkins selected and/or hand-picked another employee with less seniority, training and experience that had not brought any race discrimination complaints and/or attempted to vindicate the rights of Black civilians and/or security officers which became clear when he was told by this candidate, *"when [I am] in charge, there will be no more Black- white issues."*

396.   The Security Director position that was provided to Baldwin, Jr. in October 2021 was not previously posted; Plaintiff Barnes was not interviewed and/or considered by Defendants Jenkins and/or Payne, due to his previous complaints of race discrimination and for complaining against management's refusal to investigate and/or address race discrimination in the workplace.

397.   On October 16, 2022, Plaintiff sent an inquiry to Defendants into why his role, duties and responsibilities as a "shift supervisor" differ from white supervisors after a deposition in a federal lawsuit made him question whether he has been stripped of some authority following his reports of race discrimination on behalf of himself and other Black security police officers. See *Case No. 21-11846-CV*

398.   Defendants management, including Defendant Jenkins and RCS Security Director, failed to respond or address Plaintiffs' concerns of retaliation set forth in his October 16, 2022 letter to Defendants' management.

399.   On October 16, 2022, Plaintiff sent an inquiry to Defendants regarding the validity of the Defendants' PA330 Security Police Agency license after his deposition in a federal lawsuit raised concerns about who employs and supervises PA330 Security Police Officers working in the Renaissance Center security department.

400.   Defendants failed to respond or address Plaintiffs' concerns of retaliation set forth in his October 16, 2022 letter to Defendants' management.

401.   Plaintiff Barnes met with Defendant Payne on October 20, 2020 to discuss officers' behavior, including racial biases, discrimination and concerns of use of excessive force by specific Caucasian security police officers based on illegal considerations of race.

402.   On November 3, 2020, Defendant Payne called Plaintiff Barnes into his office, not to discuss his serious concerns of officers' racial biases, discrimination and use of excessive force based on illegal considerations of race that he brought days prior; rather, Barnes was confronted with complaints *against him* brought by the Caucasian officers he specifically complained about days prior, including Defendants Rebar and Lacelle.

403.   On approximately November 4, 2020, Plaintiff Barnes met with Defendant Jenkins to discuss the use of excessive force by Defendants' white officers against a black male which occurred on October 7, 2020; during that discussion Barnes and Jenkins discussed a similar example of excessive force based on race that occurred in April 2017 during the arrest of Obie Trice, Jr., a black male visitor to the Marriott Hotel located in the Renaissance Center.

404.   Barnes told Defendant Jenkins that the officers involved in both instances of excessive and unreasonable force should have been terminated for their brutal assaults which he opined was based on the race of the suspects.

405.   In response, Defendant Jenkins informed Barnes that, as a GM Executive, he has established a "Use of Force Board," which Barnes will be included on, in order to ensure any concerning uses of force are timely reviewed, investigated and addressed moving forward; however, such was never put into motion.

406.   On approximately November 5, 2020, Plaintiff met with RCS management and informed Defendant Payne and other management personnel about GM's Use of Force Board to which Payne replied, "[w]e are not looking at *everything*," meaning, uses of force against Black civilians will continue to go unaddressed.

407.   After months of receiving no straight answers or decisions on recommended disciplinary action by Defendants' management, Plaintiff Barnes felt he had the professional responsibility to inquire into the reporting requirements for use of force as a PA330 Security Police Agency license as well as the validity of the license that he and other security police officers work under in providing security services with arrest authority on the Renaissance Center premises.

408.   On May 20, 2022, Plaintiff Barnes filed an inquiry and report of concern with Michigan Commission on Law Enforcement (MCOLES), a division of the Michigan State Police, in order to ensure that he and the other security police officers providing security services at the Renaissance Center were properly reporting uses of force and/or were not working under a PA330 license that was fraudulently obtained by Defendants after concerns arose during his aforementioned deposition.

409.   In July, 2022, after not hearing back from MCOLES/Michigan State Police in response to his concerns related to excessive use of force against black civilians, he followed up with the agent in charge of Defendants Jenkins, GM, and RCMC's Private Security Agency License, Danny Rosa, without response.

410.   Plaintiff Barnes did not hear back from MCOLES or the Michigan State Police regarding his inquiries into the validity of Defendants' PA330 License, the reporting requirements for such or regarding the serious use of force being utilized against Black civilians at the RENCEN *until November 2023* when a Fox2 Reporter contacted MCOLES and the Michigan State Police regarding Defendants' failure to act in response to Plaintiff Barnes' complaint.

411.   Defendants' management was all aware that Plaintiff Barnes complained to GM, G4S and RCMC management and directors regarding race discrimination, racial biases of several Caucasian officers as well as their use of

excessive force and failure to follow the use of force continuum or directives without consequence and was retaliated against in response.

412. Defendants were aware that Plaintiff Barnes filed an inquiry and complaint with MCOLES/the Michigan State Police relative to their PA330 Private Security Agency License and was retaliated against in response.

413. Following his complaint and inquiry to MCOLES, Defendants' management began to refer to Plaintiff Barnes as "officer" as opposed to "supervisor," further demeaning and trying to minimize any semblance of authority held by Plaintiff Barnes.

414. Following his complaints to management and MCOLES, Defendants' management started to erode Supervisor Barnes' supervisory authority, disciplinary power, and stripped him of the ability to investigate complaints of race discrimination in the RCS workplace.

415. That in the Summer of 2023, Plaintiff reported an incident to Defendant management whereupon he believed a Caucasian officer failed to deescalate an incident and provoked a Black female into an altercation resulting in the officer being punched by this woman's husband. Plaintiff wanted this incident reviewed for an abuse of authority, racial profiling, abuse of authority, and unwarranted detention without probable cause which he believed was based on the race of the visitors to the Renaissance Center; however management refused.

416.   In response to Plaintiffs' Summer 2023 report of concern based on racial bias and/or profiling, the head of security responded that the security officer already "learned his lesson" and "got what he deserved" by being punched by a Black citizen and saw no reason to issue counseling or disciplinary action in response.

417.   Plaintiff Barnes reported management's failure to act in accordance with company policy to Human Resources Melendez immediately after this incident and had her review the surveillance footage in hopes that action would be taken against this officer; however, to date, he has not received any response to his concern.

418.   Shortly thereafter, Caucasian officers colluded in reporting that Plaintiff Barnes offended them by telling him to "mind his own business" and "focus on his own duties."

419.   Defendants Management refused to take any action in response and would not counsel the offending employee in regards to de-escalation tactics or inclusion training.

420.   In retaliation for this complaint, the Caucasian employee and his co-worker falsified a complaint against Plaintiff Barnes in effort to get management to take disciplinary action against him.

421.   When management confronted Plaintiff Barnes about the "incident" brought by a white subordinate, Plaintiff Barnes informed management that this is what the Caucasian employees have done in the past in order to get management to

retaliate against those employees that report their acts of discrimination to management.

422. Plaintiff Barnes reported this retaliatory attempts by Defendants' Security Police Officers to Defendant Baldwin, Jr. and other members of Defendants' management and human resources personnel.

423. Plaintiff Barnes' complaints of white security officers' race discrimination and racial profiling or the officers' wrongful attempts to get Defendants' management to write-up Barnes in retaliation for his reports against them was never investigated or taken seriously by Defendants' management; despite his repeated and continual attempts.

424. Barnes explained again to Defendants' management and Human Resources that this matter was blown out of proportion due to his reports of race discrimination against one of the "witnessing" officers and was in retaliation for his complaints.

425. Plaintiff Barnes' complaints of retaliation were not addressed or investigated; however, during a management meeting on approximately April 29, 2023, Plaintiff was told he would not receive discipline in response to his subordinate's allegations but would receive the same management training that all supervisors would be receiving regarding counseling employees privately, in order to avoid unnecessary disruptions in the workplace.

426.   Due to severe emotional distress following management's retaliation, Plaintiff Barnes was taken off work by his therapist and/or physicians from May through mid-August 2023.

427.   Plaintiff qualified under the FMLA for leave and was approved for such by Defendants.

428.   That Defendants interfered with Plaintiff's rights under the FMLA by harassing him and/or threatening to terminate him while he was on leave and retaliated against him for taking a leave under the FMLA by disciplining him upon his return from leave although they deciding no such discipline would be issued for such before Plaintiff took a leave in violation of the FMLA. *Family and Medical Leave Act of 1993 29 U.S.C. §§ 2601–2654 (2006).*

429.   During his qualified medical leave, Defendants attempted to cut off his medical insurance without proper notice, deny a valid medical leave, harass him with multiple requests for documents that were already provided, provided inconsistent reporting directives by a third-party company and management; and attempted to terminate him while on a qualified medical leave in violation of company policy.

430.   During his leave on approximately June 6, 2023, Plaintiff Barnes reported retaliatory attempts by white officers and their racial profiling of black individuals in the RENCEN; Barnes reiterated his retaliation and race discrimination concerns in effort for them to be addressed and investigated by Defendants pursuant

to company policy; however, Defendants merely responded that they would discuss such upon his return from leave but that never occurred.

431.   That on approximately August 15, 2023, upon return from leave, Plaintiff Barnes became aware of an incident where a security officer working for Defendants brutally attacked, punched, slammed, assaulted an elderly Black lady without probable cause or display of resistance.

432.   Plaintiff Barnes reviewed the surveillance video which captured this incident and opined that excessive and unwarranted force was utilized by the officer in charge of the arrest and further that this individual violated company policy, state law and committed a crime warranting arrest.

433.   Plaintiff met with Defendants' director level training coordinator about the review for the use of force utilized by Defendant Zani and Childs on August 14, 2023; the Training Coordinator opined that **"if the State knew this was going on, they would take away our license."**

434.   Plaintiff was clear from this conversation that Defendants' director had no intention of notifying the State of Michigan or Michigan State Police about this serious abuse of force.

435.   Defendants' Training Coordinator also mentioned to Plaintiff that he believed the attacking officer set up the entire incident and planned on arresting her before he even approached or provoked her, ostensibly due to her race.

436. Defendants' Training Coordinator also opined after reviewing the surveillance videos that the attack **"looks real bad" – especially since it's a male officer punching a woman in the face."**

437. Defendants' management stated a review of the use of force would be conducted and that Plaintiff would be a part of such; however, this review meeting never occurred and the offending officer was kept in his position, given a gun by Defendants to use while he is on duty.

438. To Plaintiff's knowledge, Defendants did not notify the State of Michigan or Michigan State Police of the attack on this Black civilian or any other incidents of excessive and/or unwarranted use of force utilized by security officers at Renaissance Center Security.

439. After waiting a significant amount of time for response to his complaints by the Michigan State Police and MCOLES, Plaintiff came to the understanding that change would only come by reporting these incidents to the Michigan Attorney General which he did on August 21, 2023.

440. Plaintiff Barnes did not receive any response from the Michigan Attorney General but Defendants by and through their agents and assigns have informed Plaintiff that they are aware of his reports and they retaliated against him as a result.

441. Plaintiff Barnes' complaint with the Michigan Attorney General described Defendants' violations of §1983 use of excessive and/or unwarranted use of force by Caucasian officers against Black civilian visitors to the Renaissance Center and reported his fear that someone will get killed if Defendants' rogue and racially biased actions are permitted to continue unabated.

442. Due to the serious nature of these incidents and lack of attention or response by Defendants, MCOLES, Michigan State Police and/or the Michigan Attorney General, Plaintiff had no alternative but to share evidence of police corruption, concealment and atrocities that are occurring with the press as a result of the foregoing in hopes that lives are saved; such constitutes protected activity under the Acts.

443. Plaintiff Barnes reported Defendants' August 2023's continued violations of law and constitutional rights to the Michigan Attorney General through its reporting and whistleblowers' Criminal Complaint hotline on August 21, 2023 as he feared this conduct would continue unaddressed by Defendants absent formal intervention from a governing body.

444. Plaintiff Barnes was never contacted in response to his Attorney General complaint which identified this matter as "urgent" requiring prompt attention as he feared lives were at stake.

445.   Plaintiff Barnes sent a follow up complaint with the Michigan Attorney General in November 2023 but has not received any response to date.

446.   Shortly after filing his Attorney General Complaint, Defendant Childs approached Plaintiff Barnes to inform him that the former union attorney for MAPS currently works for the Attorney General, stating *"that will help us down the road"* and "*we will be just fine,"* letting him know that Defendants were aware of his Attorney General complaint and the Defendants were not concerned.

447.   *On August 23, 2023*, Plaintiff Barnes received formal disciplinary action for the issues that allegedly occurred back in *April 2023*, despite his complaints that this was exaggerated in response to his race discrimination complaints.

448.   Defendants mandated Plaintiff Barnes to attend several classes, training and reviews, including inclusion and diversity training

449.   Although prior to his Attorney General complaint, Plaintiff Barnes was previously informed that such training would be given to all supervisors; however, after the complaint, he was informed that he was the only one receiving such training.

450. To Plaintiff's knowledge, no other supervisors were given any additional training as Defendants previously indicated before his medical leave and before his complaint of excessive force to the Attorney General.

451. In fact, adding insult to injury, Plaintiff Barnes, a Black male, was given diversity training while none of the Defendants' named officers and/or management personnel were ever counseled as to diversity; despite many allegations that they violated the constitutional rights of Black civilians that they brutally assaulted..

452. That Defendants retaliated against Plaintiff, and similarly situated Black officers that opposed race discrimination and/or the violation of Black civilian's constitutional rights in the Renaissance Center workplace from 2016 to present, including but not limited to reporting incidents of racial assaults, racial slurs, racial profiling, escalation of violence towards Black civilians by Caucasian security officers, violation of the use of force directives and policies by Caucasian security officers against Black civilians, including wrongful arrest, false imprisonment, assault and battery and retaliation.

453. Following Defendants' retaliatory actions and refusal to promptly or adequately respond to egregious violations of use of force and discrimination policies, Plaintiffs was forced to take a qualified medical stress leave from work in October 2023.

454. During his October 2023 medical leave, as a result of the stress endured in his workplace, Plaintiff suffered from a heart attack requiring multiple operations and procedures.

455. Defendants retaliated against Plaintiff and similarly situated Black security employees that opposed race discrimination in the Renaissance Center workplace by issuing unwarranted discipline, time off without pay, suspension, and termination.

456. That Defendants retaliated against Plaintiff for reporting violations of the race discrimination and use of force policies in violation of *ELCRA* and the *Civil Rights Act §1981 and 1983.*

457. That Defendants, including but not limited to Jenkins, Payne, Baldwin, Jr. and Greutman, agents of RCMC, G4S and GM, retaliated against Plaintiff Barnes for bringing race discrimination on behalf of others' including those brought to him by co-workers and subordinates in the Renaissance Center workplace to management in attempt to ensure that such was properly investigated and addressed by management from 2016 to present.

458. That Plaintiff does not have the same or similar roles or responsibilities as other, white, shift supervisors employed by Defendants, following his complaints of race discrimination in the workplace.

459.   That Plaintiff Barnes is not permitted to issue disciplinary action to his subordinates who violate company policies while his white counterparts are entitled to do so as long as it does not result in the termination of the employee.

460.   That historically Plaintiff Barnes was authorized to investigate claims of discrimination, harassment and/or retaliation in Defendants' workplace; however, once he started to insist that action be taken in response to the myriad of complaints brought by him and other security police officers, Defendants' management took away this authority.

461.   That Defendants retaliated against Plaintiff for opposing race discrimination in the Renaissance Center workplace and for bringing race discrimination reports on behalf of other employees and Black civilian visitors to the Renaissance Center workplace to management in attempt to ensure that such was properly investigated and addressed by management from 2016 to present.

462.   That Defendant refused to properly, thoroughly or effectively investigate any complaints of race discrimination brought by Plaintiff on behalf of himself, other employees, subordinates, and/or Black civilian visitors to the Renaissance Center from 2016 to present.

463.   That Defendant refused to properly, thoroughly or effectively investigate any complaints of race discrimination brought by Plaintiff other employees, subordinates, and/or Black civilian visitors to the Renaissance Center

113

from 2016 to present.

464.   That Defendant refused to address and/or take any action in response to any complaints of race discrimination of which Plaintiff is aware from 2016 to present.

465.   That Defendants, including but not limited to Jenkins, Payne, Baldwin, Jr. and/or Greutman, retaliated against Plaintiff Barnes for opposing violations of PA330 and requesting an investigation be launched by the Michigan Attorney General and/or Michigan Commission of Law Enforcement, a division of the Michigan State Police.

466.   That Defendants harassed and retaliated against Plaintiff for continually opposing discrimination in their workplace by bringing complaints of such to management, in violation of ELCRA.

467.   Defendant has a pattern and practice of threatening, condoning, and/or retaliating against employees who file charges of discrimination or state they will fight for equal employment opportunity for themselves and/or other similarly situated minority employees;.

468.   Plaintiff Robert Barnes was retaliated against by his employer due to his various complaints of discrimination, threats of violence from co-workers, other violations of company policies and the resulting hostile work environment that he filed with Defendant management and HR throughout his employment.

114

469. Defendants' actions were intended to, and did in effect, embarrass and humiliate the Plaintiff and similarly situated Black security officers, both past and present, that provided security services to the RENCEN in effort to make them quit and constructively discharge their employment.

470. Defendants failed to follow its own policies and procedures as it relates to Plaintiff and similarly situated Black Security Officers at the RENCEN.

471. Defendants implemented and enforced its policies in a disparate and retaliatory manner.

472. Plaintiff Barnes was disciplined by Defendants in retaliation for reporting violations of federal and state law and for engaging in activities that are protected under the *Michigan Elliott--Larsen Civil Rights Act and §1981 and §1983.*

473. That Plaintiff, Robert Barnes, by protesting different treatment based upon race was continuously retaliated against for outspoken protesting of discrimination, threats of violence, and violation of company policies, all of which has been condoned by Defendants.

474. That Defendants harassed, threatened, written up and/or retaliated against Plaintiff for reporting Defendants' officers' violations of constitutional rights based on race at the RENCEN in approximately fall 2023.

475. That Plaintiff Barnes reported complaints of excessive force and violation of Black civilians' constitutional rights to the Michigan State Police in

November 14, 2023; such actions constitute protected activity under the Acts.

476.   Plaintiff Robert Barnes was retaliated against for asserting his lawful rights as set forth herein; similarly situated employees who did not complain have not been retaliated against.

477.   Several Black Security Police Officers at the Renaissance Center were constructively discharged from their employment with Defendants due to managements' refusal to address the racially hostile work environment and pattern of using unwarranted and excessive force against Black visitors and/or employees of the Renaissance Center which was committed by several of the white officers.

478.   Defendants proffered reasons for their treatment of African American employees and employment actions taken against such minorities who have brought complaints to management are merely a pretext for discrimination.

479.   Such different and retaliatory treatment towards employees who filed complaints with management and/or HR was created, condoned and fostered by Defendants' management.

480.   Such different and retaliatory treatment towards employees who filed complaints and Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") is fostered and condoned by Defendants' management.

481.   As a direct and proximate result of said retaliatory acts of Defendants, Plaintiffs have suffered and will continue to suffer loss of earning capacity, wage loss, benefits, earning potential, loss of dignity and enjoyment of life, extreme mental, physical and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation, all past, present and future.

482.   Plaintiff and similarly situated Black Security Officers, past and present, that provided security services at the RENCEN pray for a judgment of compensatory, liquidated and exemplary damages which are fair and just in favor of the against the Defendants resulting from their retaliation, along with an award of costs and attorney fees so wrongfully incurred.

## COUNT VII DEFENDANTS' G4S, GM, RCMC AND JENKINS' ACTIONS AGAINST PLAINTIFF BARNES VIOLATED THE MICHIGAN WHISTLEBLOWER ACT

483.   Plaintiffs reassert and incorporate by reference the preceding paragraphs of this Complaint as though fully stated herein.

484.   The conduct of Defendants, by and through its management and employees constitutes a violation of the Michigan Whistleblower Act.

485.   An employee may not be retaliated against or discriminated against for opposing a violation of The Whistleblowers' Protection Act ("WPA") or for making a charge, filing a complaint, or participating in a proceeding or investigation under that statute. *Whistleblowers' Protection Act, Act 469 of 1980, MCL §15.361-15.369*

486.   That as a result of Defendants' lack of response from Plaintiff's multitude of complaints of race discrimination, racial profiling, abuse of power, hostile work environment, and wrongful arrests, assaults, false imprisonment, and use of excessive, unreasonable and unwarranted force by white security officers against Black civilian visitors and juveniles to the Renaissance Center and Detroit Marriot Renaissance Center Hotel, Plaintiff realized he had no alternative but to report such to public bodies.

487.   After reviewing the force utilized against a 61 year old Black woman by a white security officer, Barnes concluded the security officer's actions were discriminatory and criminal.

488.   Plaintiff Barnes told Defendants' management that such actions were an abuse of authority and constituted constitutional and criminal violations of law which pose a severe danger to Black civilians.

489.   Plaintiff Barnes was engaged in a protected activity as defined by the WPA when he threatened to report such abuse of authority, constitutional and criminal violations to the Attorney General. *MCL 15.361(d).*

490.   Plaintiff Barnes was engaged in a protected activity as defined by the WPA when he reported abuses of authority, abuses of force, constitutional and criminal violations to a public body, including Defendants RCMC, G4S and/or GM, Jenkins PA330 license holder, who constitute public bodies pursuant to WPA.

491.   Plaintiff Barnes, on his own initiative, took it upon himself to communicate Defendants GM, RCMC and G4S, his joint employers', wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation and abuse of authority to light to remedy the situation or harm done by the violation of constitutional rights.

492.   As soon as Plaintiff Barnes reviewed the August 2023 surveillance video showing the unreasonable and excessive use of force by Defendant Zani against a 61 year old Black female, he reported such to Defendants' upper management.

493.   On August 21, 2023, Plaintiff Barnes reported the Defendants' assault and use of force against a 61 year old Black female to the Attorney General's office.

494.   Plaintiff Barnes was engaged in a protected activity as defined by the WPA when he threatened to file and when he filed a complaint with the Attorney General.

495.   At the time Plaintiff Barnes participated in protected activities and continuing to date, he fears for the lives and safety of Black civilians at the RENCEN.

496.   Defendants were aware that Plaintiff Barnes filed this complaint with a public body.

497. Plaintiff Barnes suffered discrimination regarding his terms, conditions, and privileges of employment as a result of his internal complaints and reports to a public body in violation of the WPA.

498. At the time of his report to the Attorney General, Plaintiff Barnes suspected in good faith that a violation of the law has occurred and will continue to occur in the future.

499. Plaintiff Barnes was justified in believing that a report to a public body was necessary.

500. Plaintiff Barnes had ample evidence of a violation of the law and constitutional rights at the time he reported such to the Attorney General.

501. Plaintiff Barnes' suspicions were reasonable at the time he reported such.

502. Plaintiff Barnes was subsequently discriminated against.

503. Defendants took adverse employment action against Plaintiff Barnes for his complaint to the Attorney General and/or public body under the WPA when they issued disciplinary action, harassed and discriminated against him in August 2023.

504. A causal connection existed between Plaintiffs' protected activity and Defendants' adverse employment action.

120

505. There was no legitimate business reason for the adverse employment action taken against Plaintiff Barnes by Defendants GM, RCMC and/or G4S.

506. Any "legitimate reason" proposed or offered by the employer was not the true reason, but was only a pretext for retaliatory action against Barnes for his reports and complaints to a public body, including Defendants RCMC, GM, G4S, Jenkins and the Attorney General.

507. Plaintiff Barnes is a whistleblower who, in good faith reported and/or informed his employer he was about to report, illegal, criminal and improper conduct and was harassed and retaliated against by Defendants who took adverse employment action against him in response.

508. Defendants issued disciplinary action to Plaintiff Barnes in response to his protected activity, in violation of the WPA. *MCL §15.362*

509. As a direct and proximate result of Defendants' said violations of the Michigan Whistleblower Act, Plaintiff has suffered and will continue to suffer loss of earning capacity, wage loss, benefits, earning potential, loss of dignity and enjoyment of life, extreme mental, physical and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation, all past, present and future.

510.   Plaintiff Barnes prays for a judgment of compensatory, liquidated and exemplary damages which are fair and just in favor of the against the Defendants resulting from their violation of the Michigan Whistleblower Act, along with an award of costs and attorney fees so wrongfully incurred.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants jointly and severally in whatever sum they are deemed entitled, together with costs, interest, and attorney fees.

Respectfully Submitted,

/s/ Danielle Safran
Danielle Safran (P61965)
30300 Northwestern Hwy., Suite 337
Farmington Hills, MI 48334

November 14, 2023

122

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROBERT BARNES, on behalf of himself
and similar situated individuals,

Case No:
HON.

Plaintiffs,

v.

G4S SECURE SOLUTIONS (USA) INC.,
RENAISSANCE CENTER MANAGEMENT
COMPANY, GENERAL MOTORS, LLC.
F/K/A GENERAL MOTORS COMPANY,
GREGORY JENKINS, LARRY PAYNE,
MICHAEL BALDWIN, JR., CHAD
GRUETMAN, MICHAEL MOUILLESEAUX,
DANIEL REBAR, MATTHEW WILEY,
MATTHEW ZANI, CRAIG HACKETT,
LAWERENCE CHILDS, DOUGLAS
BAYER, AND RENE LACELLE Jointly and
Severally, Defendants.

DANIELLE B. SAFRAN (P61965)
THE SIGLER LAW FIRM, PLC.
30300 Northwestern Hwy., Suite 337
Farmington Hills, MI 48334
(248) 705-6400
safranlaw1@gmail.com
*Attorney for Plaintiffs*

## JURY DEMAND

NOW COME Plaintiffs, Robert Barnes, on behalf of himself and similarly

situated individuals, by and through their attorneys, The Sigler Law Firm, PLC. and

hereby requests a trial by jury.

123

Respectfully Submitted,



/s/ Danielle Safran
Danielle Safran (P61965)
30300 Northwestern Hwy., Suite 337
Farmington Hills, MI 48334


November 14, 2023