UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT BARNES, et al.,

      Plaintiffs,

v.

G4S SECURE SOLUTIONS (USA)
INC., et al.,

      Defendants.

Case No. 23-cv-12897

Honorable Robert J. White

---

### ORDER (1) GRANTING PLAINTIFFS' MOTION TO QUASH, (2) GRANTING INDIVIDUAL DEFENDANTS' MOTIONS TO ADOPT AND JOIN, AND (3) DENYING CORPORATE DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND DISMISS NEWLY-ADDED PLAINTIFFS

---

Plaintiffs filed this class-action alleging racial discrimination and related claims connected to their prior employment as security personnel at the Renaissance Center in Detroit, Michigan; Defendants include G4S Secure Solutions (USA) Inc. (G4S), Renaissance Center Management Company (RCM), General Motors, LLC (GM), and Allied Universal Security Services (Allied) (collectively, Corporate Defendants), as well as Gregory Jenkins, Michael Baldwin, Jr., Larry Payne, Chad Greutman, Michael Mouilleseaux, Daniel Rebar, Matthew Wiley, Matthew Zani,

Craig Hackett, Lawrence Childs, Douglas Bayer, and Rene Lacelle (collectively, Individual Defendants). (ECF No. 15, PageID.692-771).

Before the Court in this matter are Corporate Defendants' motions (1) to compel arbitration and dismiss Plaintiffs' amended complaint with respect to Plaintiffs Robert Barnes and Maurice Duck, Sr. (the original plaintiffs), or alternatively to stay the proceedings pending arbitration; and (2) to dismiss Plaintiffs' amended complaint with respect to Plaintiffs Derrick Tolliver and Michael Young, Jr. (the newly-added plaintiffs).[1] (ECF Nos. 22, 23).

Individual Defendants also move to adopt and join Corporate Defendants' motions. (ECF Nos. 26, 27). And Plaintiffs move to quash Individual Defendants' motions with respect to Defendant Rebar only. (ECF No. 36).

The Parties fully briefed the motions and the Court held oral argument. For the following reasons, the Court (1) grants Plaintiffs' motion to quash, (2) grants Individual Defendants motions to adopt and join, and (3) denies Corporate Defendants' motion to compel arbitration and motion to dismiss.

## I.   Background

This case was initially filed as a class action by Barnes. (ECF No. 1, PageID.1, 5-11). On April 1, 2024, Plaintiffs filed an amended complaint adding Duck, Young,

---

[1] Although Duck was added as a party in the same amended complaint as Tolliver and Young (ECF No. 15), this Court identifies Duck as an original plaintiff as consistent with the parties' motions and arguments at issue.

and Tolliver. (ECF No. 15, PageID.614, 637-46).  All Plaintiffs are black, former employees of Corporate Defendants[2] who worked in security at the Renaissance Center. (ECF No. 15, PageID.633-46).  Individual Defendants were all at relevant times similarly employed security personnel except Jenkins, an executive for GM, and Payne, Corporate Defendants' Security Director from 2017 to 2021.  Individual Defendants Gruetman, Mouilleseaux, Rebar, Wiley, Hackett, Zani, Childs, Bayer, and Lacelle are all white; Baldwin is black. (ECF No. 15, PageID.621-23, 625).

Plaintiffs assert discrimination, retaliation, and hostile-work-environment claims under Michigan's Elliott-Larsen Civil Rights Act (ELCRA) and 42 U.S.C. §§ 1981 and 1983—including related alleged violations of the Family and Medical Leave Act (FMLA)—as well as a claim against Corporate Defendants and Individual Defendants Payne, Baldwin, and Jenkins under Michigan's Whistleblowers' Protection Act. (ECF No. 15, PageID.692-771).

---

[2] The amended complaint asserts that Corporate Defendants "are and/or were at all relevant times herein[] joint employers for Plaintiffs and similarly situated individuals working at [the Renaissance Center] from 2019 to present." (ECF No. 15, PageID.621).  The record indicates that GM and RCM initially contracted G4S to coordinate security services at the Renaissance Center, and Allied acquired G4S in 2021. (ECF No. 22-4, PageID.1033).  RCM was dissolved in 2024, but Allied continued to employ Renaissance Center security personnel until January 2025, when its contract ended or was terminated. (ECF No. 31-2, PageID.1455-56).

**A.      Motion to Compel Arbitration and Dismiss Re: Original Plaintiffs**

On April 22, 2024,[3] Corporate Defendants moved to compel arbitration and dismiss the amended complaint with respect to Barnes and Duck, or alternatively to stay the proceedings pending arbitration. (ECF No. 22).  Attached to the motion is a declaration from Defendant Baldwin, a "Security Specialist" for Allied at the Renaissance Center, providing in relevant part:

> 4. Allied Universal utilizes an electronic system called Optyma to onboard employees.  Plaintiffs Barnes and Duck were onboarded through the Optyma system.
>
> 5. In my capacity as Security Specialist, I am familiar with the way the Optyma electronic onboarding system operates and with the way it functions, as well as the way in which prospective employees or acquisition employees' interface with the system when completing the onboarding process.  As the Security Specialist, I work with Human Resources on the overall process and implementation of policies involving documentation related to hiring or onboarding new or acquisition employees.
>
> 6. Allied Universal's Optyma electronic onboarding system is a password-protected online environment that allows employees to electronically complete and execute onboarding forms prior to commencing work for the Company.  Allied Universal's electronic onboarding forms include things like tax documents, payroll documents, and its Arbitration Agreement.  Many of these forms require employees to provide personal information that only they would know, like the name of their emergency contact or their bank account information.

---

[3] To the extent Plaintiffs argue that both Corporate Defendants' motions at issue here were untimely filed more than 14 days after Plaintiffs amended their complaint (ECF No. 30, PageID.1340-1344; ECF No. 33, PageID.1756-1760, 1762, 1779-1781), the Court already determined that the delay was excusable and retroactively extended the deadline for corporate defendants to respond (Text-Only Order, May 21, 2024).

7. When invited to the Renaissance Center site and/or local office in Southfield, Michigan to complete the onboarding process in person, the candidate or employee typically meets with the assigned Human Resources professional at which time they are required to provide documents establishing eligibility to work in the United States . . . . Once the prospective candidate or employee produces acceptable identifying documents, the electronic onboarding process is initiated by emailing a link to an email address designated by the candidate to initiate the process.

8. After the candidate provides their email address and receives the link inviting the candidate to initiate the onboarding process, the candidate then follows the link and uses the username and password they created for their application to access Allied Universal's electronic onboarding system.   Candidates can access the link on an Allied Universal branch computer or on their own cell phone device. . . . Importantly, no one else has access to the candidate's unique password unless the candidate discloses the password to them.  The system does not permit anyone other than a user with the correct username and unique password to enter a candidate's individual onboarding Portal. . . .

9. Once the candidate or acquisition employee logs into the electronic onboarding system, the candidate or acquisition employee is directed to the system's Onboarding Tasks' screen-page, where they are able to review and electronically sign the onboarding forms.  The forms cannot be filled out automatically.  They must manually complete each form.  Specifically, and in order to fill out, acknowledge receipt, or review an electronic form, candidates must manually click each box and electronically sign each document by typing their name.  A date stamp appears next to the electronic signature once signed reflecting the date the candidate executed the document.

10. In order to successfully complete the electronic onboarding process, a candidate or acquisition employee must review and/or sign all onboarding forms, including the Arbitration Agreement.

11.   The   onboarding   documents   are   automatically   and contemporaneously stored in Allied Universal's electronic onboarding

5

system in the ordinary course of business at the time a candidate completes each document.  No one at Allied Universal has the ability to subsequently alter or complete onboarding forms on behalf of a prospective candidate for employment, employee, or former employee without the system recording the name of the person initiating the change.  If anyone were to alter or complete a form, the system would include their name and timestamp on the altered document.

12. In my position, I have access to electronic onboarding documents executed by employees through the Optyma platform.  In preparing for this declaration, I reviewed Allied Universal's onboarding documents pertaining to Robert Barnes ("Barnes") and Maurice Duck, Sr. ("Duck").  Attached hereto as Exhibit A is a true and correct copy of Allied Universal's Arbitration Policy and Agreement for Barnes, which was electronically signed by Barnes on October 12, 2021, and which is currently maintained in Allied Universal's electronic personnel file for Barnes.  Attached hereto as Exhibit B is a true and correct copy of Allied Universal's Arbitration Policy and Agreement for Duck, which was electronically signed by Duck on October 11, 2021, and which is currently maintained in Allied Universal's electronic personnel file for Duck.  In addition to the Agreements, Barnes and Duck also signed various other onboarding documents on October 12, 2021 and October 11, 2021, respectively.  The Agreements signed by Barnes and Duck are virtually identical in substance.

(ECF No. 22-3, PageID.991-95).

Exhibits A and B to the Baldwin Declaration are materially identical documents titled "Arbitration Policy and Agreement," with each electronically signed by Barnes (signature dated October 12, 2021) and Duck (signature dated October 11, 2021), respectively. (ECF No. 22-3, PageID.997-1012).   These documents state, in pertinent part:

To the fullest extent authorized by law, the Parties mutually agree to the resolution by binding arbitration of all claims or causes of

6

action that the Employee may have against the Company, or the Company against the Employee, which could be brought in a court of law, unless otherwise set forth in this Agreement.  Examples of claims covered by this Arbitration Policy and Agreement specifically include, but are not limited to, claims for breach of any contract (written or oral, express or implied); fraud, misrepresentation, defamation, or any other tort claims; claims for discrimination and/or harassment; claims for wrongful termination; claims relating to any offers, promotions, or transfers made by the Company; claims for retaliation; claims for non-ERISA-covered benefits (such as vacation, bonuses, etc.); claims for wages or other compensation, penalties or reimbursement of expenses; breaks and rest period claims; claims relating to background checks; and claims for violation of any law, statute, regulation, ordinance or common law, including, but not limited to, all claims arising under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967; the Older Workers' Benefit Protection Act of 1990; the Americans with Disabilities Act; the Family and Medical Leave Act; the Consolidated Omnibus Budget Reconciliation Act of 1985; the Fair Labor Standards Act; and any other applicable federal, state, or local laws relating to discrimination in employment, leave, and/or wage and hour laws, whether currently in force or enacted hereafter.

All claims for permanent injunctive and/or other equitable relief shall be covered by this Arbitration Policy and Agreement.  However, both Parties retain the right to seek, in a court of competent jurisdiction, a temporary restraining order, preliminary injunction or other emergency/provisional injunctive relief, in order to protect their rights pending final resolution of any disputes in arbitration.  This provision includes, but is not limited to, disputes over the enforceability of any employment-related restrictive covenants, the disclosure of trade secrets or confidential/proprietary information, and defamation.

Covered claims include any claim arising from incidents, facts, or circumstances occurring prior to the Effective Date of this Agreement; any claims that arise thereafter; and claims that are the subject of purported putative class, collective, consolidated, or representative action litigation brought by any other employee.

The Parties also agree that this Agreement is intended to benefit certain third parties.  To that end, claims covered by this Agreement also include any claim or cause of action that the Employee may have against the Company's former or current clients (and their employees, contractors, representatives, or agents), customers, vendors, employees, contractors, directors, officers, shareholders, or other agents, or that the Company may have against the Employee's former or current business partners or other agents, where such claims arise out of or are in any way related to the Employee's employment with the Company.  Such third parties have the right to demand arbitration under the terms and conditions of this Agreement.

(ECF No. 22-3, PageID.999-1000, 1007-08).

The purported agreements also include a separate prohibition against participating in class- or collective-action claims, and they provide employees the right (and instructions) to opt out of arbitration. (ECF No. 22-3, PageID.999-1000, 1007-08).  They do not cover various categories of exempted claims, as explained *infra*. (ECF No. 22-3, PageID.1001, 1009).

Also attached to the motion to compel arbitration is another declaration from Tom Troup, a human resources employee for Allied, further describing the onboarding process for employees, including as specifically applied to Barnes and Duck, and stating that neither took any action to opt out of the arbitration agreement. (ECF No. 22-4, PageID.1014-31).  This declaration includes as exhibits the totality of documents Barnes and Duck electronically signed during their onboarding, including the arbitration agreements. (ECF No. 22-4, PageID.1036-149).  Additional declarations from employees uninvolved in this litigation relate their own

8

experiences executing the arbitration agreement during Allied's onboarding process without issue. (ECF No. 22-6).

Corporate Defendants argue that the Court should compel arbitration because Barnes and Duck executed valid agreements to arbitrate covering all the claims and defendants at issue in this case. (ECF No. 22, PageID.813-24).   In response,[4] Plaintiffs argue that (1) no valid arbitration agreements were formed, (2) the claims nevertheless fall outside the scope of the purported agreements, (3) Barnes and Duck did not knowingly or voluntarily waive their rights, and (4) the agreements are unenforceable under the Federal Arbitration Act (FAA). (ECF No. 30, PageID.1343-44, 1346, 1354-74).  Plaintiffs alternatively argue that they are entitled to discovery regarding whether any arbitration agreement was formed. (ECF No. 30, PageID.1346, 1374).  Finally, Plaintiffs argue that Corporate Defendants violated Local Rule 7.1 by failing to properly seek concurrence before filing their motion. (ECF No. 30, PageID.1339-40, 1344).

Attached to Plaintiffs' response is an affidavit from Duck declaring that he was initially hired by GM and RCM, and that he was required to complete the

---

[4] Plaintiffs curiously made four separate filings with respect to this response, with three identical responsive briefs filed between May 13, 2024, and May 14, 2024, and an exhibit filed separately on May 14, 2024. (*See* ECF Nos. 29-32).  Although exhibits 5 through 7 of the response(s) were technically filed after the response deadline of May 13, 2024, Plaintiffs' timely brief does cite to and rely on all the exhibits provided, so this Court will consider them accordingly.

aforementioned onboarding when those defendants contracted with G4S and Allied for security services at the Renaissance Center. (ECF No. 30-4, PageID.1389-91). Duck avers that he was not technically savvy, so his supervisor assisted him in setting up his onboarding login and navigating the process. (ECF No. 30-4, PageID.1391). According to Duck, he was rushed through the process without an attorney, not given any physical copies of the involved agreements, and his supervisor took control of the site and clicked through various pages to speed things along. (ECF No. 30-4, PageID.1391-92).

Duck avers that he never saw or personally agreed to any arbitration agreement during his onboarding, he only became aware of the purported agreement through the course of this litigation, and he would not have agreed to the included terms and waivers of his rights. (ECF No. 30-4, PageID.1392-95). Duck also avers that even if he had seen the purported agreement, he would not have believed its terms applied because he was covered under a union's collective bargaining agreement. (ECF No. 30-4, PageID.1392, 1395).

The record includes a similar affidavit from Barnes. (ECF No. 11-1, PageID.376-79). According to Barnes, Allied's onboarding process utilized electronic links to execute various agreements, but these were inaccessible, and he never was able to review the arbitration terms at issue. (ECF No. 11-1, PageID.376-79). Barnes avers that he reported the issue to management but nevertheless

provided his signature "in an empty box" "only intended to confirm receipt of the link" because he feared for his job. (ECF No. 11-1, PageID.377-78).  Barnes says he only became aware of the purported agreement through the course of this litigation, and he would not have agreed to the included terms and waivers of his rights. (ECF No. 11-1, PageID.378-79).  Barnes also avers that all "Security Officers" working at the Renaissance Center, including the individual defendants subject to his claims, were union employes covered by a collective bargaining agreement. (ECF No. 11-1, PageID.37).

Also attached to Plaintiffs' response is a collective-bargaining agreement effective until March 2025 between RCM and the Michigan Association of Police (MAP), on behalf of the Renaissance Police Officers Association (RPOA). (ECF No. 31-1).  And Plaintiffs provide a February 2024 letter from the MAP to RPOA members regarding the "dissolution" of RCM and "transition" to working under Allied, which states that members "still have a contract in effect" with terms that "still have the same legal support as they did before [RCM] was dissolved[.]" (ECF No. 31-2).

Furthermore, with respect to Barnes, Plaintiffs' response attaches a letter from Barnes to his supervisor stating in pertinent part:

> Upon "Onboarding" with Allied Universal all Renaissance Center Management Company employees signed documents and took Security Officer training classes.  However, we never received any of the associated Handbook or Polices.  As I initially reported, the online

links that were embedded did not provide access to any of the documents that we signed acknowledgements for and it's almost been one year since the Allied merger.  Will Supervisors or officers receive copies of these policies, procedures or Handbook?

(ECF No. 30-3, PageID.1385-86).

Plaintiffs relatedly attach just under 300 pages consisting of Barnes' personnel file from his employment (ECF No. 32).  And they provide an affidavit of Donald Gambrell, another employee of Corporate Defendants from 2017 to 2022, stating that he, like Barnes, signed links acknowledging receipt of an arbitration agreement during onboarding with Allied.[5]  (ECF No. 11-3, PageID.384-387).   Gambrell similarly asserts that he was never provided the arbitration terms and only acknowledged receipt thereof for fear of losing his job. (ECF No. 11-3, PageID.384-387).

In reply, Corporate Defendants argue that Barnes and Duck knowingly and voluntarily waived their rights to litigate this case in court, the evidence shows they reviewed and signed the arbitration agreements, and Plaintiffs' cited authority to claim a question of fact regarding contract formation is distinguishable from the instant case. (ECF No. 34, PageID.1825-29).   Corporate Defendants do not otherwise specifically refute Plaintiffs' other arguments, but they rely back to the original motion and urge the Court to "reject Plaintiffs Barnes and Duck's latest

---

[5] Gambrell filed his own action against GM, G4S, and RCM in 2021, and this case settled in 2022 (Case No. 21-cv-11846, ECF Nos. 1, 120).

attempt to circumvent the unambiguous terms of the arbitration agreement[s] . . . ." (ECF No. 34, PageID.1823).

### B.     Motion to Dismiss Re: Newly-Added Plaintiffs

On April 25, 2024,[6] Corporate Defendants moved to dismiss the amended complaint with respect to Tolliver and Young, pursuant to Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (failure to state a claim). (ECF No. 23).  Corporate Defendants argue that such relief is warranted because Tolliver and Young contractually agreed to a shorter limitations period related to any claims arising from their employment and failed to bring their claims within the agreed-to period. (ECF No. 23, PageID.1223-24, 1232-43).

Attached as Exhibits A and B to this motion are two identical documents apparently signed by Young (signature dated November 9, 2017) and Tolliver (signature dated August 13, 2021), respectively. (ECF Nos. 23-2, 23-3).  These alleged agreements include, in consideration for any offer of employment with RCM, a provision that "any claim or lawsuit arising out of [the individual's] employment" "MUST BE FILED WITH THE COURT NO MORE THAN SIX (6) MONTHS AFTER THE DATE OF THE EMPLOYMENT ACTION THAT IS THE SUBJECT OF THE CLAIM OR LAWSUIT.  I WAIVE ANY RIGHT I MAY HAVE

---

[6] See footnote 3.

UNDER ANY LAW THAT MIGHT ALLOW ME A LONGER TIME PERIOD TO
FILE . . . ." (ECF No. 23-2, PageID.1248; ECF No. 23-3, PageID.1250).

In response, Plaintiffs argue that (1) there is a factual dispute concerning whether the purported agreements were formed; (2) Tolliver and Young did not knowingly or voluntarily waive their rights; (3) even if the agreements were made, the waiver at issue is invalid concerning claims under the FMLA and 42 U.S.C. § 1983; (4) the waiver violates public policy as related to any civil rights claims; (5) G4S, GM, and Allied lack standing to enforce the purported agreements; and (6) Plaintiffs established a prima facie case for all their asserted claims. (ECF No. 33, PageID.1755, 1760-62, 1765-66, 1782-97). And Plaintiffs again argue that Corporate Defendants violated Local Rule 7.1 by failing to properly seek concurrence before filing their motion. (ECF No. 33, PageID.1755, 1762, 1779).

Attached to Plaintiffs' response are declarations from Tolliver and Young stating that they were both hired by Defendant RCM, in 2021 and 2017 respectively, and at that time required to complete many documents over "a very short" timeframe, while never receiving copies of these documents. (ECF No. 33-3, PageID.1810-11; ECF No. 33-4, PageID.1815-16). Tolliver and Young both declare that they never knowingly signed any agreement to shorten the statute of limitations, and that the signatures on the purported agreements were doctored. (ECF No. 33-3, PageID.1811-12; ECF No. 33-4, PageID.1816-17). Young also declares that he

14

belonged to a union during his employment with RCM, and that "[n]one of the union agreements had language shortening my statute of limitations . . . ." (ECF No. 33-4, PageID.1816).

In reply, Corporate Defendants argue that Tolliver and Young knowingly and voluntarily agreed to contractually shorten the statute of limitations for all claims arising from their employment, the agreements are valid and enforceable under state and federal law and not violative of public policy, Plaintiffs' cited authority to claim a question of fact regarding contract formation is distinguishable from the instant facts, and all claims made by Tolliver and Young are covered by the agreements. (ECF No. 35, PageID.1833-39). Corporate Defendants also note that Plaintiffs' response violates the page limits of Local Rule 7.1 because it includes as an exhibit (*see* ECF No. 33-1) a four-page extension of a public policy argument Plaintiffs made in their brief.[7] (ECF No. 35, PageID.1833 n. 2).

Corporate Defendants do not address Plaintiffs' arguments regarding concurrence or whether the purported agreements naming only RCM applied to all

---

[7] With respect to the parties competing arguments under L.R. 7.1, the Court does not condone and cautions parties to avoid any effort to circumvent this district's briefing page limit. The same applies to cursory emails that don't sufficiently allow for a meaningful exchange regarding concurrence. However, absent prejudice, the Court will address both parties' motions on the merits instead of striking any filing for a mere technicality. *See Livonia Pub. Schs. v. Selective Ins. Co.*, 443 F. Supp. 3d 815, 861 (E.D. Mich. 2018); *Jarvis v. Cooper*, No. 12-11804, 2013 U.S. Dist. LEXIS 44717, at *30 (E.D. Mich. Mar. 28, 2013); *Tuttle v. Land*, No. 10-11221, 2010 U.S. Dist. LEXIS 52057, at *8-11 (E.D. Mich. May 27, 2010).

Corporate Defendants, but they rely back to the original motion and urge the Court to reject and Tolliver and Young's "latest attempt to circumvent the unambiguous terms of the statute of limitations waivers . . . each signed at the outset of their employment." (ECF No. 35, PageID.1833).

### C.   Remaining Motions

On May 6, 2024, Individual Defendants moved to adopt and join Corporate Defendants' motions. (ECF Nos. 26, 27).   Concerning the motion to compel arbitration, Individual Defendants argue that the legal theories and arguments therein are all transferrable to them under the terms of the arbitration agreements at issue. (ECF No. 26, PageID.1278-81). Concerning the motion to dismiss, they argue that the legal theories and arguments therein are all transferrable to them because the statute-of-limitations waivers covered all claims arising out of Tolliver's and Young's employment. (ECF No. 27, PageID.1284-85).  In response, Plaintiffs argue that Individual Defendants' motions were untimely and should therefore be denied. (ECF No. 30, PageID.1342; ECF No. 33, PageID.1758-59).  Lastly, on July 24, 2024, Plaintiffs moved to quash Individual Defendants' motions with respect to Defendant Rebar only. (ECF No. 36).

## II.   Legal Standards

In deciding a motion to compel arbitration, a court "must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between

the parties and that the specific dispute falls within the substantive scope of the agreement." *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F. 3d 997, 1001 (6th Cir 2009).  Stated somewhat differently and with greater nuance, (1) the court "must determine whether the parties agreed to arbitrate;" (2) "it must determine the scope of that agreement;" (3) "if federal statutory claims are asserted, it must consider whether Congress intended those claims to be non[-]arbitrable;" and (4) "if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration." *McGee v. Armstrong*, 941 F. 3d 859, 865 (6th Cir. 2019).

"Mandatory arbitration agreements in the employment context are governed by the Federal Arbitration Act, which evidences a strong policy preference in favor of arbitration." *Mazera*, 565 F. 3d at 1001.  "Although the Federal Arbitration Act requires a court to summarily compel arbitration upon a party's request, the court may do so only if the opposing side has not put the making of the arbitration contract 'in issue.'" *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F. 4th 832, 835 (6th Cir. 2021) (quoting 9 U.S.C. § 4 ("[U]pon being satisfied that the making of an agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . . If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.")).

Where, as here, the non-movant disputes the existence of an agreement to arbitrate, the district court is to evaluate whether the non-movant has "adequately challenged the making of the contract using the standards that apply on summary judgment." *Boykin*, 3 F. 4th at 835.

Under these standards, "the movant asserting the existence of a contract[] must initially carry its burden to produce evidence that would allow a reasonable jury to find that a contract exists." *Chaudhri v. StockX, LLC*, 19 F. 4th 873, 881 (6th Cir. 2021). "[I]n order to show that the validity of the agreement is 'in issue' [under 9 U.S.C. § 4], the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Mazera*, 565 F. 3d at 1001 (second alteration in original). "If a reasonable finder of fact could conclude that no valid agreement to arbitrate exists, the issue is subject to resolution by a jury." *Id.* (quotation marks and citation omitted). In addressing these questions, this Court applies state-law principles governing contract formation. *Chaudhri*, 19 F. 4th at 881.

Corporate Defendants also move to dismiss with respect to newly-added plaintiffs under Fed. R. Civ. P. 12(b)(1) and (b)(6). "Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). However, only certain courts have

18

recognized statute-of-limitations defenses as falling under Rule 12(b)(1). 5B Charles

Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 n. 19 (4th

ed. 2024); *see also Byrne v. Clinton*, 410 F. Supp 3d 109, 121 (D.C. Cir. 2019)

("Some courts have suggested that a motion to dismiss for failure to satisfy a statute

of limitations implicates a court's subject matter jurisdiction, and therefore should

be brought under Rule 12(b)(1) . . . .  It has long been established in this circuit,

however, that a statute of limitations defense that is clear on the face of the complaint

is properly brought under Rule 12(b)(6).") (citations omitted).

The Sixth Circuit has recognized that "*most* periods of limitation involving

suits against the sovereign . . . are jurisdictional." *See Ohio Nat'l Life Ins. Co. v.

United States*, 922 F.2d 320, 324 (6th Cir. 1990) (emphasis in original).  This is

because such statutes "outline[] the terms under which the United States has waived

sovereign immunity and thereby consented to suit." *Id*.  In general, however, statute-

of-limitations defenses are waivable and not jurisdictional. *See United States v. Del

Percio*, 870 F.2d 1090, 1093-94 (6th Cir. 1989) (noting that "every circuit court of

appeals to address the issue has held that criminal statutes of limitations are waivable

affirmative defenses that do not affect the subject matter jurisdiction of the courts"

and concluding that the defendants validly consented to extend the statute of

limitations); *see also Shoucair v. Snacker*, No. 05-40341, 2008 U.S. Dist. LEXIS

48082, at *2-3 (E.D. Mich. Jun. 23, 2008) ("a statute of limitations defense would fall under Rule 12(b)(6)").

To avoid dismissal under Rule 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Ad. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  But "it is usually not appropriate to dismiss a claim under Rule 12(b)(6) based upon the statute of limitations" unless "the allegations in a complaint affirmatively show that a claim is time-barred." *Singh v. Proctor & Gamble Co.*, No. 23-3414, 2024 LEXIS 1672 (6th Cir January 24, 2024).  Further, when the parties present and the Court considers matters outside the pleadings with respect to a 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

Summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Once the movant has met its burden of production, the non[-]moving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the summary-judgment motion." *Bernard v. Wal-Mart, Inc.*, No. 22-3735, 2023 U.S. App. LEXIS 7669, at *3 (6th Cir. Mar. 30, 2023).  "In resolving a summary judgment motion, this court must view the evidence in the light most favorable to the non-moving party."

20

*Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407, 414 (6th Cir. 2024) (quotation marks and citation omitted).   "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. City of Memphis*, 928 F.3d 481, 486 (6th Cir. 2019) (quotation marks and citation omitted).

The amended complaint here does not show that the newly-added plaintiffs' claims were time-barred.  Rather, this issue was first raised by Corporate Defendants when they moved to dismiss.  And the Parties support their arguments with numerous documents, including the purported agreements essentially at issue, none of which were included in the pleadings.  Nevertheless, as explained later in this opinion, Corporate Defendants' motion to dismiss fails even if the Court considers the parties' additional evidence.  And because Corporate Defendants' motion rests entirely on a statute of limitations defense not affirmatively shown by the amended complaint, it also fails if the court does not consider the additional evidence.  The motion to dismiss should therefore be denied regardless of whether the Court considers matters outside the pleadings.

### III.   Analysis

#### A. Plaintiffs' Motion to Quash

This issue was largely addressed at the motion hearing, and the Court essentially resolved it by granting Plaintiffs' request for entry of default against Rebar in a March 4, 2025 order. (ECF No. 54).  Because Rebar is in default, he "has . . . lost his standing in court . . . [and] will not be entitled to service of notices in the cause, nor to appear in it in any way." *Frow v. De La Vega*, 82 U.S. 552, 554 (1872); *see also Kimberly v. Coastline Coal Corp.*, No. 87-6199, 1988 U.S. App. LEXIS 12265, at *6-8 (6th Cir. Sept. 9, 1988).  Additionally, Rebar "can adduce no evidence, [and] he cannot be heard at a final hearing." *Frow*, 82 U.S. at 554; *see also Kimberly*, 1988 U.S. App. LEXIS 12265 at *6-8.  Accordingly, Plaintiffs' motion to quash Individual Defendants' motions to adopt and join, with respect to Rebar only, is granted.

#### B. Individual Defendants' Motions to Adopt and Join Corporate Defendants' Motions

Plaintiffs argue that Individual Defendants' motions were untimely and should therefore be denied. (ECF No. 30, PageID.1342; ECF No. 33, PageID.1758-59).  The court disagrees.  Because Plaintiffs filed an amended complaint on April 1, 2024, Defendants initially had until April 15, 2024, to respond.  *See* Fed. R. Civ. P. 15(a)(3).  But the record shows, although nothing was entered on the docket, that Plaintiffs and Individual Defendants stipulated to extend this deadline to May 6, 2024. (*See* ECF

No. 30, PageID.1342; ECF No. 30-2, PageID.1384). Despite Plaintiffs' claims of untimeliness, Individual Defendants filed their motions to adopt and join Corporate Defendants' motions on May 6, 2024, by the stipulated deadline. The Court therefore declines to summarily dismiss Individual Defendants' motions.

Next, at least as superficially, the purported arbitration agreements cover Barnes's and Duck's claims against Individual Defendants. Specifically, the agreements cover "any [employment-related] claims or cause of action . . . against the Company's former or current . . . employees." (ECF No. 22-3, PageID.1000, 1008). Because this generally encompasses the claims against Individual Defendants, their motion to adopt and join Corporate Defendants' motion to compel arbitration is granted. Accordingly, the determinations below regarding the latter motion apply to Barnes's and Duck's claims against all Defendants in this case.

The same is true for the purported statute-of-limitations waivers with respect to Tolliver's and Young's claims. Specifically, the statute-of-limitations waivers to which Tolliver and Young purportedly agreed apply to "any claim or lawsuit" arising out of their employment with RCM. (ECF No. 23-2, PageID.1248, 1250). Therefore, Individual Defendants' motion to adopt and join Corporate Defendants' motion to dismiss is also granted, and the determinations below regarding the latter motion apply to Tolliver's and Young's claims against all Defendants in this case.

## C. Motion to Compel Arbitration and Dismiss—Original Plaintiffs

By providing the purported arbitration agreements and accompanying declarations, Corporate Defendants met their burden "to produce evidence that would allow a reasonable jury to find that a contract exists." *Chaudhri*, 19 F.4th at 881; *see also Boykin*, 3 F. 4th at 839 (concluding the same when presented with similar evidence).  The Court must therefore decide whether Plaintiffs have shown "that the validity of the agreement[s]" are "in issue," *i.e.*, that "a genuine issue of material fact [exists] as to the validity of the agreement[s] to arbitrate." *Mazera*, 565 F.3d at 1001.  And if the purported agreements are valid, the Court also must determine their scope, as well as whether any of Plaintiffs' federal statutory claims are non-arbitrable.  *McGee*, 941 F. 3d at 865.

### 1.    Agreement Validity

Under Michigan law, "[a] valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich. v. State*, 497 Mich. 197, 235 (2015).  Plaintiffs argue that the purported arbitration agreements are invalid because there was no mutuality of agreement, they are premised on an illegal employment arrangement under Michigan law, and they lack proper consideration. (ECF No. 30, PageID.1356-65).

### i. Mutual Assent

Mutuality of agreement requires "an offer and acceptance." *See Bodnar v. St. John Providence, Inc.*, 327 Mich. App. 203, 213 (2019); *Kloian v. Domino's Pizza, L.L.C.*, 273 Mich. App. 449, 452 (2006). That is, there must be "mutual assent"— *i.e.*, a "'meeting of the minds' on all the essential elements of the agreement." *Huntington Nat'l Bank v. Daniel J. Aronoff Living Trust*, 305 Mich. App. 496, 508 (2014) (quoting *Goldman v. Century Ins. Co.*, 354 Mich. 528, 535 (1958)). Whether there was a "meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kloian*, 273 Mich. App. at 454 (citation omitted).

Moreover, Michigan recognizes the legal effects of electronic signatures and records in contract formation. *See* Mich. Comp. Laws § 450.831 *et seq.*; *Hall v. Pac. Sunwear Stores Corp.*, No. 15-14220, 2016 U.S. Dist. LEXIS 46347, at *13-14 (E.D. Mich. Apr. 6, 2016). Nevertheless, "[t]he absence of a signature is not fatal to the formation of a contract because an offeree can assent through conduct, such as continued employment after the effective date of [a] policy." *Hall*, 2016 U.S. Dist. LEXIS 46347 at *13 (citing *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 213 Mich. App. 636 (1995)); *see also Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013) ("Tillman's conduct following the communication of the offer objectively

suggests that she accepted the arbitration agreement by continuing her employment without returning an opt-out form.").

Plaintiffs argue that there was no mutuality of agreement to the purported arbitration agreements because Duck and Barnes were unable to access and unaware of the agreement terms—to which they otherwise would not have agreed.  They assert that "[b]oth Plaintiffs [Barnes and Duck] were rushed through their onboarding processes, were not provided printed or electronic copies of the Agreement, were not given time to consider the Agreement or seek consultation with an attorney, and were only privy to the terms and conditions of the Policy when such was brought in Defendants' recent motions." (ECF No. 29, PageID.1319).  Plaintiffs argue that they submitted sufficient circumstantial evidence to create a question of fact regarding contract formation similar to the plaintiffs in *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F. 4th 832 (6th Cir. 2021), *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F. 3d 411 (6th Cir. 2011), and *Romano v. Blue Cross Blue Shield of Mich.*, No. 22-12901, 2023 U.S. Dist. LEXIS 76681 (E.D. Mich. May 2, 2023).

Like the present case, *Boykin* involved a defendant employer moving to compel arbitration with the plaintiff, the defendant's former employee, based on a purported arbitration agreement covering all the employment claims at issue. *Boykin*,

3 F. 4th at 835-36.  In support of its motion, the defendant provided a declaration

from a human-resources manager stating

> that [the defendant's] employees must take online training sessions . . .
> [,] including a session about arbitration.  When taking online courses,
> employees use their own unique ID and password.  During the
> arbitration session, . . . [employees] must review and accept [the
> defendant]'s arbitration agreement.  The session states in all capital
> letters that, by clicking "I ACCEPT," each employee acknowledges
> that the employee has read the agreement, that the employee and the
> company are giving up their trial rights, and that they are agreeing to
> arbitrate disputes instead.  The contract makes clear that it covers "all
> claims" against the company, including claims under the employment
> laws.

*Id.* at 836.

According to the human-resources manager, the defendant's records showed that the

plaintiff completed the arbitration training session on July 15, 2013, and the plaintiff

electronically acknowledged the arbitration contract. *Id.* at 836, 838.

In response, the plaintiff averred under oath "that he 'unequivocally' did not

consent to or acknowledge an arbitration agreement on July 15, 2013 (or at any other

time)." *Id.*  "[The plaintiff] added that he had no recollection of taking the arbitration

session, that he did not have a certificate of completion for the session, and that no

one ever told him that arbitration was a condition of his employment." *Id.*  Further,

"[a]fter his termination, [the plaintiff] also requested his personnel file under

Michigan law[, but] the records that [the defendant] provided did not include any

arbitration agreement." *Id.*

The Sixth Circuit concluded that "[the plaintiff's] evidence created a genuine issue of fact over whether he electronically accepted the contract or otherwise learned of [the defendant]'s arbitration policy." *Id.* at 835; *see also id.* at 841. In doing so, the Court first observed that "convenient memory lapses do not create factual disputes that are genuine," and a party "thus cannot expect to obtain a trial under [9 U.S.C.] § 4 simply by testifying that the party does not 'remember' signing an arbitration contract or receiving information about arbitration." *Id.* at 839-40. However, because factual conflicts must be reviewed in a light most favorable to the opposing party, "an 'unequivocal denial' *that takes the form of admissible 'evidence'* can create a genuine dispute of fact." *Id.* at 840 (emphasis added). "So a party might be able to obtain a trial under § 4 with a sworn denial that the party ever signed an arbitration agreement or received arbitration materials." *Id.*

Following these principles, the Sixth Circuit stated that *Boykin*, although a close case, presented a question of fact regarding contract formation:

> At times, [the plaintiff] testified that he does not "have knowledge or recollection" of accepting the arbitration contract or taking the arbitration session. A claim that he does not recall doing so by itself may have fallen short. Yet [the plaintiff] said more. Subject to the penalties for perjury, he flatly denied accepting an arbitration contract on July 15, 2013: "I unequivocally did not consent to, sign, acknowledge or authorize any type of arbitration agreement with [the defendant] on or after July 15, 2013, or at any time." He also flatly denied receiving information about arbitration: "I was not informed by [the defendant] that I was required to enter into an arbitration agreement as a condition of my employment." . . . [T]his evidence creates a factual

dispute over whether [the plaintiff] authorized the arbitration contract or learned of [the defendant]'s arbitration policy in other ways.

Some circumstantial evidence also supports [the plaintiff]'s denials. For one thing, [the plaintiff] requested his "personnel records" from [the defendant]—something he had a right to do under Michigan law. Even though [the defendant] told him that it had provided "all available records," it did not produce any arbitration-related records. The "absence" of these materials from [the plaintiff]'s personnel file offers some relevant evidence supporting him. While [the defendant] conclusorily asserts in a footnote that the arbitration contract does not qualify as a "personnel record," [under Michigan law], it offers no explanation why that is so.

For another thing, a [defense] lawyer contacted [the plaintiff] after he filed suit claiming that [the plaintiff] entered into a different arbitration contract when he was hired back in 2003. [The defendant] forthrightly acknowledges that the lawyer "inadvertently" attached the wrong contract and mistakenly indicated that [the plaintiff] had accepted this contract at the time of his hiring. Yet [the defendant]'s own initial confusion over which agreement is allegedly at issue likewise supports [the plaintiff]'s claim that [the defendant] had mistakenly identified him as having consented to any arbitration agreement at all.

\* \* \*

In sum, [the plaintiff] has identified a genuine dispute of fact over whether the parties have formed a contract.

*Id.* at 840-41 (citations omitted).

In *Hergenreder*, 656 F. 3d 411, the Sixth Circuit concluded that the plaintiff did not assent to any arbitration agreement with the defendant former employer. *Id.* at 417-20. This case involved the plaintiff's alleged agreement to arbitrate arising not from any signed writing, but rather from her continued employment and pursuant

to terms contained in the defendant's dispute resolution procedures (DRPs) and referenced in its employee handbook. *Id.* at 413-15.   The panel specifically concluded that there was no offer or acceptance because the defendant provided insufficient notice of the arbitration terms, and nothing showed the plaintiff's assent to said terms. *Id.* at 413, 417-20.

Regarding the lack of any offer, the panel reasoned that the employee handbook did not constitute a contract and did not *require* the plaintiff to refer to the DRPs. *Id.* at 418.

> Moreover, the simple reference in the Handbook to [the DRPs] for "details" is not "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Kloian*, 733 N.W.2d at 770 (internal quotation marks omitted).   This statement says nothing about arbitration, and it says nothing that would indicate to [the plaintiff] that accepting or continuing her job with [the defendant] would constitute acceptance.   Indeed, it is incorrect to conflate the fact that [the plaintiff] knew generally of the DRP[s] with the notion that she knew of the arbitration language—and [the defendant]'s desire to create an arbitration agreement—contained within the DRP[s].   Were [the plaintiff] required to read, or even notified of the importance of reading, the DRP[s], the analysis here might be different.   But this court's inquiry is focused on whether there is an objective manifestation of intent by [the defendant] to enter into an agreement with (and invite acceptance by) [the plaintiff], and we are not convinced that there is any such manifestation made by [the defendant] in the record in this case.

*Id.*

Regarding the lack of acceptance, the panel found "no evidence" that the plaintiff manifested an intent to be bound, even if there was an offer.   *Id.* at 419-20.

[The defendant] claims that [the plaintiff's] acceptance occurred when she elected to accept or continue her employment, but there is no evidence that [the plaintiff] knew (1) that the DRP[s] contained arbitration information or an arbitration agreement, or, more specifically, (2) that the arbitration provisions in the DRP[s] provided that electing to accept or continue employment with [the defendant] would constitute acceptance of the DRP[s'] arbitration terms. Indeed, [the plaintiff] had no reason to believe that electing to work for [the defendant] would constitute her acceptance of anything. She therefore did not voluntarily undertake some unequivocal act sufficient for the purpose of accepting the arbitration terms contained in the DRP.

*Id.* at 419 (cleaned up).

In *Romano*, 2023 U.S. Dist. LEXIS 76681, the district court found a question of fact regarding whether the plaintiff agreed to arbitrate his employment discrimination claims. *Id.* at *1. Like in *Boykin*, the *Romano* plaintiff "unequivocally denied" signing any arbitration agreement or ever being informed of the defendant's arbitration procedure. *Id.* at *5. The court noted that such a "blanket denial is unavailing" to create a question of fact when "the employer produce[s] documentation showing that the employee electronically signed the arbitration agreement." *Id.* But it concluded that the plaintiff's affidavit of denial "is sufficient to put the validity of the arbitration agreement in issue" because the defendant "has not produced incontrovertible evidence that [the plaintiff] assented to the arbitration procedure through the online application process." *Id.* at *5-6. Notably, the defendant "d[id] not have any documentation evidencing [the plaintiff]'s signature" because of a 2020 software change. *Id.* at *3. The court also concluded that there

was insufficient notice of the arbitration terms, thus precluding the plaintiff's agreement by continued employment, because (1) "[the defendant] does not allege that it provided [the plaintiff] with a copy of the arbitration procedure or that it was available to him before he began his employment" and (2) "there is no evidence that [the plaintiff] was directed to review that procedure or that continued employment would convey his agreement." *Id.* at *6-7.

Here, unlike in *Romano*, Corporate Defendants do provide documentation to show Duck and Barnes electronically signed the respective arbitration agreements. But Duck avers that he "never read, received, or reviewed" any arbitration agreement during Allied's onboarding, whereas Barnes avers that the arbitration terms were never accessible. (ECF No. 11-1, PageID.376-70; ECF No. 30-4, PageID.1392). Both deny ever agreeing to or even seeing (until this litigation) the agreement Corporate Defendants now present. (ECF No. 11-1, PageID.376-70; ECF No. 30-4, PageID.1391-95).

Duck acknowledges completing the onboarding process, but states, "I am not technically savvy[,] so [my] supervisor set up my login information and helped me several times throughout the process." (ECF No. 30-4, PageID.1390).  According to Duck, he "had difficulty accessing some of the documents and asked for assistance from [his] supervisor." (ECF No. 30-4, PageID.1391).  "Several times during the onboarding process, my supervisor reached over my shoulder and took control of

the mouse to my computer, navigating through the site in attempt to assist and move me through the process faster; when the supervisor did this, I could not see my screen and did not know what he was doing, reviewing, scrolling through and/or clicking." (ECF No. 30-4, PageID.1391).  Duck is unsure whether the supervisor accepted any agreements on his behalf during this process, and he maintains that no one ever gave him any arbitration agreement, notice thereof, or any opportunity to review it. (ECF No. 30-4, PageID.1392-95).

Barnes also acknowledges completing onboarding with Allied, but he says links to access the arbitration terms were inaccessible at the time, preventing him from ever reviewing them. (ECF No. 11-1, PageID.376-79).  Barnes avers that he reported the issue to management but nevertheless provided his signature "in an empty box" "only intended to confirm receipt of the link" because he feared for his job. (ECF No. 11-1, PageID.377-78).  Like Duck, Barnes maintains that no one ever gave him any arbitration agreement, or any opportunity to review it. (ECF No. 11-1, PageID.378-79).

Plaintiffs also provide Barnes's personnel file (ECF No. 32), arguing that the absence of any arbitration agreement therein demonstrates a question of fact concerning mutual assent like in *Boykin* (ECF No. 30, PageID.1360-61).  Plaintiffs relatedly provide the 2022 letter from Barnes to a supervisor implicitly acknowledging that he signed various documents or acknowledgments during

33

Allied's onboarding but expressing concern that "the online links that were imbedded did not provide access to any of the documents that we signed acknowledgments for . . . ." (ECF No. 30-3, PageID.1385-86). And the record includes the Gambrell affidavit corroborating that Allied's arbitration terms were inaccessible during onboarding. (ECF No. 11-3, PageID.384-387).

As made clear in *Boykin* and *Romano*, an individual's denials alone "fall short" of creating a question of fact regarding contract formation. *Boykin*, 3 F. 4th at 840. Accordingly, Barnes's and Duck's naked assertions—without sufficient supporting circumstantial evidence, cannot overcome Corporate Defendants' preliminary evidence supporting an agreement to arbitrate. *See id.* at 840-41; *see also Emerson v. Blue Cross Blue Shield of Mich.*, No. 22-12576, 2023 U.S. Dist. LEXIS 28449, at *5 (E.D. Mich. Feb. 21, 2023) ("Defendant's failure to provide evidence of the signed arbitration agreement, *combined* with Plaintiff's sworn declaration that she did not see or sign the agreement, creates a genuine dispute of fact here that precludes a motion to compel arbitration.") (emphasis added); *Anderson v. Crothall Healthcare Inc.*, No. 21-10535, 2022 U.S. Dist. LEXIS 155053, at *11 (E.D. Mich. Aug. 29, 2022) (rejecting the plaintiff's denial of knowing about any arbitration agreement in light of the defendant's contrary evidence).

The Court acknowledges some circumstantial evidence similar to that in *Boykin* to support the denials here, at least with respect to Barnes.  Plaintiffs provide the letter from Barnes to his supervisor identifying an issue with links and accessing agreement terms during the Allied onboarding, as well as Barnes's apparent personnel record devoid of the agreement at issue.  Plaintiffs also provide the Gambrell affidavit to corroborate Barnes's account, albeit from another employee with a similar interest to avoid arbitration concerning his own legal claims.  Nevertheless, Plaintiffs' evidence fails to establish a question of fact concerning whether Barnes or Duck assented to arbitration.

As an initial matter, Duck does not raise any issue with accessibility of the arbitration terms, but rather implies that a supervisor assented on his behalf.  But there is no evidence, apart from Duck's own affidavit, to support this claim.  Critically, Duck and Barnes both aver that they participated in Allied's onboarding, and Barnes explicitly states that he then signed an acknowledgment of receipt of the arbitration policy. *See DeOrnellas v. Aspen Square Mgmt., Inc.*, 295 F. Supp. 2d 753, 764 (E.D. Mich. 2003) (finding that—pursuant to Sixth Circuit precedent and the general rule that parties are bound by signing a contract they had an opportunity to review—employees may be bound by signatures on an arbitration agreement even if they do not remember signing or state they never saw the policy).

To the extent Barnes's affidavit and related evidence implicates that no employees had an opportunity to review the arbitration terms here, this contention— as explained below—is refuted by significant, compelling evidence from Corporate Defendants.  This case is also distinguishable from *Hergenreder* because Corporate Defendants (1) provide evidence that Barnes and Duck affirmatively reviewed and electronically signed the arbitration agreements and (2) do not rest on continued employment as the basis for assent.  And the case is distinguishable from *Boykin* because Corporate Defendants do not harbor any confusion concerning what agreements are at issue.

Considering the evidence submitted by both parties, the Court views this case more akin to *Anderson v. Crothall Healthcare Inc.*, No. 21-10535, 2022 U.S. Dist. LEXIS 155053 (E.D. Mich. Aug. 29, 2022), and *Brown v. Heartland Empl. Servs., LLC*, No. 19-11603, 2020 U.S. Dist. LEXIS 88951 (E.D. Mich. May 19, 2020).

In *Anderson*, the district court concluded that the plaintiff's denial of signing or knowing of an arbitration agreement was insufficient to create a question of fact regarding contract formation "in light of the record as a whole." *Anderson*, 2022 U.S. Dist. LEXIS 155053 at *7-13.  The court first distinguished *Hergenreder* because, unlike in that case, the defendant (1) contended that the plaintiff signed the arbitration agreement and (2) produced records to support this. *Id.* at *8-9.  And despite the plaintiff's denial regarding the arbitration agreement, "she clearly knew

that she signed the other employment documents provided on the platform and treated her electronic signature as binding, evinced by her beginning to work for Defendant upon completion of the onboarding process." *Id.* at *10.

The court also stated that the defendant "sufficiently show[s] the efficacy of the security procedure applied to determine that the electronic signature on the Agreement is attributable to Plaintiff" by attaching a declaration including an individual's "personal knowledge of Defendant's employment application and on-boarding system and procedures." *Id.* This declaration described the onboarding as utilizing a password-protected system with unique logins and multiple steps. *Id.* And the court noted that the plaintiff "does not allege that her profile information or unique password is available to anyone else," or that "she was presented with the [arbitration agreement] and did not understand or comprehend the terms of the agreement." *Id.* at *11.

Lastly, the court rejected the plaintiff's denial that she knew of any agreement because the defendant provided in the record a confirmation email sent to the plaintiff listing the agreement as signed during onboarding. *Id.* The court concluded: "Evaluating the totality of the circumstances, Defendant has demonstrated, through documents, electronically stored information, and affidavits, that there is no genuine dispute as to any material fact regarding the existence of an agreement to arbitrate in this case." *Id.* at *12-13.

37

In *Brown*, the court similarly emphasized a declaration from the defendant's human resources (HR) director explaining the online process through which the plaintiff allegedly agreed to arbitration. *Brown*, 2020 U.S. Dist. LEXIS 88951 at *2-4, 9-10.  This process utilized unique usernames and passwords for each employee, displayed the agreement and terms for review, and required multiple affirmative actions to complete.  The HR employee also stated that the plaintiff failed to opt out of arbitration as allowed under the agreement, and she provided copies of screens the plaintiff would have seen when reviewing the company's arbitration presentation. *Id.*  The court determined that this evidence, along with an electronic record confirming that the plaintiff completed the arbitration presentation and acknowledged the associated agreement, provided "compelling" support that the plaintiff agreed to arbitrate. *Id.* at *9-10.  The court also concluded that the plaintiff's only contrary evidence, her own declaration, was insufficient to create a question of fact regarding mutual assent. *Id.* at *10-12.  The court reasoned that her blanket denial that she did not see, agree to, or otherwise intend to be bound by the agreement (1) lacked further evidentiary support and (2) at most only indicated that she merely did not review the agreement carefully enough, or else reviewed the agreement and forgot. *Id.*

Here, Baldwin and Troup, Allied's security and human resources employees, provide that the company's onboarding utilized a password-protected online

platform for employees to review and acknowledge its arbitration agreement, among other onboarding documents. (ECF No. 22-3, PageID.991-94; ECF No. 22-4, PageID.1016-23).  Based on Troup's declarations *and* supporting screenshots of the platform, employees must individually open and acknowledge each separate document.  To do so, employees must (1) enter an electronic signature, (2) type their full legal name, (3) enter the date, and (4) click "I Accept and Continue."  And these options appear at the bottom of each page, so employees cannot accept without first scrolling through the entirety of each document's terms. (ECF No. 22-4, PageID.1017-28).  If employees do not complete the onboarding process—including reviewing, acknowledging, and either accepting or opting out of the arbitration agreement—they cannot start work for Allied. (ECF No. 22-4, PageID.1024).  Troup also declares that neither Barnes nor Duck ever opted out of arbitration, and both started work following onboarding. (ECF No. 22-4, PageID.1030).

More importantly, the totality of the records Corporate Defendants provide from Duck's and Barnes's onboardings—all of which bear the same electronic signatures and dates as the purported arbitration agreements—include emergency contact forms completed with personal information Barnes and Duck would have had to input themselves. (ECF No. 22-4, PageID.1059-63, 1121-25).  And numerous other employees who Allied also onboarded around October 2021 corroborate the

process for onboarding and state that they experienced no issue reviewing and acknowledging the company's arbitration agreement. (*See* ECF No. 22-6).

Like in *Anderson* and *Brown*, the Court finds this evidence significant and compelling to show that Plaintiffs Barnes and Duck assented to arbitration. And the Court concludes that Plaintiffs' evidence does not create a question of fact regarding either's assent thereto. This is admittedly a close case, with some facts analogous to *Boykin* and related cases. But this determination is warranted because (1) *Boykin* itself presented a close call on this issue and (2) Corporate Defendants provide more evidence of mutual assent than in *Boykin* and related cases.

Although there is some evidence supporting Barnes's concern that online links on the onboarding platform did not provide access to any arbitration agreement, Corporate Defendants provide screenshots and declarations of multiple individuals showing that the onboarding did not even utilize links. Rather, the platform's arbitration page included the entire arbitration agreement and required that employees scroll through the terms to the page's bottom to acknowledge the document and move forward.

In sum, Plaintiffs fail to establish a question of fact regarding either Barnes's or Duck's assent to arbitration.

### ii. Legality

Plaintiffs also argue that the purported agreements are premised on an illegal employment arrangement under Michigan law because security guard companies like G4S and Allied cannot employ P.A.-330-licensed individuals—like Duck and Barnes—under Michigan law. (ECF No. 30, PageID.1362-64).  The argument is not wholly clear, but Plaintiffs principally assert as follows:

> Defendants GM and RCM[] held PA 330 Security Police Agency licenses issued by the State of Michigan that provided Plaintiffs Barnes and Duck, Sr., certified security police officers, with misdemeanor arrest authority while on duty, in uniform on the premises of these employers for Plaintiffs' entire careers—**over sixty combined years under Defendants RCM[] and GM's employ.**

> Under Michigan law and Public Act 330, Security Guard Companies, such as Defendants Allied and G4S, are not eligible for Security Police Agency licensure and shall not lawfully employ arrest authority officers such as Plaintiffs under Michigan Law.  Which is why Allied was never Plaintiffs' employer until March 2024, after RCM[] forfeited the PA330 license and dissolved.  Allied would be in violation of state law if it employed Plaintiffs working as [security police officers] at the [Renaissance Center] without a license to do so or if it entered into a false contract holding themselves out as Plaintiffs' employers when such is illegal.  Any agreement to violate state law represents an improper subject matter and invalidates any such agreement, including the Policy.

> Since th[e arbitration agreements are] premised on an unlawful employment arrangement, contrary to Michigan law, this Court should deem the[m] invalid, against public policy and unenforceable.

(ECF No. 40, PageID.1363 (citations omitted)).

41

In support, Plaintiffs provide the February 2024 letter to RPOA union members regarding the "dissolution" of RCM and "transition" to working under Allied, which was set to occur on March 12, 2024. (ECF No. 31-2).  The letter states that "[t]he removal of [member's] PA 330 status and the subsequent dissolution of [RCM] will forever change the operational outlay of security for this facility." (ECF No. 31-2).  The only other information in the letter relevant to this issue provides that "the employer can rescind the PA 300 license as it currently does.   [The Michigan Commission on Law Enforcement Standards] does not require an employer to maintain that status indefinitely or for a set period." (ECF No. 31-2).

Relatedly, Duck avers that (1) he was hired by GM and RCM in 1987 as a security police officer (SPO) at the Renaissance Center; (2) GM and RCM held a P.A. 330 Security Police Agency (SPA) license for the Renaissance Center premises; (3) he has been a P.A. 300-licensed SPO for over 20 years with "authority to conduct misdemeanor arrests while on duty"; and (4) at some point, GM and RCM "contracted with G4S and/or Allied" to provide security services at the Renaissance Center. (ECF No. 30-4, PageID.1389-90).  Duck also avers as follows:

> 5. Allied and/or G4S are not legally permitted to employ me to conduct misdemeanor arrests which has been a part of my daily work duties and primary responsibilities as a Security Police Officer working at [the Renaissance Center] for the past twenty years until approximately March 2024.

> 6. In March 2024, . . . management informed all staff that RCM[]/GM forfeited their PA330 Security Police Agency license

through the State of Michigan and; thus, no [security] employees have authority to conduct misdemeanor arrests while on the premises of the Renaissance Center, regardless of whether we are certified to do so by the State of Michigan.

7. I am uncertain as to whether Allied and/or G4S have become my employer(s) since RCM[] and/or GM relinquished their PA330 Security Police Agency License for the [security] department as of March 2024.

(ECF No. 30-4, PageID.1390).

The Michigan statute Plaintiffs rely on here, Mich. Comp. Laws § 338.1080, provides that:

a private security police officer, as described in section 29, who is properly licensed under this act has the authority to arrest a person without a warrant as set forth for public peace officers [under Michigan law], when that private security police officer is on the employer's premises. Such authority is limited to his or her hours of employment as a private security police officer and does not extend beyond the boundaries of the property of the employer and while the private security police officer is in the full uniform of the employer.

Section 29 of P.A. 330, Mich. Comp. Laws § 338.1079, provides:

(1) The licensure of private security police and private college security forces shall be administered by the department of state police. The application, qualification, and enforcement provisions under this act apply to private security police and private college security forces except that the administration of those provisions shall be performed by, and the payment of the appropriate fees shall be paid to, the department of state police. . . .

(2) This act does not require licensing of any private security guards employed for the purpose of protecting the property and employees of their employer and generally maintaining security for their employer. However, any person, firm, limited liability company, business organization, educational institution, or corporation

maintaining a private security police organization or a private college security force may voluntarily apply for licensure under this act. When a private security police employer or private college security force employer as described in this section provides the employee with a pistol for the purpose of protecting the property of the employer, the pistol shall be considered the property of the employer and the employer shall retain custody of the pistol, except during the actual working hours of the employee. . . .

Here, Plaintiffs only cite to Mich. Comp. Laws § 338.1080, with no other legal authority supporting their contention of illegality. Although arrest authority under Mich. Comp. Laws § 338.1080 is limited to "the employer's premises," Plaintiffs cite no authority that companies like G4S and Allied cannot employ licensed SPOs; and even if Corporate Defendants violated Michigan law by employing SPOs without the requisite statutory licensing, Plaintiffs give no authority (or facts) to indicate how (or even that) this would fundamentally impair the employment of security personnel or any agreements pursuant to such employment. *See Am. Elec. Power Serv. Corp. v. Fitch*, No. 22-3005, 2022 U.S. App. LEXIS 24712, at *14 (6th Cir. Aug. 30, 2022) ("a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."); *see also Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir. 1995); *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F. 3d 597, 601 (5th Cir. 2016).

Further, the Court's independent inquiry reveals only limited caselaw applying Mich. Comp. Laws § 338.1080, all in the context of (1) whether private

security guards acted under the color of state law, *see, e.g., Romanski v. Detroit Entm't, L.L.C.*, 428 F. 3d 629 (6th Cir. 2005), (2) whether employers were liable when security personnel allegedly exceeded the authority of Mich. Comp. Laws § 338.1080, *see, e.g., Michaels v. General Growth Mgmt.*, No. 96-1385, 1997 U.S. App. LEXIS 7716 (6th Cir. Apr. 15, 1997), and (3) whether Fourth Amendment and other constitutional protections applied in cases involving private security guards, *see, e.g., People v. Eastway*, 67 Mich. App. 464 (1976).

In any event, as confirmed at the hearing, RCM was established through the joint efforts of GM and G4S—which then oversaw security at the Renaissance Center—to provide P.A. 330 licensed officers at the premises. Allied acquired G4S in 2021, at which time the Renaissance Center security personal were onboarded and became Allied's employees. Security personnel at the Renaissance Center were therefore jointly employed by GM, RCM, and Allied beginning in 2021, and at least until 2024 when Allied—per defense counsel at the hearing—abandoned its P.A. 330 license. Plaintiffs rely here on the union letter describing the "transition" to Allied and "dissolution" of Defendant RCM as occurring in 2024, but nothing in the record establishes that security personnel ever illegally exercised arrest authority at the Renaissance Center premises. Rather, it appears RCM was properly licensed in this regard until 2024, at which time Corporate Defendants decided to forgo this license and end security personnel's arrest authority at the Renaissance Center.

45

For these reasons, the Court cannot conclude that the arbitration agreements were premised on an illegality.

### iii. Consideration

Next, Plaintiffs argue that the purported agreements lack proper consideration because (1) Barnes and Duck were never aware of the arbitration policy, (2), Allied could not legally employ them as P.A. 300-licensed SPOs, and (3) Allied only became Plaintiffs' employer in March 2024. (ECF No. 30, PageID.1364-65). The gist of the latter two points seems to be that there was no valid employment offer by Allied to act as consideration for the arbitration agreements allegedly executed in 2021.

On the first point, the Court already addressed the alleged lack of notice under Section III.C.1.i *supra*. Similarly, the Court already concluded that Plaintiffs fail to establish that Allied employed Barnes and Duck illegally, particularly in any way that would impair the alleged agreements at issue.

The Court also rejects Plaintiffs' third point. The record includes significant evidence that Barnes and Duck became Allied's employees in 2021, after the G4S acquisition and their Allied onboarding. At this time GM, RCM, and Allied were all Barnes's and Duck's joint employers, with GM owning and overseeing the Renaissance Center itself, Allied coordinating security services at the premises, and RCM providing P.A. 300-licensed officers to handle security.

Lastly, Plaintiffs fail to address the fact that the arbitration agreements provide as consideration the parties' mutual promises to arbitrate, in addition to the offer of employment. (*See* ECF No. 22-3, PageID.1004, 1012). The Sixth Circuit has found in numerous cases that mutual promises to arbitrate claims constitute bilateral consideration. *See Mazera v. Varsity Ford Mgmt. Servs.*, LLC, 565 F.3d 997, 1002 (6th Cir. 2009); *Dantz v. Am. Apple Grp., LLC*, 123 F. App'x. 702, 708-709 (6th Cir. 2005); *see also Brown*, 2020 U.S. Dist. LEXIS 88951 at *8. Accordingly, the arbitration agreements are supported by adequate consideration.

In sum, Plaintiffs have not shown a genuine issue of material fact as to the validity of the agreements to arbitrate.

### 2.    Knowing and Voluntary Waiver

The Court must look to five factors when assessing whether a waiver of the right to litigate in federal court was knowing and voluntary:

> (1) [the] plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Hank v. Great Lakes Constr. Co.*, 790 F. App'x 690, 699 (6th Cir. 2019) (citation omitted).

According to Plaintiffs, all but the first of these factors weigh against finding any voluntary and knowing waiver in this case. (ECF No. 30, PageID.1370-71).

Plaintiffs specifically argue that Duck and Barnes did not knowingly or voluntarily waive their rights because "Defendants required all employees to complete onboarding documents the same day they were allegedly provided." (ECF No. 30, PageID.1369).  As further support, they reassert that Barnes and Duck were never provided the arbitration terms and never signed the purported agreements, and that the agreements lacked proper consideration. (ECF No. 30, PageID.1369-72). Corporate Defendants counter that Duck and Barnes knowingly and voluntarily waived their rights to litigate in court because (1) they were given ample time to review the agreements; (2) the agreements are supported by adequate consideration; and (3) employees could opt out of arbitration, but neither Duck nor Barnes did so. (ECF No. 34, PageID.1824-26).

As an initial matter, the Court has already rejected Plaintiffs' denials that Barnes or Duck ever reviewed or signed the agreements, as well as the alleged lack of consideration. *See supra* Section III.C.1.i, iii.  Returning to the factors at issue, there was therefore adequate consideration for the waiver of rights.  And Plaintiffs do not claim that the first factor (the plaintiff's experience, background, and education) is relevant here.  Additionally, the arbitration terms and associated waiver of rights are plain and clear.

Concerning the amount of time employees had to consider the arbitration terms before signing, Corporate Defendants do not specifically contest that

48

employees had to complete onboarding in one day.  Nevertheless, the clear terms of the arbitration policy allowed employees 30 additional days to affirmatively opt out of arbitration. (*See* ECF No. 22-3, PageID.999, 1004, 1007, 1012).  This was more than sufficient time for Barnes and Duck to review the agreements and—if they so desired—consult an attorney and/or opt out of arbitration. *See Morrison v. Circuit City Stores*, 317 F.3d 646, 668 (6th Cir. 2003) (the plaintiff knowingly and voluntarily waived her rights in part because the arbitration policy gave "three days in which to withdraw . . . consent to the agreement[] [and] advised applicants that they may wish to consult an attorney before signing it.").

Plaintiffs again liken this case to *Hergenreder*, which concluded that a waiver was not knowing and voluntary because the plaintiff was never reasonably notified or otherwise knew of the arbitration agreement terms contained in the defendant's dispute resolution procedures and only referenced in its employee handbook. *Hergenreder*, 656 F.3d at 413-15, 421.  This case is distinguishable from *Hergenreder*, however, because Corporate Defendants (1) provide evidence that Barnes and Duck affirmatively reviewed and electronically signed the arbitration agreements and (2) do not rest on continued employment as the basis for the waiver of rights.

The other case on which Plaintiffs primarily rely, *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005), is also distinguishable.  In *Walker*,

the plaintiffs' experience, background, and education weighed against a valid waiver because most had not graduated high school and were struggling financially. *Id.* at 381. And managers, during a rushed interview and hiring process, mislead or did not inform prospective employees regarding the arbitration agreement and terms, which *did not* include the option to revoke consent. *Id.* at 381-82. The arbitration agreement also lacked consideration because (1) the promise to arbitrate was not mutual and (2) the company could unilaterally change the rules governing arbitration. *Id.* at 379-81, 383. Such circumstances are not present here.

For these reasons, the Court concludes that Barnes and Duck knowingly and voluntarily agreed to waive their rights in federal court.

### 3. Agreement Scope

Plaintiffs argue that even if the arbitration agreements are valid, their claims fall outside the agreements' scope because the contractual language plainly exempts from arbitration any claims involving employees covered by a collective bargaining agreement (CBA) like that here. (ECF No. 30, PageID.1366-69). According to Plaintiffs, all claims that Barnes and Duck assert here are exempt under this language and thus outside the scope of the agreements because all the claims involve defendant security officers covered by the CBA between RCM and MAP. (ECF No. 30, PageID.1367).

50

In Corporate Defendants' motion, they argue that the relevant language "deals with claims that cannot legally be compelled to arbitration (e.g., ERISA, unemployment compensation, and claims covered by an applicable collective bargaining agreement)," and does not preclude arbitration when a claim merely involves or is tangentially related to an *individual* covered by a CBA.

In Michigan, unambiguous contracts are interpreted by the court as a matter of law. *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 469 (2003). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Innovation Ventures, LLC v. Liquid Mfg., LLC*, 499 Mich. 491, 507 (2016). "When interpreting a contract, the primary obligation is to give effect to the parties' intention at the time they entered into the contract." *Id.* (cleaned up). To do so, courts examine "the language of the contract according to its plain and ordinary meaning." *Id.* "If the contractual language is unambiguous, courts must interpret and enforce the contract as written." *Id.*

As an initial matter, the arbitration agreements' plain language generally covers all the claims and all Corporate Defendants in this case. First, the "Parties" section includes not only Defendant Allied, but also "its subsidiaries, affiliates, and related companies, and their successors or assign[ees]." (ECF No. 22-3, PageID.998, 1006). Plaintiffs do not dispute that this language incorporates all Corporate Defendants as parties to the agreements. Next, the contracts subject to arbitration

51

"all claims or causes of action that the Employee may have against the Company, or the Company against the Employee, which could be brought in a court of law." (ECF No. 22-3, PageID.999, 1007).  This clear and broad language certainly encompasses all Barnes's and Duck's asserted claims against Defendants, unless they are otherwise exempted from arbitration under the policy terms.

Exempt claims are discussed in Section 8 of the agreements:

> **Claims Not Covered by this Agreement**: This Agreement does not cover claims the Employee may have for workers' compensation, unemployment compensation benefits, medical or other employee welfare or pension benefits under the Employee Retirement Income Security Act (ERISA), claims brought under the National Labor Relations Act, *claims covered by an applicable collective bargaining agreement*, or any other claims found not subject to mandatory arbitration by governing law. . . . Additionally, *this Agreement does not apply to claims involving an employee who is covered by a collective bargaining agreement at the time the dispute arises or is filed*.

(ECF No. 22-3, PageID.1001, 1009) (emphasis added).

Construing this provision, the language is neither ambiguous nor contradictory.  It exempts various categories of claims, including "claims covered by an applicable collective bargaining agreement" *and* "claims involving an employee who is covered by a collective bargaining agreement at the time the dispute arises or is filed."  The uses of "or" and "additionally" make plain that these are all distinct categories of claims exempt from arbitration, some identified by the specific claim type, others not.  And the last sentence of the section clearly provides as one of these distinct exemptions those claims categorized not by the type of claim,

52

but by the employee(s) involved—specifically, employees covered by a CBA. This "additional" exemption is not in any way connected to the prior list of exempted claims, but rather applies globally to "this Agreement." Critically, Defendants proposed interpretation would render this last sentence completely duplicative and meaningless. Plaintiffs' interpretation is therefore correct.

Applying this provision, any claim from or related to a union member working security at the Renaissance Center is exempt from arbitration. At the hearing, the parties confirmed that Duck and all other lower-level SPOs at the Renaissance Center were union members subject to the CBA, whereas Barnes and any other supervisors were not. All Duck's claims are therefore clearly exempt. Regarding Barnes, although he is not covered by the CBA, all his claims still involve, at least tangentially, lower-level SPOs presumably covered by the CBA. Specifically, all of Barnes's claims for race discrimination and creation of a hostile work environment involve alleged improper conduct by at least some lower-level union employees. And his retaliation and whistleblower-protection claims involve Barnes's reports to superiors of the alleged improper conduct by these union employees. Lastly, Barnes's failure-to-promote claim involves other unqualified, presumably union employees being promoted over him on the basis of race. Given the broad scope of the exemption at issue here—and recognizing that many of the facts underlying

Barnes's claims remain unclear at this early stage of the proceedings—the Court concludes that all Barnes's claims are exempt from arbitration.

However, to the extent Plaintiffs also rely on Section 5 of the agreements as requiring adjudication by a court of any class-action claims like those brought here (ECF No. 30, PageID.1368-69), this is incorrect. Section 5 *prohibits* the filing of any class-action claims, and it only requires that "any challenges to" this prohibition be brought before a court. (ECF No. 22-3, PageID.1000).

In sum, because Barnes's and Duck's claims fall outside the scope of arbitration, Corporate Defendants' motion to compel arbitration is denied.

### 4. Enforceability Under the FAA

Plaintiffs, citing *Walker*, argue further that the arbitration agreements do not allow for the effective vindication of Barnes's and Duck's claims and therefore are unenforceable under the FAA. (ECF No. 30, PageID.1372-73). Plaintiffs specifically target Section 11(c) of the arbitration policy, which provides:

> The Parties agree that reasonable discovery is essential to the just resolution of any claims which may be covered by this Arbitration Policy and Agreement. Accordingly, nothing in this Arbitration Policy and Agreement or in the JAMS Rules shall be interpreted to limit the Parties' rights to reasonable discovery. Rather, reasonable discovery shall be allowed that is sufficient to ensure the adequate arbitration of any claims covered by this Arbitration Policy and Agreement. Generally, the Parties agree that *reasonable discovery means up to three depositions per side*, one set of requests for production of documents with up to 35 requests, and one set of interrogatories with up to 25 interrogatories. *In the event that the Parties believe this scope of discovery is inadequate*, the Parties shall meet and confer and try to

reach agreement on the scope of discovery and *the arbitrator shall have discretion to resolve any disagreement concerning the scope of discovery and to allow discovery determined by the arbitrator to be reasonably necessary to the just resolution of the dispute* considering the streamlined nature and purpose of arbitration.

(ECF No. 22-3, PageID.1002, 1010) (emphasis added).

According to Plaintiffs, the limitation of three depositions—with more only at the discretion of an arguably biased arbitrator—in a complex employment case like this "would be an egregious violation of Plaintiffs' rights to pursue [their] claims," particularly with four separate corporate defendants involved. (ECF No. 30, PageID.1372-73).

Pursuant to *Walker*, "[e]ven if there is no contract-based defense to the enforceability of an arbitration agreement, a court cannot enforce the agreement as to a claim if the specific arbitral forum provided under the agreement does not allow for the effective vindication of that claim." *Walker*, 400 F.3d at 385 (quotation marks and citation omitted). A party generally cannot avoid arbitration "simply by alleging that the arbitration panel will be biased," but this general prohibition "does not extend to an allegation that the arbitrator-selection process itself is fundamentally unfair." *Id.*

In *Walker*, the Sixth Circuit concluded that arbitration agreements were unenforceable because they did not provide for a neutral arbitral forum. *Id.* at 385-86. The court first determined that the rules for selecting an arbitration panel were

biased against employees and applicants. *Id.* at 386-87.  The court also addressed "the limited discovery" of "just one deposition as of right and additional depositions only at the discretion of the (arguably biased) panel, with the express policy that depositions are not encouraged and shall be granted in extraordinary fact situations only for good cause shown." *Id.* at 387 (citation and quotation marks omitted).  The court held that such limited discovery, if controlled by a potentially biased arbitration panel, is unfair and prejudicial to claimants:

> We acknowledge that the opportunity to undertake extensive discovery is not necessarily appropriate in an arbitral forum, the purpose of which is to reduce the costs of dispute resolution.  Indeed, when parties enter arbitration agreements at arms-length they typically should expect that the extent of discovery will be more circumscribed than in a judicial setting.  But parties to a valid arbitration agreement also expect that neutral arbitrators will preside over their disputes regarding both the resolution on the merits and the critical steps, including discovery, that precede the arbitration award.  A structural bias in the make-up of the arbitration panel, which would stymie a party's attempt to marshal the evidence to prove or defend a claim, can be just as prejudicial as arbitral bias in the final decision on the merits.  Such is the case here, providing an additional basis to conclude that [the] arbitration scheme does not allow for the effective vindication of Plaintiffs' FLSA claims.

*Id.* at 387-88.

This case is distinguishable from *Walker*.  Most importantly, Plaintiffs raise no issue with the rules for selecting an arbitrator, nor do they even allege any potential for bias (apart from merely quoting the language regarding bias from *Walker*).  And the Court sees no issue with the arbitration selection process here, which provides that "[t]he arbitrator shall be a neutral arbitrator, selected by the

agreement of the Parties, who has previous experience arbitrating employment law disputes." (ECF No. 22-3, PageID.1002, 1010). "If the Parties cannot agree on a neutral arbitrator, the Employee and the Company will use the strike and ranking method provided for under JAMS[8] rules." (ECF No. 22-3, PageID.1002, 1010).

This is sufficient to allow for the fair and effective vindication of the claims subject to arbitration here, unlike in *Walker* where (1) "[the defendant] effectively determine[d]" the potential arbitrators unilaterally and (2) no criteria—such as neutrality, educational, or experiential requirements—governed selection of potential arbitrators. *See Walker*, 400 F.3d at 386-87. Accordingly, the Court rejects Plaintiffs' contention that the arbitration agreements are unenforceable under the FAA.

### 5.   Request for Discovery

Plaintiffs also argue that they are entitled to discovery under *Boykin* because they have established an issue concerning contract formation. "Plaintiffs urge this Court to deny Defendants' motions in their entirety or, in the alternative, grant discovery as to the issue of contract formation in this case before deciding to compel arbitration or dismiss . . . ." (ECF No. 30, PageID.1374).

---

[8] JAMS, according to its website, "is the world's largest private alternative dispute resolution (ADR) provider." JAMS, *About Us*, https://www.jamsadr.com/about/ (accessed Feb. 10, 2025).

But only "a party who adequately puts the formation of an arbitration contract in issue may request discovery on that contract-formation question." *Boykin*, 3 F.4th at 841.  Because the Court concludes that Plaintiffs have not shown a genuine issue of material fact as to the validity of the agreements to arbitrate, discovery on this matter is unwarranted.

In sum, the Court rejects Plaintiffs' arguments regarding validity of the arbitration agreements, knowing and voluntary waiver, and the agreements' enforceability under the FAA, as well as their request for further discovery.  But because all Barnes's and Duck's claims involve employees subject to the RPOA CBA and thus fall outside the scope of the arbitration agreements, Corporate Defendants motion to compel arbitration is denied.

### D.     Motion to Dismiss Re: Newly-Added Plaintiffs

With respect to Plaintiffs Tolliver's and Young's claims, Corporate Defendants argue that dismissal is warranted because these plaintiffs contractually agreed to a shorter limitations period related to any claims arising from their employment and failed to bring their claims within the agreed-to period. (ECF No. 23, PageID.1223-24, 1232-43).  Plaintiffs counter that (1) there is a factual dispute concerning whether the purported agreements were formed; (2) Tolliver and Young did not knowingly or voluntarily waive their rights; (3) even if the agreements were made, the waiver at issue is invalid concerning claims under the FMLA and 42

U.S.C. § 1983; (4) the waiver violates public policy as related to any civil rights claims; (5) G4S, GM, and Allied lack standing to enforce the purported agreements; and (6) Plaintiffs established a prima facie case for all their asserted claims. (ECF No. 33, PageID.1755, 1760-62, 1765-66, 1782-97).

### 1. Agreement Validity

"The party seeking to enforce a contract has the burden of showing that it exists." *Hergenreder*, 656 F. 3d at 417. Plaintiffs argue that Corporate Defendants fail to do so because there is a factual dispute concerning whether the purported agreements were formed, specifically regarding mutual assent and consideration. (ECF No. 33, PageID.1782-85).

For the latter point, Plaintiffs argue that there was no consideration for the purported statute-of-limitations waivers because Tolliver and Young were hired weeks after they completed employment applications, without any "new consideration" for the waivers. (ECF No. 33, PageID.1785). But Michigan courts have enforced such waivers even when contained in a job application. *See, e.g., Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138, 140-41 (2005). In any event, Plaintiffs forfeit this issue because they cite no authority, nor do they provide much substantive argument, supporting that consideration is lacking under the facts here. *See Am. Elec. Power Serv. Corp.*, 2022 U.S. App. LEXIS 24712 at *14.

Regarding mutual assent, Plaintiffs primarily liken this case to *McMillon v. City of Kalamazoo*, 511 Mich. 855 (2023).  In *McMillon*, the plaintiff in 2004 filed out an employment application with the defendant that included a statute-of-limitations waiver similar to that here, but the defendant did not hire her at the time. *Id.* at 855-56.  More than a year later, the plaintiff accepted a different job with the defendant without completing any new application. *Id.*  And nothing in materials the defendant provided the plaintiff in 2005 attempted to shorten any applicable statute of limitations. *Id.* at 856.  The Michigan Supreme Court reasoned that, under these circumstances, factual questions remained concerning (1) whether the plaintiff knew in 2005 that the defendant intended to reuse her prior application materials and (2) whether she agreed at that time to be bound by the prior application. *Id.* at 857.  The court therefore found a genuine issue of fact concerning whether the plaintiff had notice "of the use of the prior application materials' future employment-related terms and whether she agreed to be bound by those materials." *Id.*

Plaintiffs assert that this case is similar to *McMillon* because "Toliver and Young, Jr. are waiving fundamental rights to civil rights protections that might accrue based on their working conditions post-hire, at a point where the employer does not even have an obligation to hire him for the job." (ECF No. 33, PageID.1784).  Plaintiffs emphasize that Tolliver applied to work as a customs protection officer but was hired as a SPO, and they therefore claim there is a question

of fact regarding whether "the shortened limitation[s] period in a[ job] application, prior to being hired for the job and with no guarantee [of] receiving the position, was binding on subsequent employment for different positions." (ECF No. 33, PageID.1783-84).  Plaintiffs seemingly argue that there could be no assent to such a waiver before RCM actually made its employment offer, or else where the employee is assigned a different position from that for which they applied.  The Court disagrees.

Tolliver and Young both declare that they had to complete various application documents when interviewing for jobs with RCM, but that at no time after they were actually hired did they ever receive or execute any statute-of-limitations waiver. (ECF No. 33-3, PageID.1811-12; ECF No. 33-4, PageID.1816-17).  But even assuming that Young and Tolliver were hired for different positions from those for which they applied, the facts of this case are distinguishable from *McMillon*.  The critical factor there was not just the different job positions at issue, but also the more than one-year gap between the plaintiff completing the initial application materials and her being offered a job.  And in the Court's view, the fact that the defendant was not hired for the first position when she completed these materials made her assent to any waiver concerning the second position even more questionable.  None of these concerns are at issue here, particularly where (1) Tolliver and Young were both hired and began work within a month of their job interviews; and (2) they were never

61

rejected with respect to their initial applications. (*See* ECF No. 33-3, PageID.1811-12; ECF No. 33-4, PageID.1816-17).

Plaintiffs also argue that—under *Romano*, 2023 U.S. Dist. LEXIS 76681, and *Emerson*, 2023 U.S. Dist. LEXIS 28449—Tolliver's and Young's unequivocal denials of ever receiving or signing the purported waivers further creates a question of fact regarding mutual assent. (ECF No. 33, PageID.1784-85). Here, Tolliver and Young both declare that they never received copies of various documents they had to complete when interviewed, they never knowingly signed any agreement to shorten the statute of limitations, and the signatures on the purported agreements were doctored. (ECF No. 33-3, PageID.1811-12; ECF No. 33-4, PageID.1816-17).

The Court notes some dissimilarities between the facts here and Plaintiffs' cited cases. First, the defendant in *Emerson* provided no evidence of the pertinent agreement and "admitted that, because of a software change, it did not have a copy of the job application or [the] agreement that Plaintiff allegedly signed." *Emerson*, 2023 U.S. Dist. LEXIS 28449, at *3. And as stated earlier, the court concluded that "Defendant's failure to provide evidence of the signed arbitration agreement, *combined* with Plaintiff's sworn declaration that she did not see or sign the agreement, creates a genuine dispute of fact here . . . ." *Id.* at *5 (emphasis added). Like in *Emerson*, the defendant in *Romano* similarly "d[id] not have any documentation evidencing [the plaintiff]'s signature" because of a 2020 software

change. *Romano*, 2023 U.S. Dist. LEXIS 76681 at *3.  Here, in contrast, Corporate Defendants provide as evidence the two agreements purportedly executed by Tolliver and Young.

Nevertheless, unlike the significant evidence Corporate Defendants presented to show mutual assent concerning the arbitration agreements addressed earlier, here they simply rest on the purported statute-of-limitations waivers alone.  Indeed, defense counsel at the hearing acknowledged that there is nothing to refute Tolliver's and Young's assertions of forgery apart from the purported agreements themselves.

These one-page agreements in no way counter Plaintiffs' position, however. They merely show the signatures and dates that Plaintiffs claim were forged, and a separate section with information to be completed by office personnel is notably blank.  The record is therefore devoid of any evidence to counter Plaintiffs' position. *See Warren v. FRB of Chicago*, No. 17-13256, 2018 U.S. Dist. LEXIS 148238, at *10 (E.D. Mich. Jul. 18, 2018) ("where a signature on a contract is forged, it cannot signify a meeting of the minds"), *adopted by* 2018 U.S. Dist. LEXIS 146967 (E.D. Mich. Aug. 28, 2018).

Ultimately, the purported waivers alone in no way refute Young's and Tolliver's unequivocal statements, made under penalty of perjury, that the signatures depicted on the waivers do not belong to them.  Stated differently, in light of Plaintiffs forgery claim and their admissible supporting evidence, Corporate

Defendants have not provided any "incontrovertible evidence," *see Romano*, 2023 U.S. Dist. LEXIS 76681 at *5-6, of mutual assent.

Accordingly, based on the evidence currently before the Court, Plaintiffs have established a question of fact regarding mutual assent, and thus also regarding whether Tolliver or Young executed valid statute-of-limitations waivers. And because Corporate Defendants have not sufficiently established any statute-of-limitations defense based on the evidence currently available *or* based on the face of the complaint, dismissal of Tolliver's and Young's claims is unwarranted at this time.

For this reason, the Court does not consider Plaintiffs' request for discovery with respect to the instant motion. That said, with Tolliver's and Young's claims not subject to dismissal and proceeding to formal discovery, Corporate Defendants are free to reraise their statute-of-limitations defense in an actual motion for summary judgment if revealed facts ultimately bear out in their favor on the issue.

Accordingly, Corporate Defendants' motion to dismiss is denied. And because the Court can resolve this motion without wading into Plaintiffs' alternate bases to deny it, the Court will not address these arguments at this time. *See Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 370, 370 n. 9 (6th Cir. 2018) (declining to address whether a Tennessee statute violated the separation of powers where it was unconstitutional under the state's constitution); *Does v. Whitmer*, No. 22-10209, 2024 U.S. Dist. LEXIS 176146, at *112 n. 55 (E.D. Mich. Sept. 27, 2024)

(declining to address alternate argument regarding the Privileges and Immunities Clause because the court held in favor of the plaintiffs regarding equal protection); *Nelson v. AIG Domestic Claims*, No. 07-11582, 2007 U.S. Dist. LEXIS 87308, at *20 (E.D. Mich. Nov. 28, 2007) ("Additionally, the Court will not address Defendants' second basis for denying benefits, as their conclusion that Plaintiff was not injured under the terms of the Plan was not arbitrary or capricious. Thus, their alternative argument is moot.").

\* \* \*

For the reasons given, the Court ORDERS that Plaintiffs' motion to quash (ECF No. 36) is GRANTED.

IT IS FURTHER ORDERED THAT Individual Defendants' motions to adopt and join (ECF Nos. 26, 27) are GRANTED.

IT IS FURTHER ORDERED THAT Corporate Defendants' motion to compel arbitration (ECF No. 22) is DENIED.

IT IS FURTHER ORDERED THAT Corporate Defendants' motion to dismiss

(ECF No. 23) is DENIED.


Dated: March 11, 2025              s/Robert J. White_____
                                   Robert J. White
                                   United States District Judge